**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KIMBERLYNN JURKOWSKI,** | |
| *Plaintiff*, | |
| **v.** | **Civil Action No. 1:23-cv-03788-ACR** |
| **DISTRICT OF COLUMBIA,** | |
| *Defendant*. | |

**DEFENDANT DISTRICT OF COLUMBIA'S BRIEF CONCERNING ALLEGATIONS OF SPOLIATION OF TEXT MESSSAGES**

**TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

*Arista Records, Inc. v. Sakfield Holding Co.*,
  314 F. Supp. 2d 27 (D.D.C. 2004) .......................................................................................... 18
*Borum*,
  332 F.R.D. ........................................................................................................................ 27, 29
*Green v. CSX Hotels, Inc.*,
  650 F. Supp. 2d 512 (S.D. W. Va. 2009) ............................................................................... 21
*Hansen v. Dean Witter Reynolds, Inc.*,
  887 F. Supp. 669 (S.D.N.Y. 1995) .................................................................................. 24, 25
*In re Old Banc One S'holders Secs. Litig.*, No. 00 C 2100,
  2005 U.S. Dist. LEXIS 32154, 2005 WL 3372783 (N.D. Ill. Dec. 8, 2005) ..................... 18, 23
*Laub v. Horbaczewski*,
  No. CV 17-6210-JAK (KS), 2020 U.S. Dist. LEXIS 252867 (C.D. Cal. July 22, 2020) ......... 26
*Mahaffey v. Marriott Int'l, Inc.*,
  898 F. Supp. 2d 54 (D.D.C. 2012) .................................................................................. 18, 24
*Matiella v. Murdock Street LLC*,
  2023 WL 2682294 (D.D.C. Mar. 29, 2023) .......................................................................... 19
*Moody v. CSX Transp., Inc.*,
  271 F. Supp. 3d 410 (W.D.N.Y. 2017) .................................................................................. 29
*Rude v. Dancing Crab at Washington Harbour*,
  245 F.R.D. 18 (D.D.C. 2007) ................................................................................................ 23
*United States ex rel. Staggers v. Medtronic, Inc.*,
  2026 WL 1475372 (D.D.C. Mar. 12, 2026) ............................................................... 27, 29, 30

*Washington Teacher's Union, Local No. 6 v. District of Columbia*,
  77 A.3d 441 (D.C. 2013) ...........................................................................................20

Rules

Fed. R. Civ. P. 37(e) ...............................................................................................Passim

Other Authorities

*The Sedona Principles*,
  19 Sedona Conf. J. ...............................................................................................19


## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 3

FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 5

   1.   **December 2021 Holocaust Reenactment**................................................................ 5

   2.   **LMER Investigation and Disciplinary Recommendation** ........................................ 6

   3.   **Union Grievance and Hearing Officer Opinion**.................................................... 8

   4.   **Arbitration** ............................................................................................................ 9

   5.   **EEOC Charge of Discrimination**......................................................................... 11

   6.   **November 2021 Step 1 Grievance**....................................................................... 11

   7.   **This Matter** ........................................................................................................ 12

   8.   **Ms. Jurkowski's Retention of Text Messages**................................................... 13

   9.   **Principal Berkowitz's Text Messages**................................................................. 14

   10.   **Assistant Principal Boisvert's Text Messages** ................................................. 16

   11.   **Tanisha Montgomery's Text Messages** .......................................................... 17

LEGAL STANDARD ....................................................................................................... 18

ARGUMENT .................................................................................................................... 19

   I.   **DCPS Diligently Preserved Documents Material to This Case.** ............................... 19

   II.   **The District Had No Duty to Collect and Preserve Text Messages Because They Are Not Material to This Case.** ........................................................................................... 23

   III.   **The Text Messages Have Been Replaced by Voluminous Documents Produced in Discovery and the Texts Ms. Jurkowski Selected to Retrieve From Her Phone.**.............. 26

     A.   **The District Has Produced a Voluminous Record on all Issues Through Discovery.**.......................................................................................................... 26

     B.   **Ms. Jurkowski Retained Many of the Text Messages at Issue.** ............................ 26

   IV.   **Ms. Jurkowski Has Suffered no Prejudice.** ........................................................ 27

**V.    DCPS Did Not Act With the Intent to Deprive Ms. Jurkowski of Evidence.** ............ 29

**CONCLUSION** .......................................................................................................... 30

**INTRODUCTION**

This case involves events occurring at Watkins Elementary School in 2021, and Plaintiff Kimberlynn Jurkowski's subsequent termination in early 2022.  In 2025, in connection with discovery in this case, Ms. Jurkowski sought text messages between herself and three other Watkins employees: Principal MScott Berkowitz, Assistant Principal Mark Boivert, and the Director of Strategy & Management, Tanisha Montgomery.  At that point in time, however, DCPS was no longer able to retrieve the texts of those employees.  Ms. Jurkowski moved to compel production of the texts.  The Court denied that motion, but ordered briefing on spoliation issues.

The bottom line is this: there is no reason to believe—and there was never any reason to believe—that the text messages would have had any significance to this case.  Most written communications, particularly on important matters were conducted through emails or "Teams" messages.  For example, the written communications of the employees in question regarding Ms. Jurkowski's "Hitler play" were exclusively by email and Teams.  Those documents have been collected and produced, resulting in ample documentation of the material issues in this litigation.  There is no evidence indicating that text messages would have supplemented the record in any meaningful way.

Certainly, during the 24-month grievance and arbitration process—when Ms. Jurkowski *was represented by counsel*—nobody thought that there were any relevant texts.  No party introduced any texts into evidence or even produced any texts in discovery, and neither party sought the production of texts.  No reference to texts appears in the decisions of the Hearing

3

Officer or Arbitrator, nor in the 1000-page transcript of the arbitration proceeding. If Ms. Jurkowski or her lawyer had attributed any significance to text messages, they would have raised the issue years earlier, when the texts still could have been retrieved.

The insignificance of any potential text messages is indeed confirmed by Ms. Jurkowski herself. She was the last person to access her texts with other Watkins employees. She selected a handful of texts to preserve, but has conceded that they contain "nothing" "that was important to [her] case." Ex. K, Jurkowski Dep. at 318:17–319:7. And when asked "what would the texts say" if she "had all the texts," Ms. Jurkowski did not describe anything beyond the minutia of daily life. *See id.* at 319:8–320:16 (describing meetings, asking for help when a kid got hurt on the playground, "Do you have this book for the [Books and Belonging with Berkowitz] or can you do this or something? Can you go for duty over here instead of over there?"); *see generally id.* at 315:20–321:6

For multiple reasons, the Court should not find spoliation nor impose sanctions. (1) DCPS diligently preserved emails, Teams messages, and the other documents that are material to this case. (2) A party is not obligated to preserve **all** documents regardless of their relevance; because no one had reason to believe that text messages were material to Ms. Jurkowski's potential litigation, there was no duty to collect and preserve texts.

Even if there was a duty to preserve the text messages at issue, sanctions can only be imposed where the lost materials "cannot be restored or replaced through additional discovery," causing prejudice to another party. *See* Fed. R. Civ. P. 37(e)(1). (3) Here, any lost texts (if there ever were any to be lost) have been replaced by (a) the voluminous documents produced in discovery, which cover the subject areas of this litigation, and by (b) the texts that Ms. Jurkowski selected to retrieve from her phone. (4) Ms. Jurkowski has suffered no prejudice. There is no

4

evidence that any lost text would provide material information that is different from or addition to the evidence already in the record.  Indeed, since Ms. Jurkowski reviewed the texts and preserved some of them, it would be illogical to believe that she discarded texts that would have furthered her case.

(5) The most serious sanctions—adverse presumptions or a default—are only appropriate where a party intentionally sought to deprive its adversary of the use of the information.  Fed. R. Civ. P. 37(e)(2).  No such finding can be made here, where old texts became unavailable simply because of routine document retention policies or settings.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.  December 2021 Holocaust Reenactment**

On Friday, December 17, 2021, the Principal of Watkins Elementary School, MScott Berkowitz, submitted an Incident Report to the District of Columbia Public Schools Labor Management Employee Relations team (LMER) alleging that librarian specialist Ms. Jurkowski had directed third grade students to reenact the Holocaust during their library time.  *See* Ex. A at Bates Nos. 180–182 (Incident Report).  Principal Berkowitz separately interviewed six students in that class.  Assistant Principal Boisvert and Jerenzo Redmond also attended each of the six interviews.  According to the interviewed students, Ms. Jurkowski's direction of the Holocaust reenactment included assigning roles to students to play Hitler, to shoot Jewish people, to dig ditches, to build and be placed in gas chambers, and to pretend to die.  *See* Ex. A, at Bates No. 168–170 (Berkowitz Notes From Student Interviews).  The students told both the Principal and their teacher, Ms. Katherine Moxley, that Ms. Jurkowski had instructed them not to tell their parents about the reenactment.  *See id.*, *see also* Ex. A, at Bates No. 188 (Moxley Statement).

The incident report with this information was sent to LMER via email and it and related documents have been produced in discovery.

The same day, LMER Chief Jade Fuller reviewed the Incident Report, viewed surveillance footage of the library during the time of the incident, and informed Ms. Jurkowski via email that she was being placed on administrative leave. The same day, Ms. Jurkowski was issued a notice of investigation informing her that she was under investigation for employee misconduct.

## 2. LMER Investigation and Disciplinary Recommendation

The next weekday, the December 17, 2021 incident was assigned to LMER investigator Stacey Carey.

Over the next few weeks, Investigator Carey interviewed Kimberlynn Jurkowski, Principal Berkowitz, Assistant Principal Boisvert, and Katherine Moxley. All four adults interviewed by Investigator Carey submitted written statements. LMER also interviewed four of the children involved in the reenactment. The four students interviewed by LMER were different children than were interviewed by Principal Berkowitz (thus in total DCPS interviewed 10 different students before Ms. Jurkowski's termination).

The students interviewed by LMER "recalled Ms. Jurkowski assigning roles for the students to play", and that they "heard Ms. Jurkowski tell the class not to tell their parents about the assignments or discussion." Ex. A, Investigatory Carey Holocaust Investigator Report at Bates No. 174.[1]

---

[1] These quotes are Carey's summaries from the first student interviewed. According to Carey, the second student told LMER that "Ms. Jurkowski stated they were going to do a play, and she asked who wanted to be the lead role in the production" and that "Ms. Jurkowski told the class not to tell their parents about the assignment." The third student stated that "Ms. Jurkowski told the class that they were doing a play, and that [redacted] volunteered to star in the

On January 28, 2022, Investigator Carey completed her report and found that the allegation against Ms. Jurkowski—that she directed a student reenactment of the Holocaust and told students not to tell their parents about it—was substantiated.  Investigator's Carey's report, with exhibits that include the written statement of witnesses, is 126 pages long, and has been produced in discovery along with related documents.  Ms. Jurkowski's statement constitutes 29 of those pages.  *See* Ex. A, at Bates Nos. 131–160.

Not a single mention of any text message is made in the entirety of Investigator Carey's report.

At the time of reenactment, Principal Berkowitz and Assistant Principal Mark Boisvert were both using DCPS-issued cell phones.  However, both Principal Berkowitz and Mr. Boisvert affirm that they did not send any text messages about the reenactment, the student interviews, the investigation, nor the disciplinary process.  *See* Ex. L, Berkowitz Dec.  ¶ 9; Ex. M, Boisvert Dec. ¶ 9.  This was a serious occurrence, and all written communication flowed through official channels: email and Microsoft Teams.  *See* Ex. L, ¶ 5; Ex. M, ¶ 4.  For instance, Principal Berkowitz and Mr. Boisvert did not send any communications to LMER via text message, because communications about employee discipline or complaints need to be communicated through official channels.  *See id*.  Principal Berkowitz and Mr. Boisvert have explained that, at this time, they typically texted with other DCPS employees about time-sensitive, day-to-day matters like leaves of absence and substitute teachers, meeting locations and times, and coordinating phone calls.  *See* Ex. K, ¶ 6, Ex. J, ¶ 6.

---

production before knowing what the position entailed" as well as that "Ms. Jurkowski looked at the cameras during the class and told the students not to tell their parents."  Carey Report at Bates 175.  The fourth student interviewed confirmed that "Ms. Jurkowski told the students not to tell their parents at the start of the class" and that "Ms. Jurkowski gave every student their part."  *Id*. at Bates 176.

Investigator Carey's findings were submitted to LMER's Disciplinary Review Board. That Board, headed by LMER Specialist Matthew Thompson, evaluated the Douglas Factors and recommended Ms. Jurkowski's termination. *See* Ex. B, Douglas Factor Report. There is no mention of text messages in the Douglas Factor Report, which has also been produced in discovery. *See id*.

Ms. Jurkowski was terminated on March 8, 2022.

### 3.  Union Grievance and Hearing Officer Opinion

Following her termination, Ms. Jurkowski obtained representation from her union, the Washington Teacher's Union (WTU). On March 17, Ms. Jurkowski submitted a Step 1 grievance of her termination in accordance with her union's collective bargaining contract, arguing that "the termination was unjustified." *See* Ex. C, LMER Response to Step 1 Grievance of Termination. After speaking with Ms. Jurkowski again and reviewing all the evidence provided by her union, LMER found that it had "not been persuaded to change course on Ms. Jurkowski's termination." *Id*. The union then requested a Step 2 hearing in front of a Hearing Officer. *See* Ex. E, WTU Step 2 Grievance of Termination.

Ms. Jurkowski was represented by counsel through her union in front of the Hearing Officer. In this hearing, Ms. Jurkowski's union was "afforded the opportunity to present evidence, witnesses, and arguments in support of their respective position(s)." *See* Ex. D, Article 6.4.2 of WTU's Collective Bargaining Agreement. In the prehearing conference, the parties were provided the opportunity to stipulate what issues would be presented at the hearing.

On August 4, 2022, Hearing Officer Cherylen Hardrick heard from the same first two students that LMER interviewed. Those students confirmed again that a Holocaust reenactment had been directed by Ms. Jurkowski and that she had told students not to tell their parents. *See*

Ex. F, Hearing Officer Cherylen Hardrick Opinion & Award, at 4. Both DCPS and the union submitted exhibits, and the Hearing Officer heard testimony from Ms. Jurkowski, Ms. Moxley, DCPS Library Director Kevin Washburn, and LMER Specialist Matthew Thompson.

In his opinion, the Hearing Officer found that he was "obligated to follow the evidence" and that it is "far-fetched (without additional evidence) to find that school administrators conspired with Ms. Moxley, LMER, students and parents to frame Grievant in this manner." Ex. F, at 6. There was no mention of any arguments about race or racism in the Hearing Officer's opinion. *See generally* Ex. F.

No text messages were mentioned in Hearing Officer Cherylen Hardrick's opinion. *Id*.

## 4. Arbitration

Ms. Jurkowski's union appealed the Hearing Officer's findings within 30 days, and the matter went to arbitration.

On March 10, 2023, counsel for Ms. Jurkowski's union served DCPS with a subpoena for documents in preparation for the arbitration. *See* Ex. G, WTU Subpoena for Arbitration (asking for 6 categories of documents, including communications about the reenactment and communications about an investigation involving allegedly stolen iPads). DCPS responded to that subpoena with 316 pages of documents, all of which have been produced again in the discovery of this current matter.

None of the documents produced by DCPS in response to the union's subpoena were text messages, nor did those documents refer to any text messages. Ms. Jurkowski's counsel did not at any time request any text messages from DCPS, nor did they claim that there were any relevant text messages.

Arbitration hearings were held before Arbitrator Rosemary Pye on April 4, May 13, October 23, and November 20, 2023. *See* Ex. H, Arbitrator Rosemary Pye Decision & Award. Ms. Jurkowski was represented by counsel throughout these hearings. The transcript of these four hearings is approximately 1000 pages long, which have all been produced in discovery. Arbitrator Pye heard testimony from Kathleen Moxley, Kimberlynn Jurkowski, Jade Fuller, Matthew Thompson, Kevin Washburn, and from the same two students interviewed by the Hearing Officer.

The first child testified that Ms. Jurkowski "told [the first child and another child] to make gas showers." *See* Ex. H, at 8. Both testifying students were shown the video of the library the day of the reenactment, and the first was able to "point[] out herself waving her hand making showers (T. 92-93), the people lying down acting as dead bodies (T. 90), her friend making trains (T. 91-92), students acting as soldiers, and [another child] as the President of the United States (T. 93)." *See id*.

The second child testified that Ms. Jurkowski "ma[d]e them act like they were getting killed." T. 122. *Id*. The second child explained that when students in the video were shown falling down, that was "[b]ecause the kids lined up in front of him. They were supposed to act like they were shooting people –shooting them – so, they fell down because they were supposed to act like they were dead." T. 122." *Id*. at 9.

The testimony heard by Arbitrator Pye and the evidence presented at the arbitration was subject to voluminous objections and cross-examination by Ms. Jurkowski's union counsel. Following the four days of hearings, on February 21, 2024, both parties submitted "[e]xcellent, timely briefs" making arguments based on the testimony and evidence presented at the hearings *See* Ex. H, at 3.

10

There was no mention of any text messages across the four days of testimony before the Arbitrator Pye, nor in the briefs submitted by WTU and DCPS to Arbitrator Pye, nor in Arbitrator Pye's 39-page Decision and Award.

Arbitrator Pye found "clear and convincing evidence" that Ms. Jurkowski had "directed Ms. Moxley's class on December 17, to enact a Hitler play." *See* Ex. H at 35.

## 5. EEOC Charge of Discrimination

Ms. Jurkowski submitted a charge of discrimination to the Equal Employment Opportunity Commission (EEOC) on September 7, 2022, alleging that Principal Berkowitz had treated her disparately and that she was placed on administrative leave after she was accused of having students reenact the Holocaust while in the library with her. *See* Ex. I, EEOC Charge.

No text communications were identified or referenced in Ms. Jurkowski's EEOC Charge.

DCPS responded to EEOC's request by searching DCPS's internal file on Ms. Jurkowski—which contained the documents previously collected by DCPS during the LMER investigation—and providing those documents to the EEOC.

The EEOC issued Ms. Jurkowski a Right to Sue letter on October 2, 2023.

## 6. November 2021 Step 1 Grievance

On November 17, 2021, about a month before the Holocaust reenactment, Ms. Jurkowski submitted a Step 1 grievance through her union alleging perceived slights by Principal Berkowitz, Mr. Boisvert, and Ms. Montgomery over the prior year. Specifically, Ms. Jurkowski alleged occurrences on March 8, 2021 (involving an author visit at the library), May 27, 2021 (involving the spring book fair), June 16, 2021 (involving a pizza party for Ms. Jurkowski's club); September 28, 2021 (involving a laptop Ms. Jurkowski alleges was delayed by two

11

weeks), September 29, 2021 (involving COVID-19 contact tracing of a student),  October 4, 2021 (involving Ms. Jurkowski's clearance to return to work after exposure to COVID-positive student), and October 20, 2021 (related to the iPad investigation).  *See* Ex. O, November 2021 Jurkowski Step 1 Grievance.

In her four single-spaced page description of her grievance, Ms. Jurkowski does not mention text messages even once.  There is no mention of race or racism.

All of these complaints were untimely under the union's collective bargaining agreement. "Any Teacher who wishes to raise a grievance must do so in writing within fourteen (14) school days of the date the Teacher or the WTU first learned of its cause."  *See* WTU CBA at 36, 6.4.1.1.1.

No litigation could be anticipated by DCPS from this grievance, because it ended almost as soon as began.    Principal Berkowitz responded to the union noting that all the allegations were untimely, and the union failed to reply to Principal Berkowitz or otherwise push this grievance further along the process outlined in the union's collective bargaining agreement.

### 7.  This Matter

The Office of Attorney General (OAG) represents the District in this matter.  After Ms. Jurkowski filed her Complaint against the District on February 8, 2024, OAG sent a litigation hold letter to DCPS on February 21, 2024.

A year later, on February 27, 2025, Ms. Jurkowski served the District with her first set of requests for production of documents.  During meet and confers regarding the District's response to Ms. Jurkowski's production, Ms. Jurkowski requested that the District produce text messages

from three specific individuals: Principal Berkowitz, Assistant Principal Mark Boisvert, and the

Director of Strategy & Management, Tanisha Montgomery.  Ms. Jurkowski apparently selected

these three because she recalled exchanging texts with them.  Throughout subsequent

interactions, Ms. Jurkowski has been consistent in seeking texts from these three people, and

only from these three.  Ms. Jurkowski sent the District a "motion to compel" that identified these

individuals as having relevant text messages.  These were also the three individuals Ms.

Jurkowski named in Court that she believed had relevant text messages.  In her deposition, Ms.

Jurkowski confirmed that she does not recall texting anyone at DCPS other than Principal

Berkowitz, Mr. Boisvert, and Ms. Montgomery.  *See* Ex. K, Jurkowski Dep. 301:3–8.

The District confirmed that none of these individuals has retained any text messages to or

from or about Ms. Jurkowski.

### 8.  Ms. Jurkowski's Retention of Text Messages

Ms. Jurkowski has provided 24 images of text messages between herself and Principal

Berkowitz and Mr. Boisvert.  *See* Ex. J, Jurkowski Text Messages.  To be exact, Ms. Jurkowski

apparently used one phone to photograph a second phone, which displayed the text messages.

The text messages provided by Ms. Jurkowski between herself and Principal Berkowitz range

from April 7, 2021 through November 9, 2021.  *See id*., at 1–19.  Ms. Jurkowski also provided

text messages between Mr. Boisvert and herself from October 15, 2021 through November 9,

2021.  *See id.*, at 20–24.

Ms. Jurkowski has provided no text messages to or from Ms. Tanisha Montgomery.

Ms. Jurkowski's testimony regarding her own access to texts is vague, evasive, and not

credible.  Her story appears to be that she claims the ability to anticipate when her mobile phones

are about to break.  When she sees that a phone is "dying or whatever, I try to get my images and

13

stuff off of it." *See* Ex. K, Jurkowski Dep. at 303:16–304:10. She claims not to remember when she took the screenshots of the texts that she has produced in this litigation. *Id.* at 304:18–20. Ms. Jurkowski testified that she had no particular motive for photographing the text messages on her "dying" phone: "I didn't have any particular reason, but I just keep my stuff, if I can get it, and I kept them." *Id.* at 304:4–5; *accord id* at 304:11-17 ("whatever I could save I kept it … And it just happened to be those particular ones which were sent to me and I just had a lot of stuff that I keep. Librarians – pack rats").

The texts Ms. Jurkowski produced show communications with Principal Berkowitz and Assistant Principal Boisvert over various mundane issues. Ms. Jurkowski admitted that the texts she preserved have no importance to this case. *Id.* at 319:1–7.

A more plausible interpretation of the evidence is that Ms. Jurkowski still has access to her texts, (or at least did in 2025 when the issue first arose). She examined the text chains between herself and Principal Berkowitz and Assistant Principal Boisvert. Perhaps she has produced all of the texts; she testified that she "she was getting whatever [she] could off [her] phone … before it died." *Id.* at 317:14–21. But if there were any other texts with Watkins employees, Ms. Jurkowski chose not to produce them, either because they are entirely irrelevant to the case or because they contradict her contentions.

## 9. Principal Berkowitz's Text Messages

Principal Berkowitz had a DCPS-issued cell phone. *See* Ex. L, Berkowitz Dec. ¶ 3. Separate and apart from any guidance from LMER or other employees at DCPS, Principal Berkowitz set his DCPS-issued phone to automatically delete text messages after a year in order to save storage on his device. *See id*. ¶ 14.

14

The vast majority of Mr. Berkowitz's written workplace communications at DCPS were sent and received through email or Microsoft Teams. *See id*. ¶ 4. This was especially true of important, serious matters like employee discipline and communications with LMER. *See id*. ¶ 5. DCPS produced hundreds of pages of Principal Berkowitz's emails and Microsoft Teams messages regarding Ms. Jurkowski's allegations. There is no allegation the District failed to retain any emails or Teams Messages from Principal Berkowitz.

Principal Berkowitz used his DCPS-issued cell phone to communicate with other DCPS employees at the school about day-to-day issues that were time-sensitive, in an environment where many employees are not always at their desks. *See id*. ¶ 6. This meant he typically texted about the timing and locations of meetings, his availability for a phone call, and sudden leaves of absence. *See id*.

These are the types of text messages that were exchanged between Principal Berkowitz and Ms. Jurkowski. *See id*. ¶ 7–8. Ms. Jurkowski agrees that the text messages between her and Principal Berkowitz were about "probably meetings or some of the party stuff with the pizza people or what else we do, BBB, Books and Belonging with Berkowitz . . . stuff like that." Ex. K, Jurkowski Dep. 319:10–15. Ms. Jurkowski agrees that "[t]here was a lot going on in the building" and the sorts of text message she typically received asked her "[c]an you go for duty over here instead of over there? That's what we use our phones for there." *Id.* 319:8–19. For example, at page one of her text messages Principal Berkowitz says "Sorry, I can't talk right now", and at page 2 Ms. Jurkowski says "I will not be in today. I will work online". *See* Ex. J,

Jurkowski Text Messages; *see id.* at 11 (Ms. Jurkowski saying "let me know when you have time to talk" and Principal Berkowitz responding "Let's catch up next week.").[2]

When asked whether she remembers anything hostile in the text messages she received, Ms. Jurkowski responded "Only the science lab thing.  I don't know if that was hostile.  I think he was just trying to get me to come to the science lab. . . I don't recall any hostile text messages, except . . . those persons from the media or wherever they were from."  *See* Jurkowski Dep. 305:15–306:5.  Ms. Jurkowski retained the text from Principal Berkowitz asking her to have a meeting in the science lab.  Ms. Jurkowski also retained a recording of that entire meeting.

Principal Berkowitz affirms that he did not send any text messages about the Holocaust reenactment, the child interviews, or the subsequent investigation.  *See* Berkowitz Dec. ¶ 9.  Ms. Jurkowski agrees that she does not remember receiving any text messages from DCPS employees about the incident.  *See* Jurkowski Dep. 320:17–6.

**10. Assistant Principal Boisvert's Text Messages**

Like Principal Berkowitz, Principal Boisvert used his DCPS-issued cell phone to coordinate day-to-day matters with other DCPS employees when those employees were away from their desk.  *See* Ex. M, Boisvert Dec. ¶ 6.  The texts between Mr. Boisvert and Ms. Jurkowski that were retained by Ms. Jurkowski support Mr. Boisvert's recollection that the text messages he exchanged with her were about day-to-day coordination of time-sensitive tasks.  *See id.* at ¶¶ 8–9.  For example, at page 20 of Ms. Jurkowski's texts Boisvert writes "What time did

---

[2]     A couple of the messages are simply inscrutable, with no apparent connection to the allegations in this case.  In one text, Ms. Jurkowski writes: "I am praying for Watkins and Peabody, our students, families, parents, teachers, community, and our world.  I wish the truth could guide us, but Kindred is trying to guide us as parts of the truth come out.  Our problems can be solved, we must hold hands, walk together, in truth, TRUTH.  You have the opportunity to make this right, please, Please do the right thing, Sir."

we say we'd meet?  I forgot."  Ms. Jurkowski responds, "After school will work for me, will that work for you?"  *See* Ex. J.

Some of the texts between Ms. Jurkowski and Mr. Boisvert that were provided by Ms. Jurkowski appear to be about coordinating the book fair in the fall of 2021.  The District produced extensive emails and Teams Messages from Mr. Boisvert about both the spring and fall 2021 book fairs, including an email where Ms. Jurkowski asked not to be involved in the book spring fair, follow-up emails from Mr. Boisvert about what responsibilities she would like to have about the spring book fair, and emails about paying the outstanding balance in the fall.  *See* Exs. P, Q, R.

Mr. Boisvert was provided a new cell phone in July of 2022 when he changed schools. *See* Ex. M, Boisvert Dec. ¶ 13.  His text messages from the old phone were not preserved when he switched to his new phone.  *Id*.

**11. Tanisha Montgomery's Text Messages**

Tanisha Montgomery was not interviewed by LMER regarding either the Holocaust reenactment or the investigation involving the missing iPads.  *See* Ex. N, Montgomery Dec. ¶ 8.

Ms. Jurkowski does not recall the contents of any text messages between herself and Ms. Montgomery.  *See* Jurkowski Dep. 301:11–13 (Q: What did you text Montgomery about?  A: You know, I really just can't recall.  Like, I want to say it was that computer that I didn't get at first, but that may have been text and email.").  The District believes this is a reference to a DCPS-issued computer that Ms. Jurkowski alleges Ms. Montgomery withheld from her for two weeks.  There are emails between Montgomery, Washburn, and Ms. Jurkowski regarding this laptop that were submitted by Ms. Jurkowski to her union following her termination. *See* Exs. S, T.

Ms. Montgomery does not recall texting Ms. Jurkowski. *See* Ex. N, Montgomery Dec. ¶ 6. Ms. Montgomery does not have the DCPS phone she used in 2021—she believes she lost access to that phone in or around 2024—and further, Ms. Montgomery does not recall when she may have received a new phone from DCPS.

## LEGAL STANDARD

Litigants have a common-law obligation to preserve documents in anticipation of litigation. This duty "does not arise unless the party controlling the documents has notice of those documents' relevance. Usually, this notice arises from discovery requests or from the complaint." *United States ex rel. Staggers v. Medtronic, Inc.*, No. 15-cv-392 (TSC/GMH), 2026 LX 122779, at *38-39 (D.D.C. Mar. 12, 2026) (quoting *In re Old Banc One S'holders Secs. Litig.*, No. 00 C 2100, 2005 U.S. Dist. LEXIS 32154, 2005 WL 3372783, at *3 (N.D. Ill. Dec. 8, 2005)). A party is only "under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." *Mahaffey v. Marriott Int'l, Inc.*, 898 F. Supp. 2d 54, 60 (D.D.C. 2012) (finding demand letter did not put hotel on notice to preserve video images of nearby lobby in elevator accident case) (quoting *Arista Records, Inc. v. Sakfield Holding Co.*, 314 F. Supp. 2d 27, 33 n. 3 (D.D.C. 2004)).[3]

Fed. R. Civ. P. 37(e) sets forth the inquiry that courts conduct in deciding whether to impose sanctions for failure to properly preserve electronically stored information (ESI):

---

[3]    These cases apply a common law duty to retain documents, not Fed. R. Civ. P. 37(e). The Advisory Committee's Notes to Rule 37 include the following: "Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable. Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve."

18

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e)(1)–(2).

Therefore, spoliation sanctions are warranted under Rule 37(e) only when: (1) the movant establishes that the allegedly spoliated ESI existed; (2) the spoliation occurred *after* the duty to preserve the ESI arose; (3) the non-moving party failed to take reasonable steps to preserve the ESI; (4) the ESI was lost as a result; and (5) the ESI cannot be restored or replaced through additional discovery. *Matiella v. Murdock Street LLC*, 2023 WL 2682294, at *7–8 (D.D.C. Mar. 29, 2023).

In addition, imposing sanctions under Rule 37(e)(1) requires a finding of prejudice, and imposing sanctions under Rule 37(e)(2) requires a finding that the ESI was lost because a party acted with intent to deprive the other party of the evidence.

## ARGUMENT

### I.      DCPS Diligently Preserved Documents Material to This Case.

The District made a reasonable and good faith effort to retain information relevant to Ms. Jurkowski's termination. *See United States ex rel. Staggers v. Medtronic, Inc.*, No. 15-cv-392 (TSC/GMH), 2026 LX 122779, at *36 (D.D.C. Mar. 12, 2026) ("The obligation to preserve relevant evidence is generally understood to require that the producing party make reasonable and good faith efforts to identify and preserve the information that is identified as

19

relevant to the claims or defenses in the matter.") (quoting *The Sedona Principles*, 19 Sedona Conf. J. at 94).

The District conducted a thorough investigation into the December 17, 2021, incident and made reasonable steps to preserve what evidence it was on notice could be material to Ms. Jurkowski's claim related to her termination.  The District interviewed the key players, collected witness statements, and obtained their testimony at hearings; the District retained all emails and Teams Messages from those individuals as well as from parents, news media, and other third parties; the District retained surveillance video of the library; the District retained the written statements and summaries of witnesses considered by the District in disciplining Ms. Jurkowski; and the District responded to every request for documents submitted by Ms. Jurkowski's union over the *years* long grievance process, retained those documents, and then responded to the EEOC's request for documents after Ms. Jurkowski filed a charge of discrimination.  The District has produced about 4000 pages of responsive documents in this matter addressing the variety of allegations in Ms. Jurkowski's Amended Complaint.

The "precise contours" of a party's claim might not be evident at the outset of litigation.  *See Staggers*, 2026 LX 122779 at \*36 (citing *The Sedona Principles* at 96, 103); Fed. R. Civ. P. 37(e) Advisory Committee note to 2015 amendment. "[S]o long as the preservation decisions are made on the basis of reasonable belief and good faith, a party should not be faulted with the benefit of hindsight if claims are modified or expanded, requiring an adjustment of the preservation obligations."  The Sedona Principles, 19 Sedona Conf. J. at 103; *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (stating that "[i]t is important not to be blinded" to the reality that "the scope of information that should be preserved" may be uncertain when a party is first put on notice of an obligation to preserve).

Ms. Jurkowski's claims against the District have ballooned over time. Before her termination, the only grievance submitted by Ms. Jurkowski was entirely untimely, and was never furthered by her union—making it impossible for the District to anticipate litigation based on the variety of minor allegations in that grievance. Further, this grievance cited only alleged violations of the Union contract, and did not reference either racial discrimination nor any federal claim. Because such matters are committed to the exclusive remedies of the Comprehensive Merits Personnel Act (CMPA), the District could not have anticipated litigation outside of the CMPA grievance process; "the courts lack subject matter jurisdiction to award relief where the CMPA's remedies are exclusive." *Washington Teacher's Union, Local No. 6 v. District of Columbia*, 77 A.3d 441, 447 (D.C. 2013).

Following termination, Ms. Jurkowski's timely Step 1 Grievance merely argued that "the termination was unjustified." *See* Ex. C, LMER Response to Step 1 Grievance of Termination. This grievance did not put the District on notice that Ms. Jurkowski would be filing a discrimination claim or a hostile work environment claim based on her race and national origin. *See Green v. CSX Hotels, Inc.*, 650 F. Supp. 2d 512, 526 (S.D. W. Va. 2009) (finding a defendant "simply could not have contemplated the initiation of a race discrimination case based on a request for accommodations under the ADA"). Ms. Jurkowski made no allegation that her termination was motivated by her race or national origin until the EEOC Complaint was filed. To the contrary, what was communicated to DCPS about Ms. Jurkowki's grievance up to that point failed to indicate that Ms. Jurkowski was making race or national origin-related claims about a hostile work environment or discrimination: even when the union escalated the grievance about Ms. Jurkowski's termination to Step 2 Grievance, that notice only informed DCPS that Ms. Jurkowski "denies engaging in any such conduct." *See* Ex E, WTU Step 2 Grievance of

21

Termination.  And even after the parties engaged in a hearing where they stipulated to the issues that would be heard, the Hearing Officer's Opinion & Award made no mention of any argument made by either party that Ms. Jurkowski's race or national origin influenced DCPS's treatment of her.  *See* Ex. F, Hearing Officer Cherylen Hardick Opinion & Award.

The District's duty to preserve information relevant to Ms. Jurkowski's hostile work environment and discrimination claims based on race and national origin did not arise until the District received the Charge of Discrimination in September of 2022.  But even then, the District had no notice that text messages were relevant to Ms. Jurkowski's claims.  Nor did a single issue about text messages arise during the months-long arbitration process, which included four days of live testimony.

Even if the District had known to go looking for text messages when Ms. Jurkowski filed her EEOC Charge, there would not have been many texts left to preserve.

Mr. Boisvert's text messages were lost in July 2022.  Therefore, when the duty to preserve Mr. Boisvert's text messages arose, there was nothing left for DCPS to preserve.

Principal Berkowitz does not recall any text messages to or about Ms. Jurkowski on the day of the reenactment on December 17, 2021 or thereafter.  He had set his text messages to delete after a year.  Accordingly, the only text messages that existed when Ms. Jurkowski's EEOC Charge was filed were Mr. Berkowitz's text messages between September 7, 2021 and December 16, 2021.

Lastly, Ms. Jurkowski has not shown beyond mere speculation that any text messages between herself and Ms. Montgomery existed.  She does not remember the content of any text messages.  Neither does Ms. Montgomery, who asserts she does not recall texting Ms. Jurkowski.  Therefore, the Court should not impose any sanctions for spoliated evidence that Ms.

22

Jurkowski has failed to show ever existed. *See, e.g., Rude v. Dancing Crab at Washington Harbour*, 245 F.R.D. 18, 23 (D.D.C. 2007) (no sanctions imposed where plaintiff failed to show that videotape allegedly destroyed did, in fact, exist).

## II.     The District Had No Duty to Collect and Preserve Text Messages Because They Are Not Material to This Case.

Ms. Jurkowski and the three DCPS employees that she seeks text messages from all agree: the important communications were not delivered by text. Nothing about the Holocaust reenactment or subsequent investigation was communicated by text message. In the year leading up to the reenactment, the only text messages exchanged between these three DCPS employees and Ms. Jurkowski were run-of-the-mill daily minutiae, as evidenced by the text messages Ms. Jurkowski chose to preserve and the declarants' memories of the types of things they typically texted about.

Therefore, the District could not have reasonably known that text messages from these three individuals were relevant to Ms. Jurkowski's claims. Text messages are not the main conduit for communications between DCPS employees; almost everything is through email or Microsoft Teams. The first time the District was put on notice of the alleged relevance of any text messages was through Ms. Jurkowski's 2025 discovery requests and subsequent statements during the parties' meet and confers. *See United States ex rel. Staggers v. Medtronic, Inc.*, No. 15-cv-392 (TSC/GMH), 2026 LX 122779, at *38-39 (D.D.C. Mar. 12, 2026) (finding that "[u]sually, this notice arises from discovery requests or from the complaint.") (quoting *In re Old Banc One S'holders Secs. Litig.*, No. 00 C 2100, 2005 U.S. Dist. LEXIS 32154, 2005 WL 3372783, at *3 (N.D. Ill. Dec. 8, 2005)).

Importantly, following her termination, for a period of about two years, Ms. Jurkowski was represented by attorneys hired by her union to represent her interests. During this time they

23

never asserted the potential relevance of *any* text message.  Text messages were never mentioned in the many witness interviews, witness statements, and hearings that occurred across the years. Ms. Jurkowski had many opportunities to seek access to text messages during this time, when those text messages would have been retrievable by DCPS.  The District had no obligation to preserve information that Ms. Jurkowski, represented by union attorneys, over the course of years, never raised as relevant to her claims.

In *Mahaffey v. Marriott Int'l, Inc.*, 898 F. Supp. 2d 54 (D.D.C. 2012), the plaintiff alleged a lobby surveillance video should have been retained, but the Court found that: (1) the "demand letter . . . gave almost no details of the alleged accident", that it (2) did not allege that "the accident occurred in the lobby", and that (3) it did not put the defendant on notice that plaintiff would require the surveillance footage to identify potential witnesses to the accident.  898 F. Supp. at 60.  In concluding that the defendant had no duty to retain the lobby video, *Mahaffey* cited *Hansen v. Dean Witter Reynolds, Inc.*, 887 F. Supp. 669, 676 (S.D.N.Y. 1995).

In *Hansen*, the plaintiff in a Title VII employment case argued that the defendant had failed to retain "trading tickets" processed by the plaintiff during her employment and argued the defendant should have known they were relevant because the tickets would have shown that plaintiff was not a poor performer.  *See* 887 F. Supp. at 675.  The court found that "neither the filing of the complaint nor the letters that the EEOC and New York State Division of Human Rights" were such that the defendant "should have known" that trading tickets would be relevant to the litigation.  *Id*. at 676.  Although the EEOC Complaint put the defendant on "notice that the relative performance of [plaintiff] and [coworker] would be at issue in the ligation", the "absence of any evidence that [defendant] relied on the trading tickets for the purpose of evaluating the

performance of its employees" persuaded the court to find that the defendant was not on notice to preserve the tickets. *Id.*

Most importantly, the court opined that, "[i]ndeed, it is interesting to note that plaintiff, who vigorously asserts that [defendant] should have known of the tickets' relevance, did not specifically ask for them significantly earlier in her letter [to defendant asking for documents] dated [two years ago]." *Id.*; *see also* 887 F. Supp. at 676 n. 4 (noting "plaintiff has failed to provide evidence of having made the initial request [for the tickets] within the three-year period during which the tickets would have been retained").

Here, like in *Hansen*, there was nothing to clue DCPS in on the relevance of these texts. Certainly, DCPS did not rely on any text messages in making any disciplinary decision about Ms. Jurkowski. And not a single witness, including Ms. Jurkowski—who was able to coordinate with her union during the investigation—raised the existence of any text messages to Investigator Carey. Text messages were never brought up by any witness in testimony before the Hearing Officer, during a time when Ms. Jurkowski was represented by her union. None of the grievances submitted to DCPS by Ms. Jurkowski through her union mentioned any text messages. Ms. Jurkowski's union submitted a subpoena to DCPS in preparation for the arbitration hearings in March of 2023. When DCPS responded with documents, Ms. Jurkowski raised no issue with the lack of text messages in DCPS's document production. Lastly, over the course of a four-day arbitration, no mention of text messages appears in the 1006-page transcript of proceedings, which included hundreds of pages of Ms. Jurkowski's own testimony. Ms. Jurkowski was represented by her union at the arbitration proceedings.

Even after raising the issue of text messages in 2025, Ms. Jurkowski admits that "I don't recall any hostile text messages, except . . . those persons from the media or wherever they were from." *See* Jurkowski Dep. 305:15–306:5.

The Court should find that the first and second prong of Fed. R. Civ. P. 37(e)'s test for spoliation are not met: there was no obligation to preserve text messages that nobody viewed as relevant, and the District diligently preserved and produced the documents that actually are relevant.

### III.    The Text Messages Have Been Replaced by Voluminous Documents Produced in Discovery and the Texts Ms. Jurkowski Selected to Retrieve From Her Phone.

### A.    The District Has Produced a Voluminous Record on all Issues Through Discovery.

The District has produced exhaustive written discovery regarding Ms. Jurkowski's grievances, the Holocaust reenactment, the investigation regarding the missing iPads, and many other subjects.  These documents include full investigative reports for both incidents and contemporaneous emails and text messages regarding the same.  The information that Ms. Jurkowski needs to litigate her claims has been amply provided, and no suggestion has been made about what *information* relevant to Ms. Jurkowski's claims is missing that has not already been provided.  *See Laub v. Horbaczewski*, No. CV 17-6210-JAK (KS), 2020 U.S. Dist. LEXIS 252867, at *25 (C.D. Cal. July 22, 2020) (finding prejudice "rather minimal" when moving parties had "received an array of other communications" and when it was not "clear to the Court that this missing evidence would significantly alter the type of evidence at [movant's] disposal or its persuasiveness").

### B.    Ms. Jurkowski Retained Many of the Text Messages at Issue.

Ms. Jurkowski was the last person to see the text messages at issue, and at some point in time, decided to retain some but not all of those text messages.  There is no argument that the

text messages Ms. Jurkowski retained have been spoliated by the District because the test for spoliation requires that the information cannot be replaced. Here, most of the information has already been replaced.

The Court should find that the last prong of Fed. R. Civ. P. 37(e)'s test for spoliation is not met regarding text messages that have already been replaced; the District cannot be sanctioned for failing to retain the text messages that Ms. Jurkowski has now submitted.

## IV. Ms. Jurkowski Has Suffered no Prejudice.

Upon finding that the threshold requirements under Rule 37(e) have been met, courts consider whether sanctions are appropriate under either Rule 37(e)(1) or (e)(2). *Borum*, 332 F.R.D. at 46. Here, even if the Court determines that some text messages were spoliated, sanctions are inappropriate because Ms. Jurkowski has not been prejudiced by any lost messages.

If the moving party establishes prejudice resulting from the spoliation, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). To demonstrate prejudice, the moving party "must do more than establish that the ESI that was irretrievably lost was *relevant*." *United States ex rel. Staggers v. Medtronic, Inc.*, 2026 WL 1475372, at *18 (D.D.C. Mar. 12, 2026). The court "may not merely presume prejudice from the fact that relevant ESI has been lost." *Id.* Instead, the moving party must produce "some evidence that the lost ESI would likely have been favorable to the moving party." *Id.* Further, a remedy "should fit the wrong," and the "severe measures authorized by Rule 37(e)(2) should not be used when the information lost was relatively unimportant and lesser measures would be sufficient to redress the loss*." Laub v. Horbaczewski*, No. CV 17-6210-JAK (KS), 2020 U.S. Dist. LEXIS 252867, at *17 (C.D. Cal. July 22, 2020).

Ms. Jurkowski has not even demonstrated that the allegedly lost text messages are relevant, much less that they would have supported her claims.  As noted above, Principal Berkowitz and Mr. Boisvert did not text about serious personnel issues.  Rather, they texted only when emails would have been ineffective—day-to-day matters to people who might not be at their desk to view a time-sensitive text.  *See* Ex. L, Boisvert Dec., Ex. M Berkowitz Dec.  Ms. Jurkowski acknowledged as much at her deposition, during which she testified that text messages would involve "probably meetings or some of the party stuff with the pizza people or what else we do, BBB, Books and Belonging with Berkowitz . . . stuff like that."  Jurkowski Dep. Tr. at 319:10–15.  No prejudice arises "from loss of the information" (*see* Fed. R. Civ. P. 37(e)) where the information in question has no importance to the litigation.

With respect to any text messages between Ms. Jurkowski and Principal Berkowitz or Mr. Boisvert, Ms. Jurkowski cannot establish prejudice arising out of spoliation when she had equal access to, and an equivalent duty to preserve, these messages.  Indeed, as discussed above, Ms. Jurkowski has produced in discovery several text messages with Principal Berkowitz and Mr. Boisvert, which suggests that she preserved at least some text messages from this period.  And she has already conceded that these text messages did not contain anything important to her case:

319

```
Q    But I guess why was it important to
preserve those text messages beyond just the fact
that they existed?  What was in them that was
important to your case?
     A    Nothing.  Nothing at that point that I
realized, no.  I just had them with all my other
junk, mm-hmm.
```

Jurkowski Dep. Tr. at 319:1–7.  Ms. Jurkowski cannot now claim that these text messages contained information relevant to her claims, much less that they contained evidence in support of her Title VII allegations.

**V.        DCPS Did Not Act With the Intent to Deprive Ms. Jurkowski of Evidence.**

Rule 37 strictly limits the usage of the most severe potential sanctions.  It is only if the court determines that the non-moving party "acted with the intent to deprive another party of the information's use in the litigation" that it may order additional sanctions, including an adverse inference jury instruction or a default judgment.  Fed. R. Civ. P. 37(e)(2).  "This intent standard is 'stringent' and 'does not parallel other discovery standards.'"  *Borum*, 332 F.R.D. at 48 (quoting *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017)).  "[T]o unlock the sanctions of Rule 37(e)(2), the moving party has 'the burden of proving "intent to deprive," rather than ordinary or gross negligence.'"  *Staggers*, 2026 WL 1475372, at *17.  Critically, courts cannot order the sanctions enumerated in Rule 37(e)(2) absent a finding of intent to deprive.  *See* Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment ("Care must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have the effect of

29

measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation.").

There is no evidence to suggest that anyone deleted text messages relating to Ms. Jurkowski with an intent to deprive her from accessing them years later in discovery. Rather, the undisputed evidence is that Principal Berkowitz's District-issued phone was configured to automatically delete messages that were more than a year old. *See* Ex. L, Berkowitz Dec. ¶ 14. Well before litigation opened in this matter, Mr. Boivert los access to his phones, unaware of any litigation need to search for texts before doing so. And there does not appear to have been any text messages that either Ms. Montgomery or Ms. Jurkowski remember related to this case. Even assuming the District was obligated to preserve the text messages at issue, its failure to implement a legal hold with respect to any of these employees' phone is insufficient to establish an intent to deprive. *See Staggers*, 2026 WL 1475372, at *18 (compiling cases).

The record contains ample, contemporaneous documentation regarding the key events in this litigation. There is no evidence that text messages would supplement the record in any meaningful way, and certainly no evidence that any loss of information was intentional.

## CONCLUSION

For the above reasons, the District did not commit spoliation, and the Court should not enter sanctions against the District for failing to preserve text messages in this matter.

Date:   June 15, 2026                    Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Jonathan Berman*

JONATHAN BERMAN [445169]
Chief, Civil Litigation Division, Section III

/s/ Andrea Negovan
NICHOLAS DREWS [1779084]
ANDREA NEGOVAN [90024450]
Assistant Attorneys General
400 6th Street, NW
Washington, D.C. 20001
(202) 741-7657; (202) 957-2865
nicholas.drews@dc.gov
andrea.negovan@dc.gov

*Counsel for Defendant District of Columbia*

**CERTIFICATE OF SERVICE**

On June 15, 2026, I emailed a copy of this brief with exhibits to Plaintiff.  I also sent a copy of this brief with exhibits via first-class mail, postage pre-paid, to:

Kimberly Jurkowski
3540 Crain Highway
Bowie, Maryland 20716
Kjurkowski777@gmail.com
*Pro se Plaintiff*

/s/ Andrea Negovan
ANDREA NEGOVAN
Assistant Attorney General

31