**UNITED STATES DISTRICT AND BANKRUPTCY COURTS**
**FOR THE DISTRICT OF COLUMBIA**

Kimberlynn Jurkowski

PLAINTIFF

VS.                                    CASE NO. 1:23-cv-03788-ACR

District of Columbia
DEFENDANT(S)    Public Schools, et al

## NOTICE

Evidence of Case 1:23-cv-03788-ACR
Superior Court document transcripts & briefs,
deposition details... please add to
evidence for case 1:23-cv-03788-ACR.

Signature

Name (if applicable, Prisoner ID No.)

Address/Facility Address

City                    State    Zip Code

Rev: 8/8/2024
*Use additional pages as needed

**RECEIVED**

JUN 16 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    1

Plaintiff's Court Filings  3-14-26: D.C. Plaintiff's Signed Declarations/Affidavits:
Superior Court:  Judge Veronica Sanchez Case 2025-CAB-8255
*Where to find evidence and details for elements of claims, dates, injury, continuous harm

Date: 3-14-26           page #340-369      Defendant:  WTU/Laura Fuchs       Details:

Date: 3-14-26           page #340-369      Defendant:  WTU/Laura Fuchs       Details:

Date: 3-14-26           page #340-369      Defendant:  WTU/Laura Fuchs       Details:

Date: 3-14-26           page #340-369      Defendant:  WTU/Laura Fuchs       Details:


Date: 3-14-26           page #325-339      Defendant:  WTU/J. Pogue-Lyons    Details:

Date: 3-14-26           page #325-339      Defendant:  WTU/J. Pogue-Lyons    Details:

Date: 3-14-26           page #325-339      Defendant:  WTU/J. Pogue-Lyons    Details:

Date: 3-14-26           page #325-339      Defendant:  WTU/J. Pogue-Lyons    Details:


Date: 3-14-26           page #299-312      Defendant:  WTU/R. Bell           Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez   2

Date: 3-14-26          page #299-312      Defendant:  WTU/R. Bell          Details:

Date: 3-14-26          page #299-312      Defendant:  WTU/R. Bell          Details:

Date: 3-14-26          page # 299-312     Defendant:  WTU/R. Bell          Details:

Date: 3-14-26          page #70-81        Defendant:  WTU/Local 6 AFT-CIO  Details:

Date: 3-14-26          page #70-81        Defendant:  WTU/Local 6 AFT-CIO  Details:

Date: 3-14-26          page #70-81        Defendant:  WTU/Local 6 AFT-CIO  Details:

Date: 3-14-26          page #70-81        Defendant:  WTU/Local 6 AFT-CIO  Details:

Date: 3-14-26          page #93-105       Defendant:  DCPS                 Details:

Date: 3-14-26          page #93-105       Defendant:  DCPS                 Details:

Date: 3-14-26          page #93-105       Defendant:  DCPS                 Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    3

Date:  3-14-26           page # 93-105        Defendant:  DCPS                    Details:


Date:  3-14-26           page #242-261        Defendant:  DC/S. Bloom             Details:

Date:  3-14-26           page #242-261        Defendant:  DC/S. Bloom             Details:

Date:  3-14-26           page #242-261        Defendant:  DC/S. Bloom             Details:

Date:  3-14-26           page #242-261        Defendant:  DC/S. Bloom             Details:


Date:  3-14-26           page #261-272        Defendant:  DC/M. Boisvert          Details:

Date:  3-14-26           page #261-272        Defendant:  DC/M. Boisvert          Details:

Date:  3-14-26           page #261-272        Defendant:  DC/M. Boisvert          Details:

Date:  3-14-26           page #261-272        Defendant:  DC/M. Boisvert          Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    4

Date: 3-14-26          page #116-125     Defendant:  DC/K. Cole          Details:

Date: 3-14-26          page #116-125     Defendant:  DC/K. Cole          Details:

Date: 3-14-26          page #116-125     Defendant:  DC/K. Cole          Details:

Date: 3-14-26          page #116-125     Defendant:  DC/K. Cole          Details:

Date: 3-14-26          page #106-115     Defendant:  DC/L. Davis         Details:

Date: 3-14-26          page #106-115     Defendant:  DC/L. Davis         Details:

Date: 3-14-26          page #106-115     Defendant:  DC/L. Davis         Details:

Date: 3-14-26          page #106-115     Defendant:  DC/L. Davis         Details:

Date: 3-14-26          page #136-145     Defendant:  DC/C. DeAnda        Details:

Date: 3-14-26          page #136-145     Defendant:  DC/C. DeAnda        Details:

D.C. Superior Court :Civil Division    Case 2025-CAB-008255    Judge V. Sanchez    5

Date: 3-14-26            page #136-145        Defendant:  DC/C. DeAnda        Details:

Date: 3-14-26            page #136-145        Defendant:  DC/C. DeAnda        Details:


Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details:4/4/24

Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details:5/16/23

Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details:10/23/23

Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details: 11/20/23

Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details:2/21/24

Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details:12/11/25

Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details:

Date: 3-14-26            page #28-39          Defendant:  DC/J. Fuller        Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez     6

Date:  3-14-26            page #166-175     Defendant:  DC/R. Harper            Details:

Date:  3-14-26            page #166-175     Defendant:  DC/R. Harper            Details:

Date:  3-14-26            page #166-175     Defendant:  DC/R. Harper            Details:

Date:  3-14-26            page #166-175     Defendant:  DC/R. Harper            Details:

Date:  3-14-26            page #             Defendant:  DC/P. Hoffman           Details:

Date:  3-14-26            page #             Defendant:  DC/P. Hoffman           Details:

Date:  3-14-26            page #             Defendant:  DC/P. Hoffman           Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    7

Date: 3-14-26          page #          Defendant:  DC/P. Hoffman          Details:

Date: 3-14-26          page #146-155          Defendant:  DC/K. Kayne          Details:

Date: 3-14-26          page #146-155          Defendant:  DC/K. Kayne          Details:

Date: 3-14-26          page #146-155          Defendant:  DC/K. Kayne          Details:

Date: 3-14-26          page #146-155          Defendant:  DC/K. Kayne          Details:

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details: 4/4/23

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details: 5/16/23

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details: 10/23/23

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details: 11/20/23

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details: 2/21/24

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    8

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details:

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details:

Date: 3-14-26          page #17-27          Defendant:  DC/ K. Moxley          Details:


Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 4/4/23

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 5/16/23

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 10/23/23

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 11/20/23

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 2/21/24

D.C. Superior Court :Civil Division    Case 2025-CAB-008255    Judge V. Sanchez    9

Date: 3-14-26          page #82-92          Defendant:  DC/A. Peoples/minorAP Details:

Date: 3-14-26          page #82-92          Defendant:  DC/A. Peoples/minorAP Details:

Date: 3-14-26          page #82-92          Defendant:  DC/A. Peoples/minorAP Details:

Date: 3-14-26          page #82-92          Defendant:  DC/A. Peoples/minorAP Details:

Date: 3-14-26          page #207-216          Defendant:  DC/J. M. Stewart          Details:

Date: 3-14-26          page #207-216          Defendant:  DC/J. M. Stewart          Details:

Date: 3-14-26          page #207-216          Defendant:  DC/J. M. Stewart          Details:

Date: 3-14-26          page #207-216          Defendant:  DC/J. M. Stewart          Details:

Date: 3-14-26          page #59-69          Defendant:  DC/S. Stover          Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    10

Date: 3-14-26          page #59-69        Defendant:  DC/S. Stover            Details:

Date: 3-14-26          page #59-69        Defendant:  DC/S. Stover            Details:

Date: 3-14-26          page #59-69        Defendant:  DC/S. Stover            Details:


Date: 3-14-26          page #313-324      Defendant:  DC/K. Washburn        Details:

Date: 3-14-26          page #313-324      Defendant:  DC/K. Washburn        Details:

Date: 3-14-26          page #313-324      Defendant:  DC/K. Washburn        Details:

Date: 3-14-26          page #313-324      Defendant:  DC/K. Washburn        Details:


Date: 3-14-26          page #156-165      Defendant:  DC/S. Gaskins         Details:

Date: 3-14-26          page #156-165      Defendant:  DC/S. Gaskins         Details:

Date: 3-14-26          page #156-165      Defendant:  DC/S. Gaskins         Details:

Date: 3-14-26          page #156-165      Defendant:  DC/S. Gaskins         Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez     11

Date: 3-14-26          page #40-58          Defendant:  DC/E. Bartolomeo          Details:

Date: 3-14-26          page #40-58          Defendant:  DC/E. Bartolomeo          Details:

Date: 3-14-26          page #40-58          Defendant:  DC/E. Bartolomeo          Details:

Date: 3-14-26          page #40-58          Defendant:  DC/E. Bartolomeo          Details:


Date: 3-14-26          page #217-228          Defendant:  L. Valmoro /Pro Se          Details:

Date: 3-14-26          page #217-228          Defendant:  L. Valmoro /Pro Se          Details:

Date: 3-14-26          page #217-228          Defendant:  L. Valmoro /Pro Se          Details:

Date: 3-14-26          page #217-228          Defendant:  L. Valmoro /Pro Se          Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez   12

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details: 4/4/23

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details: 5/16/23

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details: 10/23/23

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details: 2/21/24

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details:

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details:

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details:

Date: 3-14-26         page #229-241      Defendant:  Carmen Tull/minorMT      Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez     13

Date: 3-14-26          page #197-206        Defendant:  Jonathan Stivers/minorJS Details: 2/3/26

Date: 3-14-26          page #197-206        Defendant:  Jonathan Stivers/minorJS Details: 2/8/26

Date: 3-14-26          page #197-206        Defendant:  Jonathan Stivers/minorJS Details:

Date: 3-14-26          page #197-206        Defendant:  Jonathan Stivers/minorJS Details:


Date: 3-14-26          page #176-186        Defendant:  Lindsay Miller/minorAM          Details:False Light
4/4/23

Date: 3-14-26          page #176-186        Defendant:  Lindsay Miller/minorAM Details: False light 5/16/23

Date: 3-14-26          page #176-186        Defendant:  Lindsay Miller/minorAM          Details:False light
10/23/23

Date: 3-14-26          page #176-186        Defendant:  Lindsay Miller/minorAM          Details: False light
11/20/23

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez   14

Date: 3-14-26          page #176-186     Defendant:  Lindsay Miller/minorAM      Details:False Light
2/21/24

Date: 3-14-26          page #176-186     Defendant:  Lindsay Miller/minorAM      Details: False light
2/6/26

Date: 3-14-26          page #176-186     Defendant:  Lindsay Miller/minorAM      Details:False light

Date: 3-14-26          page #176-186     Defendant:  Lindsay Miller/minorAM      Details: False light

Date: 3-14-26          page #187-196     Defendant:  Allyson Kitchel/minorCJ      Details:

Date: 3-14-26          page #187-196     Defendant:  Allyson KitchelminorCJ      Details:3/6/26

Date: 3-14-26          page #187-196     Defendant:  Allyson KitchelminorCJ      Details:

Date: 3-14-26          page #187-196     Defendant:  Allyson KitchelminorCJ      Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez     15

Date:  3-14-26          page #253-261      Defendant:  Edwin Black Pro Se          Details:

Date:  3-14-26          page #253-261      Defendant:  Edwin Black Pro Se          Details:

Date:  3-14-26          page #253-261      Defendant:  Edwin Black Pro Se          Details:

Date:  3-14-26          page #253-261      Defendant:  Edwin Black Pro Se          Details:

Date:  3-14-26          page #286-298      Defendant:  K. Weir      /minor TA       Details: 4/4/23

Date:  3-14-26          page #286-298      Defendant:  K. Weir      /minor TA       Details: 5/16/23

Date:  3-14-26          page #286-298      Defendant:  K. Weir      /minor TA       Details: 10/23/23

Date:  3-14-26          page #286-298      Defendant:  K. Weir      /minor TA       Details: 11/20/23

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    16

Date: 3-14-26          page #286-298   Defendant:  K. Weir      /minor TA      Details: 2/21/24

Date: 3-14-26          page #286-298   Defendant:  K. Weir      /minor TA      Details:

Date: 3-14-26          page #286-298   Defendant:  K. Weir      /minor TA      Details:

Date: 3-14-26          page #286-298   Defendant:  K. Weir      /minor TA      Details:

Date: 3-14-26          page #273-285   Defendant:  B. Appelbaum/minor TA Details: 4/4/23

Date: 3-14-26          page #273-285   Defendant:  B. Appelbaum/minor TA Details: 5/16/23

Date: 3-14-26          page #273-285   Defendant:  B. Appelbaum/minor TA Details: 10/23/23

Date: 3-14-26          page #273-285   Defendant:  B. Appelbaum/minor TA Details: 11/20/23

Date: 3-14-26          page #273-285   Defendant:  B. Appelbaum/minor TA Details: 2/21/24

Date: 3-14-26          page #273-285   Defendant:  B. Appelbaum/minor TA Details:

Date: 3-14-26          page #273-285   Defendant:  B. Appelbaum/minor TA Details:

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez     17

Date: 3-14-26          page #126-135       Defendant:  Capitol Hill PTA        Details:

Date: 3-14-26          page #126-135       Defendant:  Capitol Hill PTA        Details:

Date: 3-14-26          page #126-135       Defendant:  Capitol Hill PTA        Details:

Date: 3-14-26          page #126-135       Defendant:  Capitol Hill PTA        Details:

Details:12/11/25(student interviews)

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz         Details:12/11/25/Kitchel
phone/email

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz         Details: 12/11/25/LMER emails

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz         Details: 12/11/25/Peoples
emails

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz         Details: 12/11/25/background
check

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    18

| | | | |
|---|---|---|---|
| Date: 3-14-26 Alexandria | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/incident |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/Ipads found |
| Date: 3-14-26 given | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/emails not |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/Fuller emails |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/text messages |
| Date: 3-14-26 yr | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/erase text set |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/same phone |
| Date: 3-14-26 wife | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/sent message |
| Date: 3-14-26 Jurkowski | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/articles |
| Date: 3-14-26 concerns | page #3-16 | Defendant:  DC/M. Berkowitz | Details:12/11/25/Burton |

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    19

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/Stover
concern

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/clearance
team

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details:12/11/25/Berkowitz to
LMER

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details:12/11/25/Sharon
Gaskins

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details:12/11/25/Jade Fuller

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/NJ
background

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/student
words?

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/interview
alone?

Date: 3-14-26          page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/escorted out

D.C. Superior Court :Civil Division    Case 2025-CAB-008255    Judge V. Sanchez    20

| Date: 3-14-26 work | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/others did |
| Date: 3-14-26 office | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/only my |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/transcribed |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/Redmon not |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/James not |
| Date: 3-14-26 student | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/Jewish |
| Date: 3-14-26 | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/TM selected |
| Date: 3-14-26 TM | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/not words of |
| Date: 3-14-26 leading | page #3-16 | Defendant:  DC/M. Berkowitz | Details: 12/11/25/Counsel |

D.C. Superior Court :Civil Division    Case 2025-CAB-008255    Judge V. Sanchez    21

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/Bartolomeo

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/drafted notes

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/made reports

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/directed press

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/looked for
plaintiff

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/IRT report

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/hate bias
report

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/sent home
11am

Date: 3-14-26            page #3-16            Defendant:  DC/M. Berkowitz            Details: 12/11/25/

D.C. Superior Court :Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    22

Date:  3-14-26            page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/

Date:  3-14-26            page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/

Date:  3-14-26            page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/

Date:  3-14-26            page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/

Date:  3-14-26            page #3-16          Defendant:  DC/M. Berkowitz          Details: 12/11/25/

D.C. Superior Court/Civil Division   Case 2025-CAB-008255   Judge V. Sanchez   Exhibits 1

**Defendants:  transcript 12-11-25 details: On the Record facts**

**Plaintiff's Court Filings: 6-13-26 Transcripts 12-11-25: Mscott Berkowitz: D.C. Superior Court:  Judge Veronica Sanchez Case 2025-CAB-008255 \*Where to find evidence and details for elements of claims, dates, injury, continuous harm to Plaintiff.**

Transcript: Date:12-11-25/page 8 (lines 15-22, page 9 (lines 1-11)      Deponent: Mscott Berkowitz  did not bring required documents to his deposition on 12-11-25. His  Counsel A. Negovan explained it away. This is one way documents are concealed and not given to the Plaintiff.

Transcript: Date:12-11-25/page 15 (lines 16-22), page 16 (lines 1-22), page 17 (lines 1-22), page 18 (lines 1-22), page 19 (lines 1-22), page 20 (lines 1-7). This is an issue of  spoliation and it is not clear if the Defendant (DCPS) actions to preserve the text messages, emails, and other relevant items related to the case. However, Counsel A. Negovan explained it away in Federal Court, only to find out that the Judge understood it was and is an evidence issue of spoliation. This is another way documents are concealed and not given to the Plaintiff.

Transcript: Date:12-11-25/page 20 (lines 19-22), page 21 (lines 1-22), page 22 (lines 1-22), page 23 (lines 1-22), page 24 (lines 1-22), page 25 (lines 1-22), page 26 (lines 1-22), page 27 (lines 1-22), page 28 (lines 1- 22), page 29 (lines 1-22), page 30 (lines 1-22), page 31 (lines 1-22). Page 32 (lines 1-22), page 33 (lines 1-22), page 34 (lines 1-22), page 35 (lines 1-22), page 36 (lines 1-22), page 37 (lines 1-22), page 38 (lines 1-22), page 39 (lines 1-22), page 40 (lines 1-22), page 41 (lines 1-22). This is another way documents are concealed and not given to the Plaintiff as efforts to compile and enter evidence on the record.  This is also an example of several defendants involved in working to conceal documents several months before the 12-17-21 incident which cost the Plaintiff her job, reputation, severe emotional distress, and so much more. The Plaintiff is aware that counsel has a job to do the right thing consistently.

Transcript: Date:12-11-25/page 41 (lines 22), page 42 ( lines 1-22), page 43 (lines 1-22), page 44 (lines 1-22), page 45 (lines 1-22), page 46 (lines 1-22, page 47

(lines 1-22), page 48 (lines 1-22), page 49 (lines 1-22), page 50 (lines 1-22), page 51 (lines 1-22), page 52 (lines 1-22), page 53 (lines 1-22), page 54 (lines 1-22), page 55 (lines 1-22), page 56 (lines 1-22), page 57 (lines 1-22), page 58 (lines 1-22), page 59 (lines 1-22), page 60 (lines 1-22).  This is an important detail that shows children in the third grade do not use certain vocabulary, nor do they write at certain levels, but Mr. Berkowitz gave his examples which are now part of the record. The constant interruptions from Counsel will be discussed with the Federal judge. It is not clear if Counsel is using a deposition strategy. Also, Lynette Collins was a guest attorney, who the Supervisory allowed to stay for all four of the Plaintiff's depositions on 12-11-25. Ms. Collins, interrupted, typed details into her computer the entire day, and she is the attorney for another of the Plaintiff's cases. When Counsel Negovan tried to include Ms. Collins in the Plaintiff's deposition, she informed them the Judge would be contacted. At that point Negovan and her Supervisor did not include Ms. Collins. This is deeply concerning and wrong to interfere with the deposition proceedings, work to alter evidence, clue the deponents, to adjust their answers. This is part of the harm, several violations of the plaintiff's rights, and so many other ways that evidence is concealed or removed out of the plaintiff's reach.

Transcript: Date:12-11-25/page 62 (lines 1-22), page 63 (lines 1-22), page 64 (lines 1-22), page 65 (lines 1-22), page 66 (lines 1-22), page 67 (lines 1-22), page 68 (lines 1-22), page 69 (lines 1-22), page 70 (lines 1-22), page 71 (lines 1-22), page 72 (lines 1-22), page 73 (lines 1-22). This is where the deponent had a large PR Team from DCPS to help him push the hate bias story about the plaintiff, give the plaintiff's name to people local, nationally, and internationally, and build a story which was and is not true. Even on 12-11-25, Berkowitz continued the harmful story. The deponent Berkowitz, even made up facts about the plaintiff being walked out of the building after the 10am Moxley class, not true.  The plaintiff was at school the entire day, she did all of her classes, duties, including playground duty. Deponent Berkowitz never asked her any questions, Teacher Moxley saw plaintiff entering the restroom a few feet away from the Moxley classroom, the plaintiff gave Moxley a book ticket for one of the students. Moxley never said a word about what was going on in the building with an investigation which included the plaintiff. The plaintiff found out about the All Staff Email from Berkowitz after she arrived home near 6:30pm and a reporter called her on her personal cell, to ask

her side of the story. This is the continuing hurt, pain, and the way documents, and information is concealed and was concealed in a true violation of public policy, DCHRA, EEOC retaliation, discrimination, Civil Rights 1963, and other policy that is designed to support this type of plaintiff. Moxley nor Berkowitz never saw any such hate bia or reenactment of an Holocaust lesson during the plaintiff's library time with Moxley's students, but several DCPS staff allowed the termination, concealment of documents, and a host of other policy violations which included the WTU Local 6 AFT-CIO. Also note, the plaintiff was a WTU board member and very active in the Watkins and DCPS Community which the deponent Berkowitz was well aware of. Another note, just working to show the Court that this is a very necessary amended complaint. This case will need discovery to show even more to the Court.

**Plaintiff's Court Filings: 6-13-26 Transcripts 12-11-25: Jade Fuller LMER Deposition: D.C. Superior Court: Judge Veronica Sanchez Case 2025-CAB-008255**
**\*Where to find evidence and details for elements of claims, dates, injury, continuous harm to Plaintiff.**

Transcript: Date:12-11-25/page 17 (lines 1-22), page 18 (1-22), page 19 (lines 1-22), page 20 (lines 1-22), page 21 (lines 1-22), page 22 (lines 1-22), page 23 (lines 1-22), page 24 (lines 1-22), page 25 (lines 1-22), page 26 (lines 1-22), page 27 (lines 1-22), page 28 (lines 1-22), page 29 (lines 1-22), page 30 (lines 1-22), page 31 (lines 1-22), page 32 (lines 1-22), page 33 (lines 1-22), page 34 (lines 1-22), page 35 (lines 1-22), page 36 (lines 1-22), page 37 (lines 1-22), page 38 (lines 1-22), page 39 (lines 1-22), page 40 (lines 1-22), page 41 (lines 1-22), page 42 (lines 1-22), page 43 (lines 1-22), page 44 (lines 1-22), page 45 (lines 1-22), page 46 (lines 1-22), page 47 (lines 1-22), page 48 (lines 1-22). This have several issues with background checks of plaintiff, groups requesting personal information about the plaintiff, several months before (May 2021). Deponent Fuller was assigned in the D.C. Federal Court to answer the interrogatories, request for productions, place items into the privilege folder. One item that was placed into the privilege folder was the Douglas Factor report, which DCPS and WTU concealed from the plaintiff. The plaintiff lost the opportunity to properly respond to the pre-termination time period before the final decision of termination. DCPS, WTU,

and LMER were partners in the concealment of the Douglas Factor Report.  Later in 2025, when the plaintiff did get a copy of the Douglas Factor Report, she realized it had details which would have allowed her to respond properly and stop the pretext reason for the termination. The pretext reason which comparator teachers were not impacted by nor terminated for, nor denied a placement in another school regardless of the 4.0 highest Impact score which the plaintiff had at the time, no record of true discipline, as well. True discipline is based on Berkowitz, Fuller, Boisvert, and others claims in November of 2021 unsubstantiated charges by Berkowitz of Ipad theft which the results of the investigation show unsubstantiated was concealed from the plaintiff as well.  Had the plaintiff rights not been violated and allowed to be violated by several DCPS, WTU, Watkins, and others, the termination would not have occurred.  Even Lynette Davis who requested the plaintiff to testify in an EEOC, EEO complaint by Watkins's teacher who stated the plaintiff had significant information. So, the plaintiff attended the investigation interview with Lynette Davis on December 13, 2021, supplied the information, documents, statements, names of  Watkins' teachers, parents, and community making the complaint. By December 17, 2021, Moxley and Berkowitz claimed there was a hate bias incident and a reenactment of the Holocaust with violence in the library during Moxley students time in the library.  The plaintiff was never given the opportunity to explain, answer questions on December 17, 2021. The entire investigation was not shared with the plaintiff until she arrived home at 6:50 pm on December 17, 2021, checked her email to find an email for All Staff from Berkowitz with details about a staff member who was placed on leave for a hate bias lesson in the Watkins Library.  The plaintiff also received a phone call from the press, asking for her side of the story. This is the harm, this is how documents, information, and details have been concealed from the plaintiff.  This is how the plaintiff had to wait until 2025 discovery from the District Federal Court before she could begin to make true sense of what had happened.  This is how Berlowitz and Moxley were allowed to give hearsay and make up details, force students to write, and allow Berkowitz to change words of students to fit his ideas, as the story was developed, using a DCPS press team, which the plaintiff had no idea.  Again, it was only after 2025 discovery in the District Federal Court, that the plaintiff looked at hundreds of documents to learn that Berkowitz, Bartolomeo, and others pushed a large hate bias and reenactment of the Holocaust lesson story out to local, national, and international groups using

social media, Instagram, Facebook, Tik Tok, and others.  This is how information is concealed, this is how the plaintiff has been harmed, and continues to be harmed, especially with each new re-published or search of her name.

**Plaintiff's Court Filings: 5-26-26 Amended complaint and attachments: D.C. Superior Court:  Judge Veronica Sanchez Case 2025-CAB-008255**
**\*Where to find evidence and details for elements of claims, dates, injury, continuous harm to Plaintiff.**

Exhibit 27, DCPS Facts of the case documents attached list page 282-284

Exhibit 10 Facts of Case Fuller/DCPS/LMER , page 285-288

Exhibit 22 Lafayette School DCPS slavery lesson/comparator, page 301-310

Exhibit 26-
 Lona Valmoro respond to Watkins reenactment Holocaust lesson, page 311-313

Exhibit 17-
All Staff Letter Mscott Berkowitz 12-17-21, page 314-317

I pad theft charge to plaintiff from Mscott Berkowitz, page 318

Exhibit 1(e) OEA petition for appeal, 7-1-25, page 320-324

Exhibit 1c OEA Brief, 8-1-25, page 325-333

Exhibit 9, EEOC, charge,  Position Statement and Notice of Right to Sue letter, Ipad theft investigation report, complaint Lynette Davis, 334-345

Exhibit 9, Mscott Berkowitz Deposition, TR-12-126, lines 1-22 each page, 346-470

Exhibit 9, Douglas Factors report for Kimberlynn Jurkowski 12-17-26(received after concealment in 12-17-21), page 471-474

D.C. Superior Court/Civil Division   Case 2025-CAB-008255   Judge V. Sanchez    Exhibits 6

Exhibit 9, Plaintiff Declaration 3/2026, WTU Local #6 AFT-CIO, page 475-487, Aimee Peoples/AP minor child, page 488-499

Exhibit 21, Disparate treatment staff,
Exhibit 19, Lynette Davis: J Bell Investigation Protect Activity:, Mscott Berkowitz statement, page 500-516

Exhibit 19, Karen Cole, PR, page 517-518

Exhibit 19, Elizabeth Bartolomeo, Paige Hoffman, Robyn Harper, PR, page 519-525

Exhibit 19, ESI- spoliation 3 wiped cell phones, 11-20-25, page 526-532

Exhibit 19, WTU CBA, article 6, article 7, page 533-539

Exhibit 5-26-26 counts and issues:, page 1-8

Exhibit 23 background check staff concern, page 9-13

Exhibit 23 DCPS Employee rights & responsibilities policy, page 14-21

Exhibit 21 Disparate treatment staff Watkins, page 22

Exhibit 24, DCPS security report "Hate Bias", 12-17-21, page 23-26

Exhibit 24, DCPS notice pending investigation, 12-17-21, page 27-28

Exhibit 24, DCPS ipad theft statement Jurkowski, 11-10-21, page 30-34
Exhibit 24, DCPS Hate Bias, reenactment of Holocaust statement Jurkowski, 1-24-22, page 35-49

Exhibit 24, DCPS incident I-pad theft complaint Watkins, 10-27-21, page 50-53

D.C. Superior Court/Civil Division    Case 2025-CAB-008255    Judge V. Sanchez    Exhibits 7

Exhibit 24, DCPS laptop not given to plaintiff, Kevin Washburn, page 54-66

Exhibit 24, DCPS Elena Bell, remove from Capitol Hill Watkins, page 67

Exhibit 24, DCPS/LMER Lynette Davis investigation Protective Activity Jurkowski, page 68-69

Exhibit 24, Watkins book circulation plan, Susan Bloom, page 70-72

Exhibit 24, Berkowitz refuse link for meeting to plaintiff, page 73

Exhibit 24, Berkowitz statement hate bias, reenactment of Holocaust, page 74

Exhibit 24, Berkowitz ipad investigation with WTU local#6 AFT-CIO ignored by Berkowitz, November 22, 2021, page 75-77

Exhibit 24, Berkowitz E15 teachers (Jill Mackie Stewart/Susan Bloom)  allowed to change plaintiff's schedule in May 2021, page 78-79

Exhibit 24, Berkowitz All Staff Incident hate bias, reenactment of Holocaust email, 12-17-21, page 80

Exhibit 24, Berkowitz E15, issue, change plaintiff's schedule, book fair lead change to Susan Bloom,Lynette Davis DCPS/LMER investigation, page 81-92

Exhibit 24, Ipad investigation notice no action, but remain on paid leave January 21, 2022, Jade Fuller, page 93

Exhibit 24, Watkin parent letter complaint, discrimination, disparate treatment of students in aftercare at Watkins reported, Lynette Davis DCPS/LMER investigation, page 94

Exhibit 24, Book fair, discrimination, disparate treatment, May 2021, page 95-96

Exhibit 24, no meeting link given after request for it by plaintiff, 11-5-21, page 97

Exhibit 24, refuse to give books to African American students, discrimination, Watkins admin Mscott Berkowitz, Mark Boisvert, and Susan Bloom, 2-11-21, Lynette Davis DCPS/LMER investigation, November 13, 2021page 98-102

Exhibit 24, Covid case in library, Montgomery and Berkowitz refuse to share details with plaintiff, plaintiff sent home after doctor clearance, disparate treatment, discrimination, retaliation, notes month by month 2021,  for Lynette Davis DCPS/LMER investigation, page 102-104

Exhibit 24, EEO contact with Berkowitz, 10-6-22, Lynette Davis DCPS/LMER investigation, page 105-106

Exhibit 19, Lynette Davis DCPS/LMER investigation 12-14-21, book fair disparate treatment, discrimination, retaliation, 5-27-21, Specialist team, plaintiff not included for advertising of programs 11-10-21, page 107-113

Exhibit 19, Lynette Davis DCPS/LMER investigation 12-13-21, Jill Mackie Stewart, Susan Bloom, Lauren Dunning, refuse to give program details for students of color and plaintiff, discrimination, retaliation, disparate treatment 5-20-21, page 114

Exhibit 19, Lynette Davis DCPS/LMER investigation 12-13-21,  Nurse Helena Tuitt, complained about Berkowitz discrimination, bias treatment, and she resigned from Watkins 2020,  Teresa Clark a substitute teacher at Watkins, refuse to return after Berkowitz and Boisvert discriminated and disparate treatment 2020, and new hire P.E & Health teacher at Watkins, resigned once she found out Berkowitz was the new Principal at Watkins because she worked with Berkowitz at Alexandria City School in Alexandria Virginia., Berkowitz refused to pay for refreshments and snacks for the students of color, but paid for the k-2nd grade  students who live on capital hill, but did not invite the students of color to the event, 5-2021, page 115-118

D.C. Superior Court/Civil Division     Case 2025-CAB-008255   Judge V. Sanchez     Exhibits 9

Exhibit 19, Lynette Davis DCPS/LMER investigation 12-13-21, several examples of discrimination, disparate treatment, and retaliation 10-20-21 to 12-17-21, Alan Lescht details for EEOC, page 119-124

Exhibit 19, Jade Fuller Deposition 12-11-25, page `124-170

Exhibit 19, DCHR policy 10-16-20, page 171-191

Exhibit 20, Mscott Berkowitz, Elizabeth Bartolomeo, Robyn Harper, Karen Cole, Shawn Stover, Jade Fuller, Twitter, Facebook, hate bias Jurkowski, 12-22-21, page 192-196

Exhibit 16, Mscott Berkowitz, Paige Hoffman, Robyn Harper, Elizabeth Bartolomeo, Shawn Stover, Jade Fuller, Karen Cole,  emails profile of plaintiff, Social Media, Instagram, Facebook, Twitter, 12-22-21, page 197-201

D.C. Superior Court/Civil Division    Case 2025-CAB-008255  Judge V. Sanchez    Exhibits 10

**AAA Post Hearing Briefs WTU Local #6 and DCPS 2-21-24**

Exhibit 33 AAA Arbitrator Post-Hearing 2-21-24  Brief DCPS, p. 4-9, video time line, no audio on the video, but DCPS makes false statements for video step by step.

Exhibit 33 AAA Arbitrator Post-Hearing 2-21-24 Brief DCPS, p. 12-23, does not have nor give supporting evidence that any grave conduct occurred. DCPS have given dozens of false statements, made up reasons, and violations of WTU Local #6 AFT-CIO CBA, article 6, and article 7. The investigation was bias beginning on 12-17-21 which included Mscott Berkowitz, manufacturing several false statements, contacting the press, pushing the hate bias story and a reenactment of the Holocaust.

Exhibit 33 AAA Arbitrator Post-Hearing 2-21-24  Brief WTU Local #6 AFT-CIO , Tr. p. 9-18. Introduction, background issues, discrimination, issues at Watkins

Exhibit 33 AAA Arbitrator Post-Hearing 2-21-24 Brief WTU Local #6 AFT-CIO, Tr. p. 19–24 Impact on Jurkowski

Exhibit 33 (WTU) AAA Arbitrator Post-Hearing 2-21-24 Comparator case Lafayette School DCPS Tr.  page 24-25

Exhibit 33(WTU) AAA Arbitrator Post-Hearing 2-21-24 Terminated without Just Cause by DCPS, Tr. page 25-34

Exhibit 33 (WTU) AAA Arbitrator Post-Hearing 2-21-24 Video footage does not support a finding of just cause for the termination, page 34-35

Exhibit 33(WTU) AAA Arbitrator Post-Hearing 2-21-24  The Capatano Case Lafayette School DCPS further shows DCPs lacked Just Cause to Terminate Jurkowski, page 35-36

D.C. Superior Court/Civil Division   Case 2025-CAB-008255   Judge V. Sanchez   Exhibits 11

Exhibit 33 (WTU) AAA Arbitration Post-Hearing 2-21-24 Jurkowski should be reinstated with make whole relief.. , page 36-49.

Exhibit 33 (WTU emails), 3/21/24 Appeals, challenge, other actions available..?, page 1-4

## THE ARBITRATION TRIBUNALS OF THE
## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between:  )
  )
Washington Teachers' Union, Local #6,  )
  )      AAA Case No. 01-22-0004-0484
and  )      (Kimberlynn Jurkowski Termination)
  )
District of Columbia Public Schools.  )
  )

## POST-HEARING BRIEF OF THE WASHINGTON TEACHERS' UNION, LOCAL #6, AFT, AFL-CIO

Respectfully submitted,

Olga M. Thall
James & Hoffman, P.C.
1629 K Street, NW, Suite 1050
Washington, DC 20006
(202) 496-0500
(202) 496-0555 (fax)
omthall@jamhoff.com

*Attorney for Washington Teachers' Union,
Local #6, AFT, AFL-CIO*

Dated: February 21, 2024

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

STATEMENT OF ISSUES .................................................................................................. 1

RELEVANT FACTS ........................................................................................................... 1

    A.    Teaching at Watkins Elementary School ................................................... 1

    B.    Principal Berkowitz ................................................................................ 3

    C.    December 17, 2021 ................................................................................ 5

    D.    Surprise Accusations ............................................................................. 10

    E.    Termination and Impact ........................................................................ 11

    F.    Testimony about December 27, 2021 at the Arbitration Hearing ............... 12

        1.  Ms. Moxley and the Written Statements ........................................ 12

        2.  AM ............................................................................................ 13

        3.  MT ............................................................................................ 15

    G.    The Jared Capatano Case ...................................................................... 17

ARGUMENT ....................................................................................................................... 18

I.       DCPS TERMINATED MS. JURKOWSKI WITHOUT JUST CAUSE .......................... 18

    A.    DCPS Has Failed to Meet Its Burden of Proof to Demonstrate
        Just Cause ............................................................................................ 19

        1.  The testimony of two students of 20 is insufficient to establish
            just cause here .......................................................................... 19

        2.  The written statements do not support a finding of just cause ........ 25

        3.  The video footage does not support a finding of just cause ............ 27

    B.    The Capatano Case Further Shows that DCPS Lacked Just Cause to
        Terminate Ms. Jurkowski ...................................................................... 28

II.      MS. JURKOWSKI SHOULD BE REINSTATED WITH MAKE WHOLE
       RELIEF DATING BACK TO THE DATE OF HER TERMINATION ........................... 29

    A.    *Backpay and Value of Lost Benefits* ...................................................... 29

B.      *Pre- and Post-Judgment Interest* ...........................................................................30

C.      *Tax-Gross Up*...........................................................................................................32

D.      *Reasonable and Foreseeable Expenses* ................................................................36

III.     THE INTEREST OF JUSTICE REQUIRES AN AWARD OF ATTORNEYS'
        FEES TO THE UNION. ................................................................................................38

CONCLUSION...................................................................................................................................40

CERTIFICATE OF SERVICE ..........................................................................................................42

## TABLE OF AUTHORITIES

**Cases**

*AdvoServ of N.J. Inc.*, 363 N.L.R.B. No. 143, 2016 BL 74892 (Mar. 11, 2016)............ 34 (Ex. 33)

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975).................................................... 29 (Ex. 17)

*Atl. Se. Airlines*, 101 BNA LA 515 (Aug. 9, 1993) (Nolan, Arb.) ................................. 31 (Ex. 23)

*Bothell Pediatric & Hand Therapy*, 372 N.L.R.B. No. 40, 2023 BL 11694
        (Jan. 13, 2023)................................................................................................ 37 (Ex. 45)

*Clark County*, 139 BNA LA 1055 (July 31, 2019) (Latsch, Arb.) ................................. 28 (Ex. 16)

*Clemens v. Centurylink, Inc.*, 874 F.3d 1113 (9th Cir. 2007)......................................... 34 (Ex. 34)

*Contempto Design*, 120 BNA LA 1317 (Sept. 9, 2004) (Bogue, Arb.).......................... 31 (Ex. 25)

*D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*,
        PERB Case No. 96-A-02, Slip Op. No. 459 (Jan. 17, 1996) .............................. 30 (Ex. 20)

*D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*,
        PERB Case No. 10-A-03, Slip Op. No. 1306 (Aug. 18, 2011).......................... 38 (Ex. 48)

*D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*,
        PERB Case No. 10-A-03, Slip Op. No. 1380, 2013 WL 4534266
        (Apr. 30, 2013)................................................................................................ 39 (Ex. 51)

*D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*,
        PERB Case No. 10-A-14, Slip Op. No. 1326, 2012 WL 3901597
        (Aug. 23, 2012) ............................................................................................... 39 (Ex. 52)

*DCPS v. D.C. Pub. Emp. Rels. Bd.*, Case No. 2023-CAB-004448
        (D.C. Super. Ct. filed July 19, 2023) ....................................................................35

*DCPS v. WTU (Canady)*, PERB Case No. 20-A-04, Slip Op. No. 1740
        (Mar. 19, 2020) ....................................................................................... 38, 39 (Ex. 49)

*DCPS v. WTU (Grivnow)*, PERB Case No. 23-A-03, Slip Op. No. 1844
        (June 15, 2023)................................................................................................ 35 (Ex. 39)

*EEOC v. N. Star Hosp., Inc.*, 777 F.3d 898 (7th Cir. 2015) ......................................... 34 (Ex. 35)

*Eshelman v. Agere Sys., Inc.*, 554 F.3d 426 (3d Cir. 2009)........................................... 34 (Ex. 36)

*Hallums v. United States*, 841 A.2d 1270 (D.C. 2004)................................................... 25 (Ex. 12)

*Healthbridge Mgmt., LLC v. NLRB*, 672 F. App'x 1 (D.C. Cir. 2016) ..................... 25–26 (Ex. 13)

*Hoverter v. Dir. of Patuxent Inst.*, 231 Md. 608 (1963) .................................................. 20 (Ex. 7)

*Howell Refining Co.*, 27 BNA LA 486 (Nov. 5, 1956) (Hale, Arb.) .............................. 26 (Ex. 14)

*Huthnance v. District of Columbia*, 722 F.3d 371 (D.C. Cir. 2013) ................................. 20 (Ex. 6)

*In re Borden Co.*, 20 BNA LA 483 (Feb. 12, 1953) (Rubin, Arb.) ................................. 26 (Ex. 15)

*In Re Jam.J. & Jas.J.*, 825 A.2d 902 (D.C. 2003) ........................................................... 21 (Ex. 9)

*In re Tate & Lyle, N. Am. [Lafayette, Ind.] & Int'l Bhd. of Teamsters, Loc. 1070,*
    FMCS Case No. 140523/66195-3, 136 BNA LA 316 (Nov. 18, 2015)
    (Goldstein, Arb.) ...................................................................................................... 19 (Ex. 4)

*Kaiser Permanente*, 89 BNA LA 841 (Oct. 11, 1987) (Alleyne, Arb) ........................... 31 (Ex. 24)

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ..................................................................... 21 (Ex. 8)

*Kohler Co.*, 122 BNA LA 1221 (Mar. 7, 2006) (Jennings, Arb.) .................................... 31 (Ex. 26)

*Latino Express, Inc.*, 359 N.L.R.B 518 (2012) ................................................................ 34 (Ex. 32)

*Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.,*
    PERB Case No. 16-A-06, Slip Op. No. 1618, 2017 WL 1374580
    (Mar. 23, 2017) ......................................................................................................... 39 (Ex. 50)

*Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.,*
    PERB Case No. 16-A-11, Slip Op. No. 1625 (June 9, 2017) ....................... 30–31 (Ex. 22)

*Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.,*
    PERB Case No. 17-A-04, Slip Op. No. 1637 (Aug. 25, 2017) .......................... 30 (Ex. 21)

*Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.,*
    PERB Case No. 18-A-08, Slip Op. No. 1660 (Mar. 27, 2018) .......................... 31 (Ex. 27)

*NCRNC, LLC d/b/a Ne. Ctr. for Rehab. & Brain Injury*, 372 N.L.R.B. No. 35,
    2022 BL 454091 (Dec. 16, 2022) ............................................................................. 37 (Ex. 44)

*Powell v. N. Ark. College*, Civ. No. 08-3042, 2009 BL 142427
    (W.D. Ark. July 1, 2009) ........................................................................................... 34 (Ex. 38)

*Sears v. Atchison, Topeka & Santa Fe Ry., Co.*, 749 F.2d 1451 (10th Cir. 1984) .......... 34 (Ex. 37)

*State v. Meyer*, 135 Iowa 507, 113 N.W. 322 (1907) ...................................................... 22 (Ex. 11)

*Thryv, Inc.*, 372 N.L.R.B. No. 22, 2022 BL 444427 (Dec. 13, 2022) ....................... 36, 37 (Ex. 43)

iv

*Union v. Employer*, 151659-AAA, [Number redacted], 2014 BNA LA Supp. 151659
 (Feb. 28, 2014) (Pye, Arb.)..................................................................................... 19 (Ex. 1)

*Union v. Employer*, 165768-AAA, [Number redacted], 2014 BNA LA Supp. 165768
 (July 16, 2014) (Attardo, Arb.) ............................................................................... 20 (Ex. 5)

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001)........................... 33 (Ex. 31)

*United Transp. Union v. Veolia Transp. Servs., Inc.*, FMCS No. 13-54528-3
 (Aug. 23, 2018) (Ray, Arb.)............................................................................... 35–36 (Ex. 41)

*U.S. Army Corps of Eng'rs*, 136 BNA LA 1365 (June 6, 2016) (Cohen, Arb.)............... 36 (Ex. 42)

*WTU v. DCPS (Brown)*, AAA Case No. 01-22-0000-5295 (Nov. 16, 2023)
 (Vaughn, Arb.)............................................................................................... 35, 37 (Ex. 40)

*WTU v. DCPS (Canady)*, AAA Case No. 01-16-0004-0051 (Dec. 28, 2019)
 (Vaughn, Arb.)......................................................................................... 38, 39, 40 (Ex. 53)

*WTU v. DCPS (Fields)*, AAA Case No. 01-20-0000-1793 (Mar. 13, 2023)
 (Pye, Arb.).......................................................................................................... 30 (Ex. 18)

*WTU v. DCPS (Grivnow)*, AAA Case No. 01-22-0002-4548 (Mar. 31, 2023)
 (Greenberg, Arb.)......................................................................................*passim* (Ex. 19)

**Statutes and Regulations**

5 U.S.C. § 5596(b)(1)(A)(ii)........................................................................................ 38 (Ex. 46)

5 U.S.C. § 5596(b)(2)(A).............................................................................................. 32 (Ex. 28)

5 U.S.C. § 7701(g)(1) .................................................................................................. 38 (Ex. 47)

**Other Authorities**

*Discipline & Discharge in Arbitration* (Norman Brand & Melissa H. Biren eds.,
 3d ed. 2015) (excerpts) ...................................................................................... 29, 30 (Ex. 3)

Elkouri & Elkouri, *How Arbitration Works* (Kenneth May et al. eds.,
 8th ed. 2020) (excerpts) ...................................................................................... 19, 28 (Ex. 2)

*The Suggestibility of Children: Scientific Research and Legal Implications*, Stephen J.
 Ceci & Richard D. Friedman, 86 Cornell L. Rev. 33 (2000)........................... 21, 24 (Ex. 10)

*Why Children's Suggestibility Remains a Serious Concern*, Amye R. Warren &
    Dorothy F. Marsil, 65 Law and Contemporary Problems 125 (2002)................ 22 (Ex. 54)

I.R.S. Rev. Rul. 78-336, 1978-2 C.B. 255 (1978) ......................................................... 32 (Ex. 29)

I.R.S. Rev. Rul. 89-35, 1989-1 C.B. 280 (1989) ........................................................... 33 (Ex. 30)

The Washington Teachers' Union (WTU or the Union) submits this post-hearing brief in support of its grievance against the District of Columbia Public Schools (DCPS) concerning the termination of teacher Kimberlynn Jurkowski in March 2022.

## STATEMENT OF ISSUES

At the hearing, the WTU offered the following statement of issue: whether DC Public Schools had just cause for the discharge of the grievant, Kimberlynn Jurkowski, and if not, what shall the remedy be. (Tr. at 7.) At the hearing, the Parties stipulated that the Arbitrator will retain jurisdiction for the purpose of addressing any questions about the remedy, if applicable.[1] (Tr. at 9.)

## RELEVANT FACTS

Kimberlynn Jurkowski decided as early as third-grade that she wanted to be an educator. (Jurkowski, Tr. 458.)[2] Following graduate school for a Master's Degree in library and information science, Ms. Jurkowski worked in Chicago, Illinois and Atlantic City, New Jersey before joining the DCPS staff. (Jurkowski, Tr. 461, 470–76.)

### A.    Teaching at Watkins Elementary School

Ms. Jurkowski joined Watkins Elementary School as a Library Media Specialist in 2018, following a tenure at King Elementary in Southeast DC. (Jurkowski, Tr. 490.) Ms. Jurkowski's duties included managing and maintaining the library and its collection, as well as program development and outreach to teachers and the wider school community. (Jurkowski, Tr. 556–57.)

---

[1]    Consistent with the Parties' practice and precedent, if the Arbitrator sustains the grievance, WTU intends to negotiate with DCPS over specific elements of make whole relief and ask the Arbitrator to resolve any disputes if the Parties cannot agree.

[2]    "UX" and "AX" references are to the Union's and the Agency's exhibits, respectively. "Ex." references are to the exhibits submitted along with this brief, such as copies of relevant authorities. We generally refer to the transcript by "[Witness], Tr. [Page(s)]".

Ms. Jurkowski's performance was well-regarded, earning her scores of Highly Effective in her Fiscal Year 2018-19, 2019-20, and 2020-21 IMPACT evaluations. (Jurkowski, Tr. 560–61.)

Elena Bell was principal during the first part of Ms. Jurkowski's time at Watkins. (Jurkowski, Tr. 491.) Ms. Jurkowski was able to work with Watkin's PTA to create a Maker's Space out of a library storage room. (Jurkowski, Tr. 493–94, 504.) The Maker's Space had materials for hands-on learning, including robots, computers, digital tools, Legos, costumes, paper arts, and science kits. (Jurkowski, Tr. 493–94, 503.) Under Principal Bell, Ms. Jurkowski was able to make the Maker's Space available throughout the school day, so that individual students could use the space with the permission of teachers or during their lunch periods. (Jurkowski, Tr. 501–02.) Under Principal Bell, each class visited library weekly and Ms. Jurkowski collaborated with teachers on their lesson plans. (Jurkowski, Tr. 554, 562.)

In addition to her duties as a librarian, Ms. Jurkowski conducted special club programming for the students, which she took on voluntarily. She ran one program each day of the week, such that Monday was dinosaur club, Tuesday was Legos and engineering, Wednesday was genealogy, Thursday was comic book club, and Friday was Battle of the Books and debate team. (Jurkowski, Tr. 499, 501, 505–07.) Principal Bell allowed Ms. Jurkowski to conduct a majority of these clubs during the normal school day. (Jurkowski, Tr. 506-02.)

Racial tensions at Watkins were high and continued to be over the period of Ms. Jurkowski's employment. (Jurkowski, Tr. 519–22; UX 3 at 3-4 to 3-7.) There was significant achievement gap in reading and math scores between Black and white students, which led to a lot of dissension within staff and within the parent community about what measures should and should not be taken to close the achievement gap. (Jurkowski, Tr. 519–22, 553.) The school community fought bitterly overusing substantial school funds for a shuttle running the 1-mile

2

between the Peabody and Watkins two elementary school campuses for the benefit of local families who had students at both schools, which tended to be white families. (UX 3 at 3-1.) Black students at Watkins tended to commute from other parts of D.C. outside of Watkins' boundaries, such that a merely 1-mile shuttle was not useful. (UX 3 at 3-2.) This raised serious questions of the equity of spending $1,500 in city funds for each child who uses the shuttle when its benefits were so racially disparate, school funding was constrained, and the achievement gap persisted. (UX 3 at 3-3.) Principal Bell and her supporters were strong proponents of equity and social justice for Watkins' Black families. (UX 3 at 3-3, 3-4.) The resignation of Principal Bell, Black, under pressure that she was responsible for many staff members quitting and the appointment of Principal Berkowitz, white, further fueled tensions. (UX 3 at 3-4; Jurkowski, Tr. 566.) After Principal Bell left, Black parents complained to Ms. Jurkowski, also Black, about inequitable treatment of Black students and Ms. Jurkowski relayed those complaints to the new Watkins administration. (Jurkowski, Tr. 535–37, 540–41, 543–44; UX 8.)

## B.    Principal Berkowitz

Ms. Jurkowski's circumstances worsened quickly when MScott Berkowitz took over as Principal in the last year of her employment. (*See* Jurkowski, Tr. 566.) Principal Berkowitz required the Maker's Space to be dismantled and emptied out by the maintenance staff. (Jurkowski, Tr. 506.) Principal Berkowitz did not allow the clubs to meet during the normal school day. (Jurkowski, Tr. 506.) Because the students really wanted to keep the clubs, Ms. Jurkowski was forced to shift the clubs to before school at 7:30am and arrive to school extra early to accommodate interested students. (Jurkowski, Tr. 506, 510.) However, not all interested students were able to make it to school early enough to continue in the clubs, particularly numerous Black students who had long commutes to school already. (Jurkowski, Tr. 565–66.)

3

Principal Berkowitz also cut down on scheduled class visits to the library, such that each class only now visited the library quarterly. (Jurkowski, Tr. 510, 562–63.) This inhibited students from regularly checking out books to read because they were no longer visiting weekly. (Jurkowski, Tr. 510.) Ms. Jurkowski improvised, allowing students to come between 8:00am and 8:30am to check out books. (Jurkowski, Tr. 510.) Under Principal Berkowitz, Ms. Jurkowski was no longer able to collaborate with teachers on their lesson plans. (Jurkowski, Tr. 554.) In first year that Principal Berkowitz's Vice Principal Mark Boisvert conducted her evaluation, fiscal year 2020-2021, he dropped her score down to a 353 from the previous year's 400. (UX 7.) 400 points is the highest possible score on the IMPACT scale. (UX 7 at 7-7.)

In October 2021, Principal Berkowitz falsely accused Ms. Jurkowski of stealing six iPads belonging to the school. (Jurkowski, Tr. 567, 569; UX 9 at 9-1.) Specifically, Principal Berkowitz claimed that Ms. Jurkowski was keeping the iPads off-campus for her personal use and refused to return them despite four requests by Mr. Boisvert. (UX 9 at 9-2.) Labor Management and Employee Relations (LMER) conducted an investigation of the accusation, which revealed it lacked merit. (Jurkowski, Tr. 567; UX 9.) Despite an LMER report dated November 12, 2021 that exonerated her, DCPS did not bother to provide Ms. Jurkowski with notice that she had been cleared of the accusations until January 21, 2022. (Jurkowski, Tr. 577–78; UX 10.) Ms. Jurkowski never even received notice of which iPads she was specifically accused of stealing until after the investigation concluded. (Jurkowski, Tr. 573.) Dr. Washburn, the Director of Library Media Specialists for DCPS, was able to confirm that all iPads assigned to Watkins were accounted for. (Jurkowski, Tr. 573.) The Maker's Space's iPads, which were not part of Watkins' inventory system, were still being loaned out by Watkins' library to students

4

and staff. (Jurkowski, Tr. 574.) As found by the investigation, they were last loaned out to Vice Principal Boisvert and there was no record that they had all been returned by him. (UX 9 at 9-4.)

C.      December 17, 2021

The school year beginning September 2021 was the students' first full school year back to in-person learning from the COVID-19 pandemic. (Jurkowski, Tr. 587–88.) Having been away from the procedures, processes, and behavioral expectations of in-person school for so long, the students came back rowdier than they previously were. (Jurkowski, Tr. 589.) Ms. Jurkowski, in setting up the library, had specifically designed it with multiple spaces for students to be able to relax. (Jurkowski, Tr. 960.)

On December 17, 2021, Katherine Moxley's third-grade class of 20 students was dropped off by Ms. Moxley at the library. (Moxley, Tr. 71; Jurkowski, Tr. 591–92, 635.) The students came in and sat down on the carpet. (Jurkowski, Tr. 635.) Ms. Jurkowski had to move some of the students around because a few students were touching others or distracting each other. (Jurkowski, Tr. 636–37.) Ms. Jurkowski greeted the students and explained the plan for the day. (Jurkowski, Tr. 636–37.) As seen in the video, sitting on the carpet quickly resulted in some kids lying down, starting to roll around, jumping up to dance, leap frogging, and otherwise physically acting up.  (Jurkowski, Tr. 637, 639; AX 3, Video at 9:39–9:53; 9:58.) As Ms. Jurkowski explained, "there are kids on the carpet who feel really comfortable, but I have to remind them we're not on the playground. But they will roll and do stuff." (Jurkowski, Tr. 637.)

By December 17, Ms. Moxley's students had mostly completed the digital presentations they had been working on in library and Ms. Jurkowski had sent out invitations to families for a viewing, likely to occur after the winter break. (Jurkowski, Tr. 594.) The family event was in flux because Principal Berkowitz had not agreed to it yet. (Jurkowski, Tr. 594.) Ms. Jurkowski

5

explained to students that they could continue to work on their digital presentations or select books to read. (Jurkowski, Tr. 594, 635–36, 638.) Some students asked if they could also talk about Battle of the Books, which was open to third graders for the first time that school year. (Jurkowski, Tr. 595, 638.) Ms. Jurkowski explained that they could talk about Battle of the Books, which would include talking about the basis for debate and negative and affirmative types of questions. (Jurkowski, Tr. 595.) Students offered various topics for the discussion: fire drills in schools, learning styles of high energy kids, things that happened during World War II, and jobs. (Jurkowski, Tr. 595–96, 613, 638, 639, 767.)

Specifically, AM offered fire drills that were "fake" and not necessary. (Jurkowski, Tr. 613, 63, 823.) KT offered raised learning styles, later clarifying that he was interested in jobs and resources for different learning styles. (UX 17 at 14.) TA offered World War II and jobs. (Jurkowski, Tr. 616.) TA had a keen interest in World War II and other wars, as demonstrated by the list of books he checked out from Watkin's library between September 5, 2021 and December 15, 2021. (Jurkowski 599–601, 610; UX 11.) TA, on numerous occasions in library class, had talked about his father's collections of books about World War II and how much TA knew about World War II. (Jurkowski, Tr. 613.) Similarly, TA's digital presentation was about military plans and equipment. (Jurkowski, Tr. 614.) Over the course of multiple classes, Ms. Jurkowski acknowledged his interests and encouraged his interest in his father's books, but gently steered him to the history section of Watkin's library. (Jurkowski, Tr. 613.)

After brainstorming topics, the students brainstormed and discussed on what would be good debate questions. (Jurkowski, Tr. 595–96, UX 17 at 10.) During that discussion, TA persisted with sharing his interests about World War II and Hitler with the class:

> [TA] explained: His father's books about WWII and Hitler were the best books and he learned many things about WWII and Hitler. [TA] said "Hitler's job caused

6

> many people to die and then Hitler committed suicide." In response to Tomas, I stated "Thank you [TA] for sharing those details and I am not sure about things that happened during WWII and how Hitler's life ended, and I am sure your father's books are informative. I reminded students that there are many books and resources that have different ideas about what Hitler did and how Hitler's life ended." Our job is to read more books, and learn different points of view about people, jobs, and how others feel about their jobs." [TA] further described the things that Hitler's job included like trains, camps, showers with gas, ditches that people were placed into, and how people were starved before the Americans came to help."

(UX 17 at 14; Jurkowski 783–84, 786.) This then sparked other students to chime in:

> [A] explained that the showers were dangerous because of the gas." [G] described the trains as being made to carry the people to the ditches." Student [KT] showed that people would dig ditches." I asked students how people felt about the job based on our discussion?" Student [G] said "They were forced to do the job by the boss." Student, [KT] said "That was the job that people could do." Student [A] said "They did not like the job." Students [J, N, T, and K] were not sure how people felt about their jobs." [A] said "It would be a good idea to have more books about jobs and people's feelings about work."

(UX 17 at 15; Jurkowski, Tr. 777, 783–84, 786, 820, 822, 835, 868.) Ms. Jurkowski then jumped in and maneuvered the students to questions of jobs, leadership, and when Americans entered in World War II. (Jurkowski, Tr. 771–80, 789–90; UX 17 at 14.)  At this point, TA became upset about Ms. Jurkowski dismissing his raising how Hitler's life ended. (Jurkowski, Tr. 620, 649, 778, 858). TA then ran behind Ms. Jurkowski's desk. (Jurkowski, Tr. 617, 620, 649). Ms. Jurkowski talked to TA, and then he rejoined everyone and worked with the group nicely to finish the lesson. (Jurkowski, Tr. 617, 620). It was important to Ms. Jurkowski that TA did not feel rejected by her. (Jurkowski, Tr. 778, 858.) Nevertheless, Ms. Jurkowski did not let TA continuously go on talking about Hitler or World War II atrocities. (Jurkowski, Tr. 777.)

Ultimately, the students doing the Battle of the Books activity voted on three debate questions: (1) Why should students be allowed to return to the classroom for personal items during a fire drill?, (2) Why do students with more energy need a different style of learning?, and (3) Why did some people do their job and how did they feel about the work during WWII? (UX

7

17 at 10; Jurkowski, Tr. 595–96, 791, 822–25, 828.) In allowing students to debate the third question, Ms. Jurkowski had intended that students would discuss jobs from World War II like the American President or just typical jobs – teachers, librarians, mayors, professors, parents, or other community members – with regard to good and bad performance. (Jurkowski, Tr. 777, 806–07.) Ms. Jurkowski was trying to give the students some freedom over which jobs they wanted to discuss. (*See* Jurkowski, Tr. 826.)

The students doing the Battle of the Books activity then congregated in pairs or small groups of partners to practice debating any of the questions, with one or more students talking about one side of an argument and the other students talking about the other side of an argument for three questions. (Jurkowski, Tr. 597, 613, 789–99, 827, 943–44; UX 17 at 9.) This exercise involved students talking about society, its policies, and whether additional policies should be adopted and how. (Jurkowski, Tr. 647.) As Ms. Jurkowski explained, debate is not about the notion that both sides of an issue are valid, but about learning how to argue and give reasons for an opinion. (*See* Jurkowski, Tr. 799.) As an overall teaching method, debate is supposed to inspire students to want to gain additional knowledge through reading to be able to better articulate what they are arguing. (Jurkowski, Tr. 800.) As an exercise she picked for December 17, these debate practices were intended to get the third graders interested in joining the debate team that met at 7:30am on Fridays. (Jurkowski, Tr. 827.)

Ms. Jurkowski checked in, listened to the students to see how they were doing, and made sure they were staying on topic with the three questions. (Jurkowski, Tr. 597, 649.) As Ms. Jurkowski walked around the room and listened to the groups arguing the affirmative and negative sides, she did not see or hear anything disturbing. (Jurkowski, Tr. 620, 641–43, 659, 857.) Ms. Jurkowski did not hear mention of World War II in the small groups. (Jurkowski, Tr.

8

813.) Ms. Jurkowski did not hear TA talk about Hitler or World War II in the small groups. (Jurkowski, Tr. 834–35, 856–57.)

During the debate practice, the students were playful and freely moving about the room. (Jurkowski, Tr. 640, 781, 995.) To the extent that the students are still actively listening and participating, Ms. Jurkowski does not interfere just to correct their posture or stop students playing: "As long as I don't see them hurting each other or doing anything weird, then I don't, you know, I don't need to interrupt their conversation of how they have their conversation about it, unless it sounds inappropriate." (Jurkowski, Tr. 640.) Some students were goofing around in other ways or making noises, which Ms. Jurkowski allowed so long as the students were generally discussing the questions and not hurting each other. (Jurkowski, Tr. 645–46, 661–62, 781, 802.) When asked about a student that was hopping, Ms. Jurkowski explained, "Yeah, that's my energy guy, little K." (Jurkowski, Tr. 659; AX 3, Video at 9:55–9:56.) Ms. Jurkowski's priority was keeping the students interested in debate. (*See* Jurkowski, Tr. 646, 649.)

Conversely, if students got off track or did not seem to have much to say, Ms. Jurkowski tried to come by and ask questions to re-engage them. (Jurkowski, Tr. 655, 658–59.) Likewise, if students started espousing ideas that were counter to safety, Ms. Jurkowski redirected them. (Jurkowski, Tr. 779.) This happened both in the case of TA initially, but also with the topic of fire drills when Ms. Jurkowski emphasized that it was indeed unsafe for students to go back into a building where a fire alarm was ringing to get a pet or toy. (Jurkowski, Tr. 779.)

When some students finished their debate earlier than the rest, some moved about the room, including towards the end of the room where the tables are, or towards the front of the room by the door. (Jurkowski, Tr. 850.) The students moving throughout the library was not a problem. They were free to get books from around the library and read, or hang out and chat,

9

until Ms. Jurkowski finished with all the students. (Jurkowski, Tr. 851, 947.) Ms. Jurkowski had

wanted to move the students on to a second level of debate, but ran out of time. (Jurkowski, Tr.

852.)

When the class period with Ms. Moxley's class ended, her students left the library and a

fourth-grade class came for the next class period. (Jurkowski, Tr. 621.) Later that same day, Ms.

Jurkowski saw Ms. Moxley at about 1pm when Ms. Jurkowski stopped by to give her a little

yellow sticky for A to indicate that A had too many books already checked out to check out

more. (Jurkowski, Tr. 623.) At no time during that encounter or the rest of that day did Ms.

Moxley indicate to Ms. Jurkowski any concern about what the students did during library class.

(Jurkowski, Tr. 625.)

### D.    Surprise Accusations

Ms. Jurkowski did not instruct Ms. Moxley's class to reenact scenes of violence having to

do with the Holocaust or any part of World War II, or otherwise reenact the Holocaust or any

part of World War II. (Jurkowski, Tr. 618, 620, 663–64). At no time did Ms. Jurkowski say the

word "Holocaust" or hear a student say the word "Holocaust." (Jurkowski, Tr. 862.)

As seen in the video, the class is very playful. (Jurkowski, Tr. 648, 995.) No one looks

scared or uncomfortable or fearful of participating. (Jurkowski, Tr. 648–49.) Ms. Moxley's class

generally seemed happy. (Jurkowski, Tr. 857.) Ms. Jurkowski bears no ill-will against the Jewish

community and has Jewish family members in her ancestry. (Jurkowski, Tr. 698.)

In the evening of December 17, 2021, Ms. Jurkowski was at home checking her work

email when she saw a message to staff from Principal Berkowitz stating, "Today we received a

report that students in Ms. Moxley's 3rd grade class were asked to re-enact the Holocaust as part

of their library time." (Jurkowski, Tr. 665, 668; UX 12 at 12-2.) The email did not refer to Ms.

10

Jurkowski by name, but as Watkins' only librarian, it would have been well known to the school community that the email was identifying her. (Jurkowski, Tr. 665, 677; UX 12 at 12-2.) Principal Berkowitz circulated a different email to parents of the whole school, stating "we received a report of a classroom of students receiving a lesson that included portraying different perspectives of the Holocaust... Additionally, there were allegations of a staff member using hate speech during the lesson, which is unacceptable and not tolerated at our school." (Jurkowski, Tr. 679; UX 12 at 12-3.)

Neither Principal Berkowitz, nor anyone else from Watkins, contacted Ms. Jurkowski to verify the facts or get her side of the story prior to circulating the emails that evening. (Jurkowski, Tr. 678, 681–82; UX 12.) As longtime WTU Field Representative Charles Moore testified, it was highly unusual for DCPS to publicly issue a statement to the community identifying the subject of an allegation before such investigation has even concluded. (Moore, Tr. 353–54.) Mr. Moore has been representing WTU members for over 50 years. (Moore, Tr. 392.)

That same evening, reporters started calling Ms. Jurkowski asking about the incident alleged in Principal Berkowitz' emails. (Jurkowski, Tr. 678, 682; UX 13 & 14.) Ms. Jurkowski does not know how the reporters got her name or her personal phone number. (Jurkowski, Tr. 678.) The claim that Watkin's librarian required students to reenact the Holocaust and engage in hate speech was picked up the national press within days of December 17, 2021 and well before the DCPS investigation concluded in February 2022. (UX 1; JX 5.)

### E. Termination and Impact

That same day on December 17, 2021, DCPS placed Ms. Jurkowski on administrative leave pending investigation. (JX 4.) On February 14, 2022, DCPS informed Ms. Jurkowski that she would be terminated effective March 8, 2022 for "Violations of 5-E DCMR Section 1401.2

11

(b) Grave Misconduct; and 5-E DCMR Section 1401.2 (v) Other Conduct During and Outside of Duty Hours That Would Affect Adversely the Employee's or the Agency's Ability to Perform Effectively." (JX 5.)

By the termination, Ms. Jurkowski lost her livelihood, which has negatively impacted her family finances. (Jurkowski, Tr. 691.) The media attention that Principal Berkowitz's email drew has further adversely impacted Ms. Jurkowski and her family. The Jurkowski family has received threats of violence from people claiming to know who they are and where they live. (Jurkowski, Tr. 691, 697.) As Ms. Jurkowski testified, "It's been one of the hardest things in my life... we're all struggling, and we continue to struggle each day. It is a true hardship." (Jurkowski, Tr. 692.) She and her children have stopped going to large public spaces out of fear that they will be attacked. (Jurkowski, Tr. 692–93.)

### F.    Testimony about December 27, 2021 at the Arbitration Hearing

#### 1.  Ms. Moxley and the Written Statements

Ms. Moxley testified that when she picked the students up from Ms. Jurkowski on December 17, 2021, she lined the students up in the hallway and noticed that the students didn't have books in their hands. (Moxley, Tr. 17.) Ms. Moxley asked the class what they did in library, to which students responded that they put on a play. (Moxley, Tr. 17.) Ms. Moxley asked what the play was about and MT responded that it was about Hitler. (Moxley, Tr. 17.) Students went on to tell her about particular roles that they played as the class walked down the hallway. (Moxley, Tr. 17, 32.)

The class then entered Ms. Moxley's classroom and she had everyone sit down. (Moxley, Tr. 17.) Ms. Moxley "gave everyone a piece of paper" and "asked them to write down what happened during library class." (Moxley, Tr. 17.) She then collected their papers and brought

12

them downstairs to Principal Berkowitz. (Moxley, Tr. 17–18, 32.) Principal Berkowitz asked to speak to the students individually. (Moxley, Tr. 73.) Ms. Moxley asked which students felt comfortable doing that, several students raised their hands, and Mr. Berkowitz had private conversations with those students. (Moxley, Tr. 73–74.)

Ms. Moxley's testified that Agency Exhibit 1 consists of 16 separate written statements, of which she could identify 14 as belonging to specific students in her class. (Moxley, Tr. 47–57.) Ms. Moxley offered no explanation of why 4 students did not produce written statements of what they did in library class when she instructed all 20 students to write down what happened during class. Ms. Moxley also never testified that Agency Exhibit 1 consisted of all written statements she received or collected from her class that day.

The written statements at Agency Exhibit 1 describe a play involving World War II, Hitler, guns, shooting, playing dead, gas chambers, ditch diggers, Pearl Harbor, France, and Russian soldiers. (AX 1.) In some of the written statements, students specifically identify roles they or classmates played, including Hitler, the president, dead person, judge, general, ditch digger, and "gas chamber person." (AX 1.) None of the written statements use the terms Ms. Jurkowski, librarian, or library, or otherwise indicate that this was an event that occurred in the library or that Ms. Jurkowski directed the students to engage in this conduct. (*See* AX 1.)

### 2. **AM**

At the time of the arbitration hearing on April 4, 2023, AM was 10 years old. (AM, Tr. 80.) AM testified Ms. Jurkowski taught her class about World War II and what Hitler did to people and made them "act out all of the things that he did and like we all had like jobs and like you had to act out the roles," including digging holes, pretending to be dead, or being buried. (AM, Tr. 81–82, 84.) AM testified that Ms. Jurkowski specifically instructed her to act the gas

13

showers. (AM, Tr. 83.) AM testified that Ms. Jurkowski told the class not to tell their parents or teachers because Ms. Jurkowski would get in trouble. (AM, Tr. 84–85.)

AM testified that Ms. Moxley instructed the class, "you can write anything down… just write down what happened and like you're not in trouble." (AM, Tr. 85–86.) AM "did write down some stuff, but not a lot." (AM, Tr. 86.) However, there is no written statement from AM entered into evidence by DCPS. (AX1.) DCPS did not ask AM to identify which written statement was hers from Agency Exhibit 1. (AM, Tr. 86.) Ms. Moxley, in identifying the student statements, did not ascribe a statement to AM. (Moxley, Tr. 47–57.)

In addition to talking to her parents about what occurred, AM had 2-3 prior conversations with DCPS's attorney to prepare for the arbitration hearing, all which her parents also attended. (AM, Tr. 101, 105.) Her parents were watching her give the testimony in the arbitration hearing from the same room. (AM, Tr. 101.) At the prior Step 2 hearing where AM testified, Mr. Moore cross-examined AM and asked her if she could see what was happening on the floor of the library and AM stated repeatedly that she could not. (Moore, Tr. 376–77, 380, 385, 388.) At that Step 2 hearing, she explained her lack of a view to the library rug area by testifying that she was behind a tall bookcase. (Moore, Tr. 376–77, 380, 385.) At the arbitration hearing, AM testified that she was behind a bookcase, but testified in detail about activities she saw happening across the library floor from her vantage point. (AM, Tr. 90–92.)

Mr. Moore testified that he witnessed AM receiving coaching from both her parents during her testimony at the virtual Step 2 hearing. (Moore, Tr. 381–82.) Specifically, he noticed AM's parents whispering to AM. (Moore, Tr. 384–85.) Mr. Moore brought this to the attention of the Hearing Officer, who stopped the hearing to have a conversation with AM's parents. (Moore, Tr. 382, 386.) When the hearing resumed, the coaching of AM ceased. (Moore, Tr. 382.)

14

Eric Miller, the father of AM, admitted that he was present in the same physical space with AM when she testified at the virtual Step 2 hearing via Teams in August 2022. (Miller, Tr. 713.) He denied speaking during the Step 2 hearing and speaking to AM during the Step 2 hearing. (Miller, Tr. 713.) He made no denial of generally coaching AM's testimony in advance of the hearing and he made no denials of his wife coaching AM's testimony during or in advance of the hearing. (Miller, Tr. 713, 717.) DCPS did not ask Mr. Miller to identify AM's written statement with Agency Exhibit 1. Mr. Miller offered no explanation for why AM's written statement is missing from Agency Exhibit 1.

### 3. MT

At the time of the arbitration hearing on April 4, 2023, MT was 9.5 years old. (MT, Tr. 108.) MT testified that Ms. Jurkowski made her class reenact the Holocaust, specifically telling the class, "we're going to reenact the Holocaust." (MT, Tr. 110.) Ms. Jurkowski told MT to become president and act like the president. (MT, Tr. 111.) MT did so by "going to meetings and make speeches about what we were going to do with the situation." (MT, Tr. 111.) MT testified that "the whole class had like a role. So, there were some kids being chambers – gas chambers, others acting like they were getting shot, and one kid was actually Hitler." (MT, Tr. 111.) MT testified that Ms. Jurkowski told the students to "act like they were building gas chambers or tell other kids to act like they were getting shot and some kids even were shooting other children." (MT, Tr. 113.) MT testified that Ms. Jurkowski told the student playing Hitler to go behind a desk and act like he was killing himself. (MT, Tr. 114.) Then Ms. Jurkowski was going to debate MT about "what happened on January 6th, but then we ran out of time and we went to class." (MT, Tr. 114–15.) MT testified that Ms. Jurkowski told the class not to tell their parents. (MT, Tr. 115.)

MT testified that Ms. Moxley "asked us what we did in library and we told her what happened. After that, when we got to the classroom, she made us write down what happened, dropped us off in another classroom, and gave the papers to the teacher." (MT, Tr. 116.) MT wrote down a list of student names and the roles they played. (MT, Tr. 116; AX 1 at 21.)

MT testified that the Holocaust reenactment on December 17, 2021 was not the first instance of Ms. Jurkowski asking the class to engage with the Holocaust. "A couple weeks before" or three library classes prior to the Holocaust reenactment in December 2021, "we did a debate on if the Holocaust was good or bad" that mostly consisted of "two other kids." (MT, Tr. 111–13.) In that debate, Ms. Jurkowski told them not to tell their parents and "it wasn't Hitler's fault, but she said that she's acting it out to get both side's perspectives." (MT, Tr. 112.)

MT had talked to Ms. Moxley, his parents, "our side's lawyer," and DCPS attorney Ms. Bellamy about the alleged incident. (MT, Tr. 124–26.)

Like AM, MT also gave prior testimony on the alleged incident. (MT, Tr. 126, AX 4 at 3.) Per the Hearing Officer's Step 2 Opinion & Award, MT and AM "were a little unclear on some of the details involved," but specifically testified that Ms. Jurkowski told the class that Hitler hurt people because he "had a bad Christmas." (AX 4 at 4.) Conversely, at the arbitration hearing, MT and AT were well-prepared to testify as to the details, but now made no mention of Ms. Jurkowski telling them that Hitler hurt people because he "had a bad Christmas." Mr. Moore similarly testified that during his cross-examination of AM and MT at the Step 2 Hearing, he asked them to identify in the video footage the students engaging in the different aspects of reenactment alleged – digging ditches, shooting people, loading people into trains, and gas chambers. (Moore, Tr. 380–81.) Neither AM nor MT could identify those activities in the video footage. (Moore, Tr. 380–81.) Conversely, at the arbitration hearing, MT and AT were well-

16

prepared to identify classmates performing these specific acts in the video footage. (AM, Tr. 89–94; MT, Tr. 118–23.)

### G.    The Jared Capatano Case

WTU President Jacqueline Pogue Lyons testified regarding her work, prior to August 2016, as WTU Field Representative, and between August 2016 and April 2021 as General Vice President. (Lyons, Tr. 240–41.) As a Field Representative, President Lyons advised teachers on challenges they were having in schools, filed grievances, advocated for teachers at Step 2 hearings, and supported teachers in certification and professional development (Lyons, Tr. 241.) In here capacity as a General Vice President, President Lyons supervised the work of the WTU Field Representatives. (Lyons, Tr. 245.)

During her time as General Vice President, President Lyons supervised a grievance filed on behalf of Jared Catapano, a white fifth-grade teacher at Lafayette Elementary School. (Lyons, Tr. 246.) President Lyons knew Mr. Catapano and his circumstances well, as he was also a member of WTU's Executive Board and a member of WTU's bargaining team. (Lyons, Tr. 247.) DCPS investigated Mr. Catapano for a lesson plan about the Civil War and slavery that ultimately resulted in students reenacting slavery where the Black students in the class were made to be the slaves and also to drink from water fountains that were labelled as segregated. (Lyons, Tr. 249, 252, UX 5 at 5-1.) Students complained about the lesson to their parents, who complained about it to the school administration, which conducted an investigation. (Lyons, Tr. 249–50, 276; UX 4.) Outrage over the event spread quickly through the local and national press. (Lyons, Tr. 251–52, 276; UX 5.) Two other teachers planned the original lesson and curriculum with Mr. Catapano, but the incident happened only in his class. (Lyons, Tr. 253.)

WTU represented Mr. Catapano in the DCPS investigation. (Lyons, Tr. 258–59.) Following the investigation that substantiated the occurrence of the incident, DCPS chose not to discipline Mr. Catapano and only required him to take sensitivity training via a professional development webinar by a certain date. (Lyons, Tr. 271, 277; UX 6.) DCPS's letter of April 14, 2020 directing Mr. Catapano to complete the sensitivity training states, "Although no disciplinary action is being taken against you, DCPS remains concerned about the judgment exercised in the incident in question." (UX 6 at 6-1.) Further:

> When assigning the "A Nation Divided" curriculum and permitting students to do a reader's theater script, tableaux, or podcast, there was no anticipated response for students' reactions to the new way this material would be presented. Had this material been planned with an appropriate anticipated response, it would have ensured that you would have been made aware of, and able to respond to, students' discomfort after being asked to play the role of slaves. It is expected that moving forward, you will be more thoughtful in the planning of your lessons and implement anticipated response model with fidelity.

(UX 6 at 6-1.)

## ARGUMENT

### I.    DCPS TERMINATED MS. JURKOWSKI WITHOUT JUST CAUSE.

"Just cause" is a term of art in collective-bargaining agreements. It consists of a number of substantive and procedural elements. Primary among its substantive elements is the existence of sufficient proof that the employee engaged in the conduct for which she or he was disciplined. "Other elements include: (1) the degree to which the violation affects the employer's operation; (2) whether the employee has been disciplined for offenses of a like nature in the past, and, if so, the number of such instances; (3) the lapse of time since the last offense of a like nature for which the employee was disciplined; (4) that the employee know or reasonably could be expected to know ahead of time that engaging in a particular type of behavior would likely result in discipline; (5) that there be a reasonable relationship between an employee's misconduct and

18

the punishment imposed; and (6) that similarly situated employees be treated similarly and disparate treatment be avoided." *Union v. Employer*, 151659-AAA, [Number redacted], 2014 BNA LA Supp. 151659 (Feb. 28, 2014) (Pye, Arb.) (Ex. 1).

### A.    DCPS Has Failed to Meet Its Burden of Proof to Demonstrate Just Cause.

The quantum of evidence that arbitrators apply in ordinary discipline and discharge cases is "preponderance of the evidence." *See* Elkouri & Elkouri, *How Arbitration Works*, Ch. 15.3.D.ii Quantum of Proof (Kenneth May et al. eds., 8th ed. 2020) (excerpts attached as Ex. 2). However, in cases where the employee's alleged offense constitutes a serious breach of law or an act of moral turpitude or social stigma that would ruin an employee's reputation, arbitrators apply a "clear and convincing evidence" or similarly high standard. *Id.* As both the widespread media coverage of Ms. Jurkowski's alleged offense and the death threats against Ms. Jurkowski and her family that followed from it indicate, Ms. Jurkowski is charged with act of moral turpitude and social stigma likely to ruin an employee's reputation. (UX 2.)  Accordingly, given the gravity of the circumstances, DCPS should be held to the "clear and convincing evidence" standard of proof. Nevertheless, whether under a "preponderance of the evidence" or "clear and convincing evidence" standard, DCPS has failed to establish just cause.

### 1.    The testimony of two students of 20 is insufficient to establish just cause here.

The testimony of two students of 20 is insufficient to establish just cause here. It is well established in arbitration that the failure of a party to call an available witness gives rise to a presumption that the witness's testimony would be adverse to the position of the party that could have called him. *Discipline & Discharge in Arbitration*, Ch. 12.II.D (Norman Brand & Melissa H. Biren eds., 3d ed. 2015) (excerpts attached as Ex. 3);  *In re Tate & Lyle, N. Am. [Lafayette, Ind.] & Int'l Bhd. of Teamsters, Loc. 1070*, FMCS Case No. 140523/66195-3, 136 BNA LA 316

(Nov. 18, 2015) (Goldstein, Arb.) (Ex. 4) ("In instances in which a party can call witnesses which presumably would testify favorably for that party and the party does not call them, the opposing party is entitled to a presumption that the missing witnesses would have testified adversely."); *Union v. Employer*, 165768-AAA, [Number redacted], 2014 BNA LA Supp. 165768 (July 16, 2014) (Attardo, Arb.) (Ex. 5). This presumption is well-established and widely accepted across both civil and criminal litigation, and even often included in model jury instructions. *See e.g.*, *Huthnance v. District of Columbia*, 722 F.3d 371, 382 (D.C. Cir. 2013) (Ex. 6); *Hoverter v. Dir. of Patuxent Inst.*, 231 Md. 608, 609 (1963) ("[I]t is well settled that failure of a party to produce an available witness who could testify on a material issue, if not explained, gives rise to an inference that the testimony would be unfavorable, and is a legitimate subject of comment by counsel in an argument to the jury.") (Ex. 7)[3]

Here, DCPS avers that 20 students in Ms. Moxley's class all witnessed and were made subject to Ms. Jurkowski's misconduct, but DCPS only offers the testimony of 2 students. DCPS has offered no evidence that the other students were unavailable to testify. DCPS has offered no evidence that it even made any good faith efforts to have any of 90% or 18 missing eyewitnesses testify at the arbitration hearing, including affirmatively seeking parental consent for the minor witnesses to testify at the hearing.

Even in the context of adults, testimony by only 2 of 20 available eyewitnesses to an alleged event raises red flags. This is more so the case when the testimony is from children, who

---

[3]    *See also* Instruction No. 2.080 Unexplained Failure to Produce Important Witness, Virginia Model Jury Instructions – Civil (23, March 2023) ("If you believe that a party, without explanation, failed to call an available witness who has knowledge of necessary and material facts, you may, but are not required to, infer that witness's testimony would have been unfavorable to the party who failed to call the witness."), *available at* https://www.vacourts.gov/courts/circuit/resources/model_jury_instructions_civil.pdf.

are acknowledged to have more difficulty with testifying truthfully. As explained by the U.S. Supreme Court in *Kennedy v. Louisiana*, "[s]tudies conclude that children are highly susceptible to suggestive questioning techniques like repetition, guided imagery, and selective reinforcement. 554 U.S. 407, 443 (2008) (*citing* Stephen J. Ceci & Richard D. Friedman, *The Suggestibility of Children: Scientific Research and Legal Implications*, 86 Cornell L. Rev. 33, 47 (2000)) (Ex. 8). The District of Columbia Court of Appeals has likewise found that while "researchers disagree on the degree to which children can be influenced by such conduct, most studies have concluded 'that young children are more susceptible than older individuals to leading questions and pressures to conform to the expectations and desires of others.'" *In Re Jam.J. & Jas.J.*, 825 A.2d 902, 915 n.7 (D.C. 2003) (*citing* Stephen J. Ceci & Richard D. Friedman, *The Suggestibility of Children: Scientific Research and Legal Implications*, 86 Cornell L. Rev. 33, 47 (2000)) (Ex. 9).

In *The Suggestibility of Children: Scientific Research and Legal Implications*, the comprehensive review relied on by both the U.S. Supreme Court and District of Columbia Court of Appeals, the authors explain the many different issues researchers have identified that interfere with the truthful testimony of children: children's desire to conform their narrative to their own expectations of what was supposed to happen; children's desire to conform to the expectations or pressures of an interviewer; children's answers to repeat questions are often characterized by exactness and confidence, regardless of their accuracy level, such that a repeated erroneous response become incorporated into a child's memory; children are more suggestible in groups than when alone; children are more likely to remember their answers to earlier questions than the underlying events themselves; when asked to freely recall an event, children usually give correct but very brief answers, and they often omit important details;

21

directed and focused questioning of children, such as leading and repeated questions, can elicit important missing details but the method leads to suggestibility; younger children lack the capacity to interrogate the workings of their own memory. 86 Cornell L. Rev. at 40–41, 45–46, 52 (excerpts attached as Ex. 10). One of the greatest challenges in this area is that because a child's free recall of any event typically leads to such sparse information, investigators purposefully use leading and repeated questions to elicit new factual details in furtherance of the investigation. 86 Cornell L. Rev. at 45–46 (Ex. 10).

Conversely, leading and repeated questions can have a significant tendency to suggest to children the answers expected of them and alter their narrative. 86 Cornell L. Rev. at 37 (Ex. 10). As explained in *Why Children's Suggestibility Remains a Serious Concern*, Amye R. Warren & Dorothy F. Marsil, 65 Law and Contemporary Problems 125 (2002) (Ex. 54), suggestiveness takes many forms that can seem innocuous to the untrained adult: bias-causing reinforcement (e.g., an interviewer praising a child's memory after he or she answers "yes" to a leading question or encouraging the child to try harder if he or she answers "no"); invitations to speculate (e.g., "Do you think maybe that X happened?"); "option-posing" or "forced-choice" questions that frame the acceptable responses as limited (e.g., "Did you suggest doing that or did she suggest doing that?"). Add to all these scientific findings the well-established recognition that a child cannot be expected to appreciate fully the significance of testifying under oath or the risk of punishment for perjury. *See, e.g., State v. Meyer*, 135 Iowa 507, 113 N.W. 322, 323 (1907) (Ex. 11).

Accordingly, in the universe of young children, the reliability and truthfulness of testimony cannot be taken for granted. Here, the testimonies of the two students here have undeniable credibility problems. AM claimed that she produced a written statement in response

22

to Ms. Moxley's instruction, but no such written statement exists within Agency Exhibit 1. DCPS made no effort to identify AM's written statement through Ms. Moxley, AM, or AM's father. The only possible conclusions to be drawn from this obvious omission is that either AM's recollections of December 17, 2021 are erroneous, or DCPS is strategically withholding AM's statement from this proceeding because it does not conform to AM's testimony. Mr. Moore's testimony that AM's parents were whispering to and coaching her during her testimony at the Step 2 hearing further casts doubt on why AM's written statement is missing if she is certain she drafted one. (*See* Moore, Tr. 381–82.)

MT claimed that December 17, 2021 was in fact not the first time Ms. Jurkowski had taught the class about the Holocaust, as she had similarly instructed the class to debate the pros and cons of the Holocaust on prior occasion. According to MT, on that occasion, Ms. Jurkowski allegedly claimed that Hitler was not at fault for the Holocaust and instructed the class not to tell their parents or teachers about the debate. Yet, despite DCPS's extensive investigation into Ms. Jurkowski's conduct with Ms. Moxley's class, any claim of a second instance of library class where Ms. Jurkowski had the students inappropriately engage with Holocaust or World War II content was clearly not substantiated or DCPS would have brought forward such evidence.

Further, the testimony of both AM and MT has visibly evolved over time. As both the Hearing Officer Opinion and Award found and Mr. Moore testified, AM and MT were able to give few clear details at the Step 2 hearing in August 2022 about Ms. Jurkowski instructing the class to reenact the Holocaust. (AX 4 at 4; Moore, Tr. 376–77, 380, 385.) AM admitted then that she could not even see what her classmates were doing on the library floor because she herself was behind a tall bookcase. (Moore, Tr. 376–77, 380, 385.) Neither AM nor MT could identify the specific acts of digging ditches, shooting people, loading people into trains, and gas

chambers in the video footage. (Moore, Tr. 380–81.) Yet, by the time of the arbitration hearing eight months later in April 2023, AM and MT inexplicably had many more details of what they saw and could now identify the same acts in the video footage. (AM, Tr. 89–94; MT, Tr. 118–23.) This sudden shift in being able to provide more and new details is not easily explained away. In the normal course, witnesses' recollections generally do not improve with the passage of time.

Thus, the testimony of AM and MT is not so clear and credible that it can be reasonably relied on alone. Two of 20, or 10%, is within the range of incorrect answers identified in a study of children's reliability – 16% for the six-to-ten-year-olds, and 9% for the eleven-to-fifteen-year-olds. 86 Cornell L. Rev. at 50. Further, DCPS's case here gives no assurance that any safeguards were taken here to avoid coaching or preserve the impartiality of the students' testimony. *See* 86 Cornell L. Rev. at 58–59 (recommending video recordings be taken when a child witness is interviewed as an easy method to show no coaching occurred) (Ex. 10).

The student witnesses here had already been through numerous repetitions of questioning and likely selective reinforcement of certain answers – Ms. Moxley, Principal Berkowitz, their parents, the investigators, the testimony in front of the hearing officer, and several preparation sessions with DCPS's attorneys. (*See* Moxley, Tr. 69–70, 73.) Moreover, these inquiries repeated and continued over the course of years – December 2021 to April 2023 – and AM and MT would have been as young as 8 and 9 when they started. It is doubtful that a child can be questioned about a single event so many times over the course of years and not pick up on the responses that the adults are seeking to hear or interested in. Ms. Jurkowski testified that Ms. Moxley's students spontaneously started discussing Hitler and World War II in library class based on TA's repeatedly bringing up the subject because of his personal interest. It is not difficult to see how,

24

over the course of repeated leading questioning by adults, two impressionable children's version of the events could have been shaped from a short student-led discussion of a historical event to a claimed reenactment of such historical event.

Certainly, there are difficult cases in this world where a child alleges abuse by an adult, there are no other witnesses beyond the adult, and fact finders are in the difficult position of determining how reliable a child's disputed testimony is. That is not this case. In this case, there were 20 eyewitnesses. If all 18 students were shown to be unavailable, there were also multiple DCPS's investigators – former law enforcement officers – who personally interviewed Ms. Moxley's class and over whom Principal Berkowitz likely has no authority. (*See* Thompson, Tr. 181–82.) DCPS omits all those witnesses from its case and proffers only two students whose testimony poses serious credibility problems. DCPS must actually satisfy its burden of proof to demonstrate just cause in this disputed case. It cannot simply rely, as it seems to, on the fact that Mrs. Jurkowski has already been tried in a court of public opinion because DCPS gave numerous press statements before even concluding an investigation.

Accordingly, given the circumstances here, the testimony of the two students is not sufficient to establish just cause.

### 2. The written statements do not support a finding of just cause.

The 16 written statements do not support a finding a finding of just cause. First, the written statements do not meet any standard for admissible hearsay. DCPS has wrongly claimed that the written statements are present sense impressions. A present sense impression must be made both spontaneously and contemporaneously with the events described. *Hallums v. United States*, 841 A.2d 1270, 1277–78 (D.C. 2004) (Ex. 12); *Healthbridge Mgmt., LLC v. NLRB*, 672 F. App'x 1 (D.C. Cir. 2016) (Ex. 13). Here, neither requirement is satisfied. The students did not

act spontaneously. Ms. Moxley, AM, and MT all unambiguously testified that Ms. Moxley instructed the students to write the statements after the students had left the library and returned to the classroom. (Moxley, Tr. 17; AM, Tr. 86; MT, Tr. 116.) Likewise, the written statements were not made contemporaneously with the events purportedly described therein, without interruption and interference. Ms. Moxley testified that she first discussed with her students what happened in the library class and only then asked them to write the statements. (Moxley, Tr. 17, 32.) She testified that talking in the hallways while transitioning between classes is usually not allowed at Watkins, but she spoke with her students about library class the entire time they walked back to her classroom. (Moxley, Tr. 32.)

Second, the written statements should be given little weight because they are contradicted by evidence which has been subject to cross-examination. Hearsay evidence is to be given little weight if contradicted by evidence which has been subject to cross-examination. *See Howell Refining Co.*, 27 BNA LA 486, 492 (Nov. 5, 1956) (Hale, Arb.) (Ex. 14); *In re Borden Co.*, 20 BNA LA 483, 484 (Feb. 12, 1953) (Rubin, Arb.) (Ex. 15). Here, Ms. Jurkowski's testimony contradicts the written statements to the extent that they purport to describe library class on December 17, 2021. Relatedly, the WTU has had no opportunity to cross-examine the 15 students whose written statements DCPS asks the Arbitrator rely on. Only MT both identified her statement and was available for cross-examination. Further, the written statements are also not fully legible – consistent with the handwriting of 3rd graders. (*See* AX 1.) It would be patently unfair to hold against Ms. Jurkowski hearsay that not only was not subject to cross-examination, but cannot even be fully deciphered.

Third, the written statements do not support any factual conclusion involving Ms. Jurkowski's conduct. By on their plain language, no statement makes any mention of Ms.

Jurkowski, the librarian, or the library. (*See* AX 1.) All 16 statements describe an event that could have just as easily happened at recess, on the playground, in a different class, with a different adult, or with no adults present at all. (*See id.*) AM and MT testified that Ms. Jurkowski played a large and significant role in the reenactment – instructing each student what they were to do in the Holocaust reenactment play. (AM, Tr. 81–84; MT, Tr. 110–13.) The written statements do not support this. Not one of the 16 written statements ascribe any role or conduct to Ms. Jurkowski, or otherwise connect her to the events described therein. (*See* AX 1.)

For all these reasons, the written statements do not support a finding of just cause.

### 3. The video footage does not support a finding of just cause.

The video footage does not support a finding of just cause. The video footage shows Ms. Moxley's students moving around a lot and taking advantage of the fact that they are not being required to quietly sit at desks. The physical actions that Ms. Moxley's students are seen taking are not consistent with what DCPS claims the Holocaust reenactment consisted of: ditch digging, executions, gas showers, and Hitler's suicide. The video show students occasionally running, leapfrogging, hopping, skipping, waiving their hands around, swinging their arms, knocking knees together, kicking the air, dancing, play fighting, switching seating surfaces, rolling around on the carpet, stretching, and crawling. (AX 3, Video 9:36–10:15).

The fact that this is just a video of Ms. Moxley's class being children is made evident when it is compared to the next class that comes in at 10:25am, a fourth-grade class. (Jurkowski, Tr. 621.) Between 10:25am and 10:31am, the students meet with Ms. Jurkowski on the carpet and they similarly exhibit the movements of young children: dancing, walking, jumping, moving between seating surfaces, lying down on the carpet, rolling, spinning in a chair, and covering their heads with their arms and bowing their heads to the carpet. A majority of students then go

27

off to work at computers. A few students remain on the carpet, where they put their hands on each other and start play fighting (AX 3, Video 10:33:52–10:32:55) until Ms. Jurkowski comes over to them. Later, a student is laying down on the carpet examining reading material and swinging, first, his legs, and then, his arms, in the air. (AX 3, Video 10:41–10:43).

Accordingly, the video footage does not support a finding of just cause.

### B.    The Capatano Case Further Shows that DCPS Lacked Just Cause to Terminate Ms. Jurkowski.

The record evidence of the Jared Capatano case shows that DCPS lacked just cause to terminate Ms. Jurkowski. "Arbitrators agree that just cause is based on the principle that an employer must apply well established work rules in a fair and even-handed manner, and that an affected employee has adequate notice of the rules and the consequences of a failure to follow them." *Clark County*, 139 BNA LA 1055, 1060 (July 31, 2019) (Latsch, Arb.) (Ex. 16). *See also* Elkouri & Elkouri, *How Arbitration Works*, Ch. 15.3.F.Xiii (Kenneth May et al. eds., 8th ed. 2020) (excerpts attached as Ex. 2) (quoting a decision explaining, "there must be reasonable rules and standards of conduct which are consistently applied and enforced in a nondiscriminatory fashion… thus all employees who engage in the same type of misconduct must be treated essentially the same").

Mr. Capatano's case and Ms. Jurkowski's case share the same nexus of key facts: between 2020 and 2021, a teacher was accused of making elementary school students reenact violent and disturbing historical events, students were deeply upset by the experience, the school community was outraged, the incident received a lot of negative publicity in the national press that embarrassed DCPS, and the DCPS investigation concluded the alleged incident was substantiated. Yet, DCPS did not discipline Mr. Capatano and DCPS issued Ms. Jurkowski the most severe possible discipline – termination. DCPS has offered no evidence of any new,

28

intervening disciplinary policy that would justify the extreme difference in discipline despite the same type of misconduct. Accordingly, DCPS's failure to treat all employees who engage in the same type of misconduct the same with regard to the severity of discipline Shows that DCPS lacked just cause to terminate Ms. Jurkowski.

## II.    MS. JURKOWSKI SHOULD BE REINSTATED WITH MAKE WHOLE RELIEF DATING BACK TO THE DATE OF HER TERMINATION.

"Arbitrators uniformly hold that an employee who is discharged without just cause is entitled to a 'make whole' remedy." *See Discipline & Discharge in Arbitration*, Ch. 13.I (Norman Brand & Melissa H. Biren, eds., 3d ed. 2015) (excerpts attached as Ex. 3). The purpose of this remedy is to "place the employee in the same position that she would have been in if the improper discipline had not occurred." *Id.* Given DCPS's lack of just cause to terminate Ms. Jurkowski, the Arbitrator should follow these well-established principles and award Ms. Jurkowski a standard remedy of (1) reinstatement with full seniority and credit for her Doctorate, and (2) "make whole" relief, which includes lost earnings and benefits from the period of her termination until her reinstatement (less interim earnings), interest, a tax gross-up, attorney's fees, and any reasonable and foreseeable damages from her termination.

### A.    *Backpay and Value of Lost Benefits*

A "make whole" remedy is defined as follows: "[t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–19 (1975) (Ex. 17). Arbitrators frequently recognize that, to achieve this goal, the employer must provide more than lost base wages. As described in a leading treatise, arbitrators have "exercised their broad discretion to restore the status quo ante by taking a wide range of remedial actions, including… awarding lost bonuses, wage increases, and overtime pay, vacation, holiday, and leave credits, pension and welfare

29

benefits, and insurance coverage." *See Discipline & Discharge in Arbitration*, Ch. 13.II.B (Norman Brand & Melissa H. Biren eds., 3d ed. 2015) (excerpts attached as Ex. 3). Accordingly, the Arbitrator should award lost earnings and benefits as part of Ms. Jurkowski's make-whole relief.

### B.    *Pre- and Post-Judgment Interest*

The remedy in this case should include interest, as shown by recent arbitration awards between the parties, D.C. Public Employee Relations Board (PERB) precedent, general equitable principles, and the Back Pay Act. Interest at 4% is generally included in make-whole remedies in arbitrations between WTU and DCPS. *See WTU v. DCPS (Fields)*, AAA Case No. 01-20-0000-1793 (Mar. 13, 2023) (Pye, Arb.) (Ex. 18); *WTU v. DCPS (Grivnow)*, AAA Case No. 01-22-0002-4548 (Mar. 31, 2023) (Greenberg, Arb.) (Ex. 19). Such interest should be awarded from the time wages were wrongly denied to the date of the award (*i.e.*, pre-award interest) as well as from the issuance of the award to the date of payment (*i.e.*, post-award interest).

In numerous cases, the PERB has held that an award of interest is "within an arbitrator's equitable remedial authority to make a grievant whole for the loss of pay as well as the period of forbearance from this pay." *D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*, PERB Case No. 96-A-02, Slip Op. No. 459, at 2 (Jan. 17, 1996) (Ex. 20). *See also Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.*, PERB Case No. 17-A-04, Slip Op. No. 1637, at 3 (Aug. 25, 2017) (Ex. 21); *Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.*, PERB Case No. 16-A-11, Slip Op. No. 1625, at 3 (June 9, 2017) (same) (denying arbitration review request of award granting pre-judgment and post-judgment interest) (Ex. 22).

30

Because money loses value over time, interest is a necessary component of a make-whole remedy. "In virtually all other forums—courts and administrative agencies—a prevailing party routinely receives interest on delayed payments. That is a matter of simple justice: getting a sum a year late does not make the recipient whole." *Atl. Se. Airlines*, 101 BNA LA 515, 525 (Aug. 9, 1993) (Nolan, Arb.) (Ex. 23). *See also Kaiser Permanente*, 89 BNA LA 841, 845 (Oct. 11, 1987) (Alleyne, Arb.) ("There is no rational reason why interest should not be awarded on a back-pay award.") (Ex. 24). As one arbitrator explained nearly two decades ago, "[a]rbitrators with increasing frequency award interest on back pay awards not only because the NLRB has done so since 1962, but also because an award of interest on earnings wrongfully withheld from the grievant for a period of time is necessary to actually make the grievant whole." *Contempto Design*, 120 BNA LA 1317, 1323 n.2 (Sept. 9, 2004) (Bogue, Arb.) (Ex. 25); *see also Kohler Co.*, 122 BNA LA 1221, 1237 (Mar. 7, 2006) (Jennings, Arb.) (noting an "evolution in the thinking" in labor arbitration, and describing the modern view that interest is within the "inherent power of the arbitrator" and awarded because of the time value of money) (Ex. 26).

Interest must be included in this case for another reason: it is mandatory under the Back Pay Act, which applies to Ms. Jurkowski as an employee of the District of Columbia. The DC PERB has recognized that the Act "not only authorizes but *requires* interest on back pay" to DC government employees. *Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.*, PERB Case No. 18-A-08, Slip Op. No. 1660 (Mar. 27, 2018) (emphasis added) (Ex. 27). Specifically, the Back Pay Act provides that backpay to a federal employee "shall be payable with interest." 5 U.S.C. § 5596(b)(2)(A) (Ex. 28).

Accordingly, the Arbitrator should order 4% interest from the date of termination until DCPS's full payment of make whole relief to Ms. Jurkowski.

31

### C.    Tax-Gross Up

When an employee is unlawfully terminated and then reinstated with backpay, that is not the end of the analysis as to whether the employee has actually been made "whole" for the effects of the unlawful termination. The economic realities of restoring an individual to the position they would have been in but for the unlawful termination require additional elements to achieve "make whole" relief. One area where this manifests is the additional tax burden of an employee receiving a lumpsum backpay payment as a result of a wrongful termination. Thus, an award of this kind, sometimes called a "tax gross up," is a necessary component of make-whole relief in a case like this.

The U.S. federal tax system utilizes progressive income tax rates, which means that individuals are subject to higher tax rates at higher levels of income. *See* Internal Revenue Service, *Internal Revenue Bulletin: 2023-48*, Section 3. 2024 Adjusted Items, .01 Tax Rate Tables.[4]

Treasury regulations mandate that backpay awards are taxed as wages in the year they are paid to and received by an employee, and not based on the calendar years the lost income is otherwise attributable to. *See* I.R.S. Rev. Rul. 78-336, 1978-2 C.B. 255 (1978) ("Under the provisions of section 31.3402(a)-1(b) of the regulations, the back pay award ordered by the court is wages in the year paid, not in the year or years earned, and is subject to federal income tax withholding at the rates in effect at the time the award is paid.") (Ex. 29); I.R.S. Rev. Rul. 89-35, 1989-1 C.B. 280 (1989) ("The employee portion of the taxes under section 3101 of the Code should be computed by applying the tax rate in effect at the time the back wages are received by

---

[4]    *Available at* https://www.irs.gov/irb/2023-48_IRB#REV-PROC-2023-34.

the employee.") (Ex. 30); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 203 (2001) ("In line with the text and administrative history of the relevant taxation provisions, we hold that, for FICA and FUTA tax purposes, back wages should be attributed to the year in which they are actually paid.") (Ex. 31).

As an illustration of WTU's request for a tax gross up, consider the following two scenarios involving a teacher who makes $100,000 per year and simplified tax rates.[5]

> Scenario 1: Teacher receives a salary of $100,000 for three years. He pays 20% of that salary in taxes, leaving him with $80,000 per year, for a total of $240,000.

> Scenario 2: Teacher is wrongfully fired at the beginning of the first year. Three years later, he receives a backpay award of $300,000. Because of progressive taxation, he pays a higher overall tax rate of 30%, leaving him with $210,000.

Has the teacher in Scenario 2 been made whole? No. He has lost $30,000 due to his wrongful termination. Reviewing this exact issue in 2012, the NLRB determined:

> In addressing the need to compensate employees for the heightened tax burdens they face as a result of discrimination against them, we note that both courts and administrative agencies have ordered such relief, essentially for the same reasons we find it appropriate here. When, for example, the Third Circuit first approved a district court's imposition of a tax compensation remedy, it observed that a principal remedial purpose of employment statutes is "to make persons whole for injuries suffered on account of unlawful employment discrimination," and that in exercising discretion in fashioning remedies, district courts should endeavor "to restore the employee to the economic status quo that would exist but for the employer's conduct." The court held that without this type of equitable relief in appropriate cases, it would not be possible to fully restore the employee to the economic status quo. ...

> For these reasons, we shall henceforth routinely require respondents to compensate employees for the adverse tax consequences of receiving one or more lump-sum backpay awards covering periods longer than 1 year.

---

[5]    This example is provided for purposes of illustration only.

33

*Latino Express, Inc.*, 359 N.L.R.B 518, 520–21 (2012) (Ex. 32).

The NLRB has consistently followed this approach since 2012. *See, e.g., AdvoServ of N.J. Inc.*, 363 N.L.R.B. No. 143, 2016 BL 74892 (Mar. 11, 2016) ("[W]e shall order the Respondent to compensate Kowinsky for any adverse tax consequences of receiving a lump-sum backpay award.") (Ex. 33). This type of award is not limited to the NLRB. Numerous federal circuit courts have recognized that a tax gross-up is a necessary element of make-whole relief when an employee has been wrongly terminated. *See, e.g., Clemens v. Centurylink, Inc.*, 874 F.3d 1113, 1116–17 (9th Cir. 2007) (agreeing with Third, Seventh, and Tenth Circuits that tax gross-up relief is available to make an employee whole in Title VII case) (Ex. 34); *EEOC v. N. Star Hosp., Inc.*, 777 F.3d 898, 903–04 (7th Cir. 2015) (agreeing with Third and Tenth Circuits that "without the tax-component award, [the plaintiff] will not be made whole, a result that offends Title VII's remedial scheme") (Ex. 35); *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 440–43 (3d Cir. 2009) ("[A] district court may, pursuant to its broad equitable powers … award a prevailing employee an additional sum of money to compensate for the increased tax burden a back pay award may create.") (Ex. 36); *Sears v. Atchison, Topeka & Santa Fe Ry., Co.*, 749 F.2d 1451, 1456–57 (10th Cir. 1984) (upholding a tax gross up because under Title VII, "the trial court has wide discretion in fashioning remedies to make victims of discrimination whole") (Ex. 37). *See also, e.g., Powell v. N. Ark. College*, Civ. No. 08-3042, 2009 BL 142427 (W.D. Ark. July 1, 2009) (concluding in FMLA case that if back pay awarded by jury will push the employee into a higher tax bracket than she would have been in had the monies been timely paid, "in equity the [employer] should be required to cover that expense as part of making [employee] whole") (Ex. 38).

34

Arbitrators have made similar awards, including in WTU-DCPS cases. In *Grivnow,*[6] Arbitrator Paul Greenberg ordered DCPS to pay, and the PERB affirmed, a tax gross-up as part of the wrongfully terminated teacher's make-whole remedy. *Grivnow*, Decision on Remedy, Slip Op. at 16 ("As WTU correctly notes…, over the years the interaction of large settlements and the tax system have garnered more concern among adjudicators … and it has become relatively common for prevailing employees to be awarded a "tax gross-up" to account for the adverse tax consequences of receiving lump-sum settlements.") (Ex. 19); *DCPS v. WTU (Grivnow)*, PERB Case No. 23-A-03, Slip Op. No. 1844, at 7–8 (June 15, 2023) ("In the absence of any contractual restrictions, we find the ability to order monetary remedies such as the "tax gross-up" are within the arbitrator's authority to determine an appropriate equitable remedy") (Ex. 39).

Subsequently, in *Barrington Brown*, Arbitrator M. David Vaughn similarly ordered DCPS to pay a tax gross-up to the wrongfully terminated teacher. *WTU v. DCPS (Brown)*, AAA Case No. 01-22-0000-5295, Slip Op. at 11 (Nov. 16, 2023) (Vaughn, Arb.) ("It is clear that, but for the Employer's improper termination, Grievant would have paid taxes based on income spread over multiple years and might have been in lower tax brackets (and thus paid less taxes) than tax due on the basis of the lump sum payment of back wages.") (Ex. 40). *See also United Transp. Union v. Veolia Transp. Servs., Inc.*, FMCS No. 13-54528-3, Slip Op. at 12 (Aug. 23, 2018) (Ray, Arb.) (Ex. 41). *Accord, e.g., U.S. Army Corps of Eng'rs*, 136 BNA LA 1365, 1372 (June 6, 2016) (Cohen, Arb.) (ordering employer to "make the employees whole" by adjusting the back pay "if an employee is placed in a higher tax bracket, or the amount of tax paid to the

---

[6] The tax gross-up remedy ordered in the Arbitrator's Award in *Grivnow* was appealed by DCPS to PERB. PERB affirmed the Arbitrator's Award. *DCPS v. WTU (Grivnow)*, PERB Case No. 23-A-03, Slip Op. No. 1844 (June 15, 2023) (Ex. 39). DCPS subsequently appealed the PERB decision to D.C. Superior Court, where the matter is currently pending. *See DCPS v. D.C. Pub. Emp. Rels. Bd.*, Case No. 2023-CAB-004448 (D.C. Super. Ct. filed July 19, 2023).

Federal Government is increased because of receiving several years' back pay in one year") (Ex. 42).

Accordingly, the Arbitrator should order a tax gross-up here to the extent that a multi-year backpay award causes Ms. Jurkowski to incur higher tax liability, subject to the Superior Court decision in *Grivnow*.

### D.    *Reasonable and Foreseeable Expenses*

As a part of make whole relief, the Arbitrator should order here direct or foreseeable pecuniary harms suffered by Ms. Jurkowski as result of her termination.[7] This ruling would be in accordance with recent decisions of the National Labor Relations Board (NLRB). *See Thryv, Inc.*, 372 N.L.R.B. No. 22, 2022 BL 444427 at 9–10 (Dec. 13, 2022) (Ex. 43). There, the NLRB ruled that its make-whole awards should compensate employees for "all direct or foreseeable pecuniary harms that result from a respondent's unfair labor practice," including "penalties if [the employee] must make early withdrawals from her retirement account in order to cover her living expenses." *Id.*

The NLRB further explained: "We cannot fairly say that employees have been made whole until they are fully compensated for these kinds of pecuniary harms… the Board must strive to ensure that employees are more fully restored to the situation they would have inhabited but for a respondent's unfair labor practice." *Id.* Since *Thryv*, the NLRB and its administrative law judges have included this form of relief in dozens of cases. *See, e.g., NCRNC, LLC d/b/a Ne. Ctr. for Rehab. & Brain Injury*, 372 N.L.R.B. No. 35, 2022 BL 454091 (Dec. 16, 2022) ("Respondent shall also compensate employees for any other direct or foreseeable pecuniary

---

[7]    To be factually proven at a later time, or preferably, subject to an agreement by the Parties.

harms incurred as a result of the unlawful suspension and discharge.") (Ex. 44); *Bothell Pediatric & Hand Therapy*, 372 N.L.R.B. No. 40, 2023 BL 11694 (Jan. 13, 2023) (same) (Ex. 45).

In the recent WTU-DCPS case, the Arbitrator in *Grivnow* stated that he was initially "reluctant" to adopt the approach set forth by the NLRB in *Thryv. See Grivnow*, at 12 (ordering compensation in the amount of a student loan balance, student loan interest payments, and lost graduate credits as part of make whole relief) (Ex. 19). [8] However, that Arbitrator ultimately awarded the compensation sought by the Union because the logic of *Thryv* is compelling. *See id.* at 12–13. The *Thryv* rule simply ensures that affected employees are truly put in the same position they would have been if not for the employer's wrongful acts. Thus, in *Barrington Brown*, the Arbitrator ordered that make whole relief necessarily included reimbursement for early withdrawal fees the teacher was forced to incur from his DCPS retirement account when he needed income to live on following his wrongful termination. *Brown*, at 14 (also ordering compensation in the amount of student loan forgiveness the teacher would have been entitled but for his termination) (Ex. 40).

Accordingly, the Arbitrator should order compensation for direct or foreseeable pecuniary harms here to the extent that Ms. Jurkowski incurred any and can prove them to the Arbitrator's satisfaction, subject to the Superior Court decision in *Grivnow*.

## III. THE INTEREST OF JUSTICE REQUIRES AN AWARD OF ATTORNEYS' FEES TO THE UNION.

Under the Back Pay Act, an employee who has been found by appropriate authority under a collective bargaining agreement "to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay" is

---

[8]     These parts of the Arbitrator's Award were affirmed by PERB. PERB's decision is currently on appeal before the D.C. Superior Court.

entitled to recover, among other things, "reasonable attorney fees related to the personnel action." 5 U.S.C. § 5596(b)(1)(A)(ii) (Ex. 46). 5 U.S.C. § 7701(g) sets forth the standard for awarding fees: fees are warranted "in the interest of justice, including any case in which a prohibited personnel practice was engaged in by the agency or any case in which the agency's action was clearly without merit." 5 U.S.C. § 7701(g)(1) (Ex. 47).

The PERB has "long recognized the applicability of the Federal Back Pay Act to District of Columbia employees and its application in arbitration awards." *D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*, PERB Case No. 10-A-03, Slip Op. No. 1306 at 10 (Aug. 18, 2011) (Ex. 48). Additionally, the PERB has accepted the list of examples of when a fee award may be deemed in the interest of justice set forth in *Allen v. U.S. Postal Serv.*, 2 M.S.P.R. 420: where "(1) the agency engaged in a prohibited personnel practice; (2) the agency's actions are clearly without merit or wholly unfounded, or the employee is substantially innocent of charges brought by the agency; (3) the agency's actions are taken in bad faith; (4) the agency committed gross procedural error; or (5) the agency knew or should have known that it would not prevail on the merits when it brought the proceeding." *See DCPS v. WTU (Canady)*, PERB Case No. 20-A-04, Slip Op. No. 1740 at 7 (Mar. 19, 2020) (citing *Allen v. U.S. Postal Serv.*, MSPB Docket No. AT075299011, 2 M.S.P.R. 420, 593 (1980)) (Ex. 49). As the PERB pointed out, moreover, the *Allen* list is non-exhaustive and illustrative and thus does not capture every situation in which attorneys' fees may be in the interest of justice. *Id.*

Here, if the Arbitrator agrees that DCPS's discharge of Ms. Jurkowski failed to meet the burden of proof for just cause because DCPS proffered just 10% of available evidence, the case falls under the "agency knew or should have known that it would not prevail on the merits when it brought the proceeding" *Allen* factors.

38

As it repeatedly does, DCPS may contend that the Union's request for attorneys' fees is improper because it contradicts Article 6.5.10 of the Parties' 2016-2019 CBA, which provides that the Parties "shall have the right, at their own expense, to legal and/or stenographic assistance at Step 3." (JX 1 at 39–40.) But the PERB has held that this provision, as well as identical provisions from other agreements, do not restrict an arbitrator's equitable power to award attorneys' fees pursuant to the Back Pay Act. *See, e.g., DCPS v. WTU (Canady)*, PERB Case No. 20-A-04, Slip Op. No. 1740 at 5–7 (Mar. 19, 2020) (finding that the WTU-DCPS CBA does not restrict an arbitrator's ability to award attorneys' fees) (Ex. 49); *Metro. Police Dep't v. Fraternal Ord. of Police/Metro. Police Dep't Labor Comm.*, PERB Case No. 16-A-06, Slip Op. No. 1618, 2017 WL 1374580, at *2 (Mar. 23, 2017) (finding that identical language from another D.C. agency collective bargaining agreement did not restrict arbitrator's equitable power to award attorneys' fees) (Ex. 50); *D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*, PERB Case No. 10-A-03, Slip Op. No. 1380, 2013 WL 4534266, at *5 (Apr. 30, 2013) (same) (Ex. 51); *D.C. Dep't of Corr. v. Fraternal Ord. of Police/Dep't of Corr. Labor Comm.*, PERB Case No. 10-A-14, Slip Op. No. 1326, 2012 WL 3901597, at *3 (Aug. 23, 2012) (same) (Ex. 52).[9]

---

[9]   DCPS may cite Arbitrator Wolf's opinion in the 2009 *Fluellen* arbitration between DCPS and WTU in support of its argument that Article 6.5.10 of a *prior* collective bargaining agreement is a waiver of the Union's right to attorneys' fees. But "arbitrations do not create binding precedent even when based upon the same collective bargaining agreement." *DCPS v. WTU (Canady)*, PERB Case No. 20-A-04, Slip Op. No. 1740 at 5 (Mar. 19, 2020) (Ex. 49) (internal quotations omitted). Moreover, the *Fluellen* decision pre-dated these PERB decisions, which make clear the PERB's view is that such language does not provide an express limitation on the Arbitrator's equitable power to formulate a remedy inclusive of attorneys' fees. To the extent that the Arbitrator follows any arbitral precedent, it should follow the more recent decision in *Canady*, which is consistent with the PERB's view and which was upheld by the PERB. *See WTU v. DCPS (Canady)*, AAA Case No. 01-16-0004-0051, at 12–13 (Dec. 28, 2019) (Vaughn, Arb.) (holding that WTU's entitlement to attorneys' fees was not waived by Article 6.5.9) (Ex. 53).

39

In sum, an award of attorneys' fees is not precluded by the Parties' CBA and is in the interest of justice due to DCPS's admitted CBA violation and failure to satisfy its burden of proof.

## CONCLUSION

For the reasons described above, the Arbitrator should sustain the grievance and order DCPS to reinstate Ms. Jurkowski and make her whole in accordance with WTU's Demand for Arbitration, including:

- Reinstatement of Ms. Jurkowski, with full seniority, to her former position or a substantially similar position;
- lost earnings from the date of her termination until the first day of her reinstatement, inclusive of Ms. Jurkowski's teaching salary and all contractual salary increases, raises, bonuses, stipends, and other compensation that Ms. Jurkowski would have been entitled to if she had not been terminated without just cause as a member of the WTU bargaining unit;
- pre- and post-judgment interest on Ms. Jurkowski's backpay and the value of her lost benefits;
- the value of Ms. Jurkowski's lost health, retirement, and other benefits;
- a tax gross-up for the difference in taxes Ms. Jurkowski will owe on her make whole award versus what she would have owed if she was able to keep working and be compensated in each year;
- reimbursement for any reasonable and foreseeable expenses as a result of her termination that Ms. Jurkowski can prove;
- purging the termination from Ms. Jurkowski's personnel records and other DCPS files;
- the WTU's attorneys' fees; and
- any other relief the Arbitrator deems just and proper in this matter.

Dated: February 21, 2024                    Respectfully submitted,

/s/ Olga M. Thall
Olga M. Thall
James & Hoffman, P.C.
1629 K Street, NW, Suite 1050
Washington, DC 20006
(202) 496-0500
(202) 496-0555 (fax)
omthall@jamhoff.com

*Attorney for Washington Teachers' Union,*
*Local #6, AFT, AFL-CIO*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, copies of the foregoing Post-Hearing Brief of the Washington Teachers' Union, Local #6, AFT, AFL-CIO and accompanying Exhibits were served via email on Davigny Jean-Louis (DavignyJeanLouis@adr.org) from the American Arbitration Association who, in turn, will serve them on the following:

Rosemary Pye
pye.arbitrator@gmail.com

*Arbitrator*

Kevin Stokes, Esq.
Supervisory Attorney Advisor
De'Yan Harris, Esq.
Attorney Advisor
D.C. Office of Labor Relations and Collective Bargaining
441 4th Street, NW, Suite 820 North
Washington, DC 20001
kevin.stokes@dc.gov
deyan.harris1@dc.gov

*Attorneys for District of Columbia Public Schools*

/s/ Olga M. Thall
Olga M. Thall
James & Hoffman, P.C.
1629 K Street, NW, Suite 1050
Washington, DC 20006
(202) 496-0500
(202) 496-0555 (fax)
omthall@jamhoff.com

*Attorney for Washington Teachers' Union,*
*Local #6, AFT, AFL-CIO*

42

**AMERICAN ARBITRATION ASSOCIATION**
**BEFORE**
**ARBITRATOR ROSEMARY PYE**

|  |  |
|---|---|
| WASHINGTON TEACHERS' UNION, LOCAL #6, AFT, AFL-CIO <br><br> Union, <br><br> v. <br><br> DISTRICT OF COLUMBIA PUBLIC SCHOOLS <br><br> Agency. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) AAA Case No. 01-22-0004-0484 <br> ) Kimberlynn Jurkowski <br> ) <br> ) <br> ) <br> ) <br> ) |

**POST-HEARING BRIEF**

## I.    INTRODUCTION

This matter arises from a Demand for Arbitration filed by the Washington Teachers' Union ("WTU") on behalf of Kimberlynn Jurkowski, ("Jurkowski") challenging her termination. Ms. Jurkowski was a D.C. Public Schools ("DCPS") library media specialist at Watkins Elementary School. Her duties included managing programs, collection development, community outreach and teaching PreK through 12th grade students among other responsibilities to support the teachers and the community with library resources and instruction. On December 17, 2021, Jurkowski instructed her third-grade library students to reenact the Jewish Holocaust. Thereafter, DCPS investigated the incident and on February 14, 2022, issued a Notice of Termination which advised Ms. Jurkowski that she would be terminated from her position effective March 8, 2022. Specifically, the Notice of Termination indicated that the grievant was being terminated under 5-E DCMR 1401.2 for (b) "Grave Misconduct" and (v) "Other Conduct During and Outside of Duty

1

Hours That Would Affect Adversely the Employee's or the Agency's Ability to Perform Effectively." For the reasons discussed more fully below, the Union's grievance should be denied and DCPS's decision to remove Ms. Jurkowski from her position should be upheld.

## II.     PRELIMINARY STATEMENT

The Hearing Transcript is comprised of 1003 pages. For the purposes of this Post-Hearing Brief, the Hearing Transcript will be cited herein as "T. at ____," based on the pdf file pagination. Joint Exhibits will be cited herein as "JX __." Agency Exhibits will be cited herein as "AX __." Union Exhibits will be cited herein as "UX __." Additionally, there are two video files containing footage from the library on December 17, 2021. The videos demonstrate two different angles. The first video, labeled 57_2nd_Library_1 12-17-2021 09h10-10h45, will be cited herein as "V. 1." The second video, labeled 58_2nd_Library_2 12-17-2021 09h10-10h45, will be cited herein as "V. 2."

## III.    PROCEDURAL HISTORY

WTU's filed its grievance for Ms. Jurkowski's removal on May 27, 2022. *See* JX-2. Notably, WTU failed to argue in its grievance whether removal was the appropriate penalty for coaching a class of eight-yar-old children to reenact scenes from the Holocaust. Instead, WTU focused its grievance entirely on denying that Ms. Jurkowski engaged in any misconduct at all.

On August 4, 2022, Cherylen Hardrick, a neutral hearing officer, held a Step 2 Hearing. AX 4 at 2. Hearing Officer Hardrick rejected WTU's arguments that Jurkowski never engaged in misconduct by instructing her third-grade students to reenact Holocaust events. *Id.* at 5-6. The hearing officer concluded that the disciplinary actions against Ms. Jurkowski were reasonable and justified, and upheld the grievant's termination. *Id.* at 6. WTU invoked arbitration on September 26, 2022.

2

On April 4, 2023, Arbitrator Rosemary Pye commenced a hearing on the merits of the above-captioned case. The hearing involved several additional days: October 23, 2023, November 20, 2023, and November 27, 2023. At the hearing, DCPS asked the Arbitrator to deny the grievance and find that DCPS had cause to remove Ms. Jurkowski from employment as a Library Media Specialist.

## IV.    STATEMENT OF FACTS

Ms. Jurkowski was a library media specialist for Watkins Elementary School. JX 4. Her duties included managing programs, collection development, community outreach and teaching PreK through 12th grades students to support the teachers and the community with library resources and instruction. Hearing Tr. Vol. 3 at 478:1-9. On December 17, 2021, Ms. Moxley, third grade teacher at Watkins, dropped her third-grade class off to the library for Ms. Jurkowski's library instruction. UX. 17 at 8. The class began at 9:35am and ended at 10:20am. *Id.* at 8. Just three minutes later, Ms. Jurkowski had the students line up on either side of her, face each other, and mimic a battle stance. AX 3 (58_2[nd]_Library_2 at 9:38:24)[1]. So begins their reenactment of one of the most horrifying genocides that the world has ever seen. It was not enough that the students had already debated about whether the Holocaust was good or bad in Jurkowski's previous library class. T. at 111:17-20. These eight-year-olds were required to re-enact the Jewish Holocaust for the duration of the entire library class period, finally ceasing when Ms. Moxley returned to the library to take the students back to their classroom. *Id.* at 10:19:17; T. at 114:20-115:2. To make the chronological timeline as straightforward as possible, the following two charts demonstrate and identify timestamps for all the events that are visible in the video footage:

---

[1] There are two videos in the file containing Agency's Exhibit 3. Both videos show the full library instruction period for Ms. Moxley's class on December 17, 2021, only with different angles. The time stamps referenced are found in the top left corner of the video footage.

3

| Chronological Timeline of Class Period 57_2nd_Library_1 12-17-2021 09h10-10h45 (Video 1) Note: This angle has white boards and black digital board in the top left corner. There is a double window in the top right corner of this video footage. A green chair can be seen at the bottom of the video screen, a little towards the right of the screen. ||
|---|---|
| 9:57:34-9:57:42 | Jurkowski is seen in the top left of video near carpet with children. She then points to the carpet and several of the children immediately fall to the ground where she pointed. |
| 9:58:16 | Jurkowski instructs the remaining students to walk over to the opposite side of the room and the children follow her there. |
| 9:58:44 | A student in white striped shirt runs over to where Jurkowski is standing near the board in left of video and begins to mimic the movements of someone who is taking a shower and washing up. (Corroborates with gas showers that students testified they were instructed to take). T. at 82:14-83:14; 92:12-93:9; |
| 9:58:50 | Jurkowski then instructs a few other students, including A.M., to come near the student in a white striped shirt, and she gestures towards the students. Jurkowski then raises both hands several times instructing the students to get down, and the students then drop to the ground. |
| 9:59:13 | Jurkowski instructs student M.T. to come stand next to student T.A., and the two can be seen holding their hands near their ears. |
| 10:00:40 | Student in white shirt in left of video near bookshelf makes shooting gestures towards the students across the classroom. |
| 10:01:33 | Jurkowski walks back over to the student who is sitting on the handprint carpet and raises her arms up and down in the same manner she did at 9:58:50 where she is instructing the students to drop down. The students then drop down on the carpet in a lying position. Jurkowski repeats this gesture several times. |
| 10:01:51 | Two male students (one in white shirt and one in gray shirt) pretend to hit and kick the students that Jurkowski instructed to lie down, as Jurkowski claps. |

4

| 10:04:05 | Student (T.A. – red shirt) walks to the back of the classroom alone and stands there facing the rest of the class. |
|---|---|
| 10:05:07 | Jurkowski then tells T.A. to come back to the rest of the students. |
| 10:09:00-10:03:32 | Several of the students begin holding their hands to their ears as if talking on a telephone, to include M.T., A.M., and a male student wearing a green shirt. |
| 10:09:53 | Students M.T., A.M., K.T. (white striped shirt) and a student in a green shirt go sit at the table in the back of the room. |
| 10:10:19 | M.T. begins to pretend to talk on a telephone while sitting at the table with the other three students described above.<br><br>Simultaneously, Jurkowski is talking to T.A. and a student in an orange shirt. |
| 10:10:29 | Jurkowski tells the student in orange shirt to stand in a certain spot behind the bookshelf and the student moves there. She then tells T.A. to stand near the student in the orange shirt. |
| 10:12:45 | Jurkowski tells the students sitting on the carpet to stand up. |
| 10:12:49-10:14:16 | Three of the four students who had been sitting at a table in the back of the classroom now stand up and start to hold hands in front of M.T. (president) as if protecting her.<br><br>Mr. Jurkowski is standing in front of the students at the front of the classrooms, making different types of gestures with her hands, to include pointing in different directions as if signaling directions and locations to the students. |
| 10:14:16-10:14:42 | Jurkowski then instructs some of the students closer to the carpet to go back to the carpet and to get down. |
| 10:14:48 | A student in a white shirt is standing in front of Jurkowski. He turns around to face student M.T. and K.T. in back of class and then makes gunshot gestures towards them. K.T. is then seen stepping back as if pretending to be impacted by the gunshot. |

5

| | Jurkowski is then seen again making different gestures to signal instructions to students. |
|---|---|
| 10:16:00 | M.T. is instructed to come back to the front of the classroom where she stands next to Jurkowski. |
| 10:17:00 | Jurkowski continues to make gestures and instruct children to stand in different places near her. |

| Chronological Timeline of Class Period<br>58_2nd_Library_2 12-17-2021 09h10-10h45 (Video 2)<br>This video's angle shows a fully windowed wall on the left of the screen. The handprint carpet is on the right, and the blue carpet is visible on the opposite side of the handprint carpet (blue carpet not visible in Video 1). | |
|---|---|
| 9:57:36 | M.T. is walking around near the front of the classroom pretending to talk on a telephone by holding her hand up to her ear. |
| 9:57:32-9:57:42 | The students on the handprint carpet fall to the ground (following Jurkowski's instruction that can be seen at the same time in Video 1). |
| 9:57:42 | Two male students, one in green shirt and one in white shirt, start running from the blue carpet toward the students on the handprint carpet. The two boys then pretend to shoot at them while they are lying down. |
| 9:58:57 | Although Ms. Jurkowsi's upper body is cut off by this video angle, you can clearly see her crouching down and placing her hands down to instruct the students on the blue carpet to lie down. The students then drop down as if dead the same way the students on the handprint carpet did. Then, the student in the green shirt starts to drag another student as if dragging a deceased body away. |
| 9:59:19 | A.M. and the student in the white shirt start making kicking gestures towards the student's body. |
| 9:59:20 | M.T. (President) is walking around the middle of the carpets pretending to talk on the telephone. |
| 10:01:01 | Ms. Jurkowski faces the front of the classroom telling the students something. She is facing a child in a mint green shirt who is closer to the wall and that child then drops as if pretending to be dead. He then sits up and |

6

| | |
|---|---|
| | makes a shooting gesture towards Ms. Jurkowski and the students standing near her. Immediately after, the student in the striped shirt standing next to Jurkowski makes shooting gestures in the direction of the other student. |
| 10:01:13 | Student T.A. (red shirt) goes over behind the library desk (top right corner) near the orange chairs to sit alone and peeks at the other students. Ms. Jurkowski is looking in his direction and gesturing. |
| 10:01:19-10:01:21 | T.A. pretends to put something in his mouth. |
| 10:01:21 | A child in a dark shirt comes behind the library desk and starts to pretend to shoot T.A. |
| 10:01:28 | Another child in a green shirt comes behind the library desk and pretends to shoot T.A. and T.A. then falls as if being shot. The student in the striped shirt comes behind the library desk as well and pretends to shoot T.A. Many other students come behind the library desk and pretend to shoot T.A. |
| 10:01:50 | Jurkowski gestures and the "shooters" return to the handprint carpet near Jurkowski, and they then start to pretend to kick and attack the students who are still lying on the handprint carpet pretending to be dead. |
| 10:02:01 | Jurkowski and some other students walk back over to the library desk near T.A. and then has that group of students return to the blue carpet. |
| 10:02:34 | Three children near the blue carpet start pretending to attack and shoot each other. A fourth child joins seconds later. |
| 10:04:08 | T.A. walks to the back of the classroom alone and stands facing the rest of the class. |
| 10:04:35-10:04:55 | Jurkowski walks to the middle of the carpet and is talking to the children, gesturing towards different students as she speaks, as if identifying them. |
| 10:05:05 | Jurkowski turns sideways and gestures towards T.A. who is still in the back of the classroom. He then walks to Jurkowski, and she makes gestures towards him as she is speaking to the students. |
| 10:07:23 | M.T., A.M. and K.T. (striped shirt) are now standing with Jurkowski and T.A. Jurkowski |

| | places her hands on M.T. as if presenting something, and then she gestures for K.T. to stand next to M.T. in front of the class. |
|---|---|
| 10:07:36 | Jurkowski gestures for the student in a green shirt to go sit in a green chair next to A.M. |
| 10:09:29-10:09:33 | Jurkowski claps as she walks among the students as if they just finished performing. |
| 10:09:53 | M.T., K.T., A.M. and a student in a green shirt go to the back of the room. |
| 10:11:20-10:12:21 | Jurkowski points to a spot on the floor between the two carpets and three boys go stand in that area. Jurkowski starts to talk to the boys while making different gestures with her hands. |
| 10:12:23 | Jurkowski makes a swinging gesture with her arms towards the front of the classroom while still facing the three boys, and they then sprint to an area on the carpet where she gestured. One boy is crawling along the floor. |
| 10:12:51-10:13:07 | In the back of the classroom, K.T. and the boy in the green shirt start to stand in front of M.T. and lock arms. A.M. then joins them. |
| 10:12:54 | K.T. (white striped shirt) is in back of the classroom and makes a gun gesture with his hand. |
| 10:13:30 | At the front of the classroom, the remaining students on the handprint carpet are lined up, facing the three boys on the opposite side of the room. |
| 10:14:18 | Jurkowski starts gesturing in different directions and various students start to move in different directions depending on where she's pointing. |
| 10:14:45 | Jurkowski steps closer to the student in the white T-shirt and white shoes and makes a gesture. He then turns and starts pretending to shoot the students to the left. |
| 10:14:50 | K.T. (white striped shirt) steps back as if impacted by the other student's pretend gunshot. |
| 10:14:58 | Jurkowski steps forward again and gestures to A.M. and the student in the white shirt to stand in front of her and the students walk there. |
| 10:15:09 | Jurkowski makes a gesture with both her arms and then starts walking backwards. A.M. and |

8

| | |
|---|---|
| | the other student start to repeat the gesture Jurkowski just made. |
| 10:16:00 | M.T. starts to walk to the front of the classroom. |
| 10:19:19 | The students line up for dismissal and then exit the classroom. |

The students characterized Ms. Jurkowski's instruction as them "putting on a play." T. at 17:9-17; 18:8-15; 20:1-7; 114:5-9; 119:8-123:3. Jurkowski specifically assigned roles to the students based on real life actors of the Holocaust, to include Adolf Hitler, the U.S. President, Nazi soldiers, and Jewish Holocaust victims. *Id.* at 18:12-15; 20:1-7; 34:2-3; 83:17-22; 93:22; 111:1-13; 113:14-22; 114:6-9; 119:20-21; 120:1-13. There is no video footage that shows either the students or Jurkowski holding or reading a book of any kind during the instructional period. Just before the library class period ended, Jurkowski told the students not to tell their parents or other teachers that they had re-enacted the Holocaust in class. T. at 84:21-85:1; 112:4-7.

When Ms. Moxley returned to the Watkins Elementary library to retrieve her students, the students immediately begin to tell Ms. Moxley what occurred in the library period once safely under her supervision. T. at 17. Ms. Moxley, alarmed at what the students relayed to her and immediately conscious of the seriousness of the students' accounts, then had her students write down what happened in their library class on December 17, 2021. *Id.* Once the students were done giving their written account of Ms. Jurkowski's library instruction, Ms. Moxley then submitted the written statements to the Watkins Elementary school principal, M. Scott Berkowitz. T. at 17-18 and 76:8-10. The gist of the students' statements can be found in the following chart:

| Fact | Corroborating Student (AX. 1) |
|---|---|
| Tomas Applebaum played the role of Hitler | Lincoln (p.1) <br><br> Malaika Tull (p.14) <br><br> Ben (p. 18) |
| Malaika Tull played the role of U.S. president | Malaika Tull (p. 14) |

9

| | |
|---|---|
| Jurkowski told the students the Holocaust occurred because Hitler "had a bad Christmas." | Lincoln (p. 1)<br><br>Ben (p. 18) |
| The students pretended to build and get into gas chambers and gas showers. | Lincoln (p. 1)<br><br>Ariall (p. 8-9)<br><br>Malaika Tull (p. 14) |
| Some students built trains for soldiers and Holocaust victims | Lincoln (p. 1)<br><br>Gabryella (p. 6-7)<br><br>Ben (p. 18)<br><br>King (p. 20) |
| Some students pretended to shoot and kill each other, while others pretended to be shot and killed. | Lincoln (p. 1) ("I got shot")<br><br>Miguel (p. 2) ("I shot people) ("I killed billions of people.")<br><br>Kayun (p. 3) ("Hitler hiyered[sic] people to killed[sic] us") ... ("I aso[sic] got killed and people also starved")<br><br>Trinity (p. 4) ("I was one of the dead people who got shot")<br><br>(p. 5) ("I had killed many people.")<br><br>Gabryella (p. 6-7)<br><br>Ariall (p. 8-9) ("and triing[sic] to murder Hitler.")<br><br>Delilah (p. 10) ("I was a die psoein[sic]."<br><br>Jhoi (p. 11-12) ("I was killd[sic] and I was put in a din stak whth[sic] a lot of dead [people]."<br><br>Malaika (p. 14)<br><br>(Noah Clark p. 16)<br><br>Ben (p. 18)<br><br>King (p. 20) (includes a drawing of a stick figure shooting another stick figure, with the word "dead" next to him) |
| Some students were tasked to build ditches to put other students in | Miguel (p. 2) |

10

| | Trinity (p. 4) |
|---|---|
| | Noah Clark (p. 16) |
| | Ben (p. 18) |
| | King (p. 20) |
| Some students stated after the play, they came back to life from the dead to ask Hitler why he killed them. | Miguel (p. 2) |
| | Delilah (p. 10) ("I come [back] to live and ask why did you kill me.") |
| Several students expressed negative feelings about what they did in library class and said they did not want to participate. | Lincoln (p. 1) ("I was a little scared." |
| | Trinity (p. 4) ("i think this inappeit!![sic])* *student attempting to spell inappropriate |
| | Gabryella (p. 6-7) ("I thot[sic] it was sorry that people [would] kill some people.") |
| | King (p. 20) ("but we got forced to kill I did not want to") |
| Students identified the events during library on December 17, 2021 as a play. | Trinity (p. 4) |
| | Malaika Tull (p. 14) (does not specifically say "play," but identified the students as "acters"[sic]." |
| | Ben (p. 18) ("Hitler Play) |

When Principal Berkowitz received the written statements from Ms. Moxley, he requested to speak with the students individually. T. at 73:12-21. Ms. Moxley asked which students felt comfortable speaking with Principal Berkowitz about the library class period, and those students then had private conversations with Principal Berkowitz on the same day. T. at 73:20-74:4.

Also on that same day, December 17, 2021, the DCPS Labor Management and Employee Relations (LMER) division issued a Notice of Pending Investigation to Ms. Jurkowski. JX 4. She was placed on administrative leave the same day she received the Notice. T. at 364:17-365:17. DCPS concluded its investigation and issued to Jurkowski a Notice of Termination on February 14, 2022, effective March 8, 2022. JX 5. The grounds for termination were grave misconduct based

11

on Jurkowski's orchestrating the students' reenactment of the Holocaust during third grade library class. *Id.*

## V.    ISSUES

1.    Did Kimberlynn Jurkowski engage in grave misconduct when she coached her third-grade library through an explicit, detailed and gruesome reenactment of scenes from the Jewish Holocaust?

2.    Did DCPS have just cause to terminate Jurkowski for engaging in that grave misconduct?

## VI.    LEGAL AUTHORITY

The Parties' Collective Bargaining Agreement ("CBA") governs the standard for the discipline of bargaining unit members. Article 7 of the CBA states, in pertinent part:

7.3    The standard for disciplining permanent employees shall be just cause…
7.4    Disciplinary actions shall be subject to the grievance and arbitration process provided for in this Agreement.

JX 1.

In arbitration proceedings the burden of proof required to support the termination of an employee is unsettled and, thus, the arbitrator generally determines the required quantum of proof. *Village of Posen v. Illinois Fraternal Order of Police Labor Council*, 2014 IL App (1st) 133329, ¶ 40. Generally, the preponderance of the evidence standard is applied to ordinary discipline and discharge cases. *Id.*

## VII.    ARGUMENT

There is no question that, based on the facts in this record, Kimberlynn Jurkowski engaged in grave misconduct by forcing third grade, eight-year-old elementary school students—who were entrusted to her care— to re-enact graphic murder scenes from the Holocaust. And based on this

record, not only did DCPS have just cause to terminate her as a result; but termination was the only appropriate penalty for her reprehensible actions.

A.    Jurkowski engaged in grave misconduct by orchestrating her third-grade library students' reenactment of graphic murder scenes from the Jewish Holocaust.

DCPS has provided ample evidence that Jurkowski instructed students to reenact Holocaust scenes, which WTU cannot refute. Ms. Jurkowski's testimony about the third-grade library class period began and ended with assertions that were completely discredited by the video evidence that was included in the record and by the testimony from all of the District's witnesses. She begins her testimony by recalling that during the first five minutes of the class period she talked to the children about what would happen in class that day. T. at 635:13-16. Upon reviewing video footage from December 17, 2021, Jurkowski testified that the students started class with a school-wide greeting in which the students stepped into a circle, said "good afternoon," and then sat down. T. at 636:2-10. However, the evidence refutes such testimony because Jurkowski is seen in the video positioning students in a straight line on either side of each other and the children are not in a circle. V. 1 at 9:37:53. At 9:38:25 it is apparent that Jurkowski is motioning for a child in a gray shirt to stand on the other side, as if to create some sense of balance in the number of children on each side. V. 2.

Jurkowski testified that the children were unable to present digital presentations to their parents which was part of their original assignment, so the students suggested instead that they practice debates for an extracurricular debate program called "Battle of the Books." T. at 638:2-11. Jurkowski then said that at the beginning of class, the students voted for debate topics by way of raising hands and they selected three main topics. T. at 638:11-22; 646:10-13. However, that testimony is not supported by the evidence. In fact, nothing in the video footage suggests students are voting by raising their hands or having discussions regarding any proposed debate topic once

13

they end the battle stance that Jurkowski claimed was their morning greeting, up to the point in which student M.T. jogs to the back of the classroom. V. 1 at 9:38:50-9:51:24. At that point, the students would have been in class for over 15 minutes, since the class started at 9:35AM.

Ms. Jurkowski alleged in both her investigative report statement and in her hearing testimony that the three students to propose debate topics were A.M., K.T. and T.A. UX. 17 at 14-15.[2]; T. at 791:16-20; 801; 803:7-13. M.T. is seen standing towards the end of the classroom away from the other students and appears to be giving a speech, which corroborates with M.T.'s testimony. T. at 111:10-13. Ms. Jurkowski offered longwinded answers to simple questions to cover up the truth, purposefully causing confusion. T. at 808:11-810:19. While students can be clearly seen on the library surveillance video pretending to shoot each other and fall to pretend to be dead, Jurkowski offers no explanation beyond mere horseplaying.

Ms. Jurkowski also testified that at some point during the debate, students gathered into small groups to talk about the different debate topics. T. at 835:4-6. However, in no part of the video surveillance do the students all go in different areas of the classroom to have small group discussions.

Both students from Ms. Moxley's third grade class who testified at the hearing and were present in the library on December 17, 2021 testified that Ms. Jurkowski made them reenact the Holocaust. T. at 82:1-12; 110:1; 116:7. Katherine Moxley testified that her third-grade students told her they reenacted scenes from the Holocaust, and she had the students write about their library class period immediately upon returning from the library. T. at 17-18. The students' statements all corroborate that they were instructed by Ms. Jurkowski to reenact Holocaust events, with shooting and killing their fellow classmates being the most glaring memories from the class period (15

---

[2] Union's Exhibit is 29 pages, but Grievant's statement itself is 28 pages. The citation references the full 29 exhibit pages, but within the statement, the referenced content can be found on "Kj pages 13 and 14 of 28."

students specifically wrote about shooting and/or killing). AX 1. It is clearly apparent that Ms. Jurkowski instructed her third-grade library students to reenact the Holocaust.

B.    Ms. Jurkowski's lack of credibility and accountability.

Jurkowski's testimony contained glaring inconsistencies. She first testified on two different occasions that she was familiar with the library curriculum for third grade students. T. at 488:9-21; T. at 731. Then, just moments later, upon further examination, she reneged on that admission and stated she, an educator for over twenty years, was confused by the idea of a library curriculum. T. at 734:3-20; 736:15-737:1.

Further, Ms. Jurkowski's testimony made speculations about where students of different races lived in distance to Watkins Elementary. T. at 495-496. There is no reasonable basis for Ms. Jurkowski to make such determinations since she would not have reason to inquire into Watkins' residential demographics. However, it is not implausible that she accessed such confidential information even after being placed on administrative leave, as she revealed she had done to view student T.A.'s library records. Union Exhibit 11 is the library reading list—or book checkout list— for student T.A. T. at 610:16-20; T. at 962:19-963:8. The reading list has a time stamp that indicates it was generated on January 31, 2022. UX. 11. Ms. Jurkowski was placed on administrative leave December 17, 2021, and she was prohibited from accessing confidential DCPS student records. However, she did so to find information that would support her false narrative that faults an eight-year-old child for Ms. Jurkowski's egregious library class period activities. T. at 964-965.

Ms. Jurkowski's position remains that she never told students to reenact the Holocaust. She claims the allegations are lies and that the students, Ms. Moxley, Principal Berkowitz, DCPS' investigators and administration, and the parents of Watkins Elementary School all conspired against her. For Jurkowski's position to be true, it would mean the adults had less than six hours

15

to coach students into fabricating an elaborate string of events. Furthermore, it would mean the adults had collaborated even before December 17, 2021, to get the students to make sure their actions in Ms. Jurkowski's library class aligned with what they were conspiring to accuse her of. Only then could the video footage showing the children shooting, digging graves and ditches, creating showers, and falling dead be explained while maintaining Ms. Jurkowski never made them reenact the Holocaust. There is no credibility in Ms. Jurkowski's position. Without question, Ms. Jurkowski instructed her third-grade library students to reenact the Holocaust.

C.    Ms. Jurkowski's removal was appropriate.

The long-established analysis utilized in determining just cause for terminations is found in the Merit System Protection Board's (MSPB) holding in *Douglas v. Veterans Administration*, 5 M.S.P.R. 313 (1981). That analysis has been consistently conformed to in District of Columbia jurisprudence. See *Brown v. Watts*, 993 A.2d 529, 532 footnote 3 (D.C. 2010). Courts have additionally held that an agency's decision will not be reversed unless it failed to consider the relevant factors, or the imposed penalty constitutes an abuse of discretion. *Butler v. Department of Motor Vehicles*, OEA Matter No. 1601-0199-09 (February 10, 2011) citing *Employee v. Agency*, OEA Matter No. 1601-0012-82, *Opinion and Order on Petition for Review*, 30 D.C. Reg. 352 (1985).

1.    The Nature and Seriousness of the Offense

When evaluating whether a penalty is reasonable, the Board places *primary* importance upon the nature and seriousness of the offense and its relation to the [employee's] duties, position, and responsibilities. *Ward v. U.S. Postal Serv.*, 2009 M.S.P.R. 173. Here, Ms. Jurkowski's actions were inexplicable, as there was no nexus to the students reenacting the Holocaust and the third-grade curriculum for DCPS. The fact that Ms. Jurkowski told the students not to tell their parents

16

or other teachers about the reenactment makes the conduct increasingly egregious. Further, Jurkowski introduced ideas of gun violence, suicidal ideation, and murder to eight and nine years olds who may have never broached these topics. The Holocaust is excluded from the third-grade curriculum. So, if the students had not revealed what they were ordered to do—to Jurkowski's chagrin—they would not have received the appropriate counseling that is afforded to DCPS students when lesson plans involve sensitive subject areas. DCPS reasons that removal was appropriate given the nature and seriousness of ordering students to reenact the Holocaust.

### 2.    Job Level and Type of Employment

DCPS considered Jurkowski's job level and type of employment. This factor looks to the grievant's status. Jurkowski was employed as a library media specialist. The position is considered prominent because it is student-facing. Jurkowski's profession involved frequently conducting lessons for students and she was solely responsible for their wellbeing during the library period. Jurkowski's misconduct on December 17, 2021, severely violated her responsibilities.

### 3.    Prior Misconduct

No prior misconduct documented.

### 4.    Grievant's Past Work Record

DCPS' records demonstrate Jurkowski's past work record was satisfactory.

### 5.    Erosion of Supervisor's Confidence

This factor considers the effects of the misconduct on the supervisor's confidence that grievant can successfully perform her duties as assigned. Watkins Elementary's Principal, Mr. Berkowitz, was greatly disturbed by Jurkowski's misconduct. T. at 153:18-154:7.

17

6.      Consistency of Penalty with Past Practice

Jurkowski's misconduct is unprecedented from any current or former DCPS employees, so there is no comparative basis.

7.      Consistency of Penalty with Table of Penalties

This factor is not applicable.

8.      Notoriety

Jurkowski's misconduct garnered local, national and international media attention within days of its occurrence, including articles in the *Washington Post* and *New York Times*. T. at 362:21-363:2. Many DCPS parents and administration members expressed outrage regarding the misconduct and closely monitored the actions that DCPS leadership took to hold Jurkowski accountable. T. at 299:11-22.

9.      Notice of Warning About Conduct

This factor assesses whether the employee knew or understood the consequences of the misconduct. While there was no specific rule or policy regarding reenactments of historical genocides, Ms. Jurkowski has been employed with DCPS for an extensive number of years and understands that the subject matter was inappropriate to be introduced to third grade students. She testified that she was familiar with the library curriculum for third grade students. T. at 488:14-21; 731:22-732:2. Furthermore, Ms. Jurkowski was aware that her conduct was inappropriate, which is why she told her third-grade students not to tell any other adults about the library class events. T. at 32:15-16; 84:21-85:1; 112:6-10.

10.      Potential for Rehabilitation

This factor determines whether an employee can return to work rehabilitated. The MSPB has previously upheld a termination decision in which the "[grievant] lacked potential for

18

rehabilitation because he did not acknowledge his wrongdoing." *Villada v. U.S. Postal Serv.*, 2010 M.S.P.B. 232, 4. Similarly, Ms. Jurkowski, the grievant in this case, denies any wrongdoing, despite countless statements from students that explain what occurred during library, as well as video evidence that demonstrates what Jurkowski instructed the students to do on December 17, 2021. There is no potential for rehabilitation where Jurkowski refuses to acknowledge and take accountability for her actions.

11.    Mitigating Circumstances

No mitigating circumstances were documented.

12.    Effectiveness of a Lesser Penalty

As explained above, Ms. Jurkowski has not admitted to any wrongdoing nor attempted to help DCPS comprehend why she made her third graders reenact scenes from the Holocaust. The egregiousness of Ms. Jurkowski's conduct is further elevated by the fact there was no basis for a lesson plan to involve the reenactment, since nothing of the third-grade curriculum involves World War 2, Hitler or the Holocaust. Jurkowski's conduct was unprecedented, and to stay consistent in her lies, she has called to question the integrity of each of Ms. Moxley's third grade students, Ms. Moxley herself, and Principal Berkowitz.

Furthermore, there has been significant public attention surrounding this incident. There is no school or position that DCPS could place Ms. Jurkowski in without strong backlash from parents and fellow administration. Ms. Jurkowski instructed students to lie, and she continues to lie even after those students bravely decided to be honest. DCPS cannot risk that following a suspension, Jurkowski will go to another school, repeat the same or similar actions, and lie her way out of just consequences. A lesser penalty would not successfully hold Ms. Jurkowski accountable for her actions.

19

Just one year prior to Ms. Jurkowski's conduct, the U.S. Court of Appeals addressed whether a high school teacher could be terminated for teaching anti-Semitic views to his high school students and disseminating anti-Semitic material introduced through a high school history lesson on the terrorist attacks of September 11, 2001 *(i.e.,* "the 9/11 attacks"). *Ali v. Woodbridge Twp. Sch. Dist.,* 957 F.3d 174 (3rd Cir. 2020) (affirming *Ali v. Woodbridge Twp. Sch. Dist.,* Civil Action No. 17-2210, 2019 WL 1930754 (D.N.J. April 30, 2019)). In *Ali,* the high school history teacher included links in his lesson plan materials to an article entitled "Jews are Like a Cancer, Woe to the World if they Become Strong." *Id.* at 178. Before disseminating the article, the teacher had already encouraged students to embrace Holocaust denial, explicitly telling a student he was "proud" she concluded that Hitler's Holocaust "saved Germany." 2019 WL 1930754 at *2. The plaintiff teacher in Ali never apologized for presenting the articles to the students. *Id.* at *3. The Township School District's superintendent sent the plaintiff teacher home the day he was informed of the misconduct and terminated the teacher the following day. *Id.* The District Court of New Jersey upheld the termination on the following reasoning:

> The reason is consistent and clear. Plaintiff provided students access to a repugnant, hateful, and inflammatory resource, without any sense of regret or apology. This is a legitimate ground for termination . . . These were serious concerns about students advancing theories of Holocaust denial based on what they learned in Plaintiff's classroom. *Id.* at *6.

In the present case, the students who were affected by Ms. Jurkowki's misconduct were third graders, not high schoolers. Furthermore, Ms. Jurkowski's students were not introduced to a third-party source and encouraged to do individual research on the subject matter, they were instructed to participate in the reenactment of these heinous events. In addition, the District Court of New Jersey upheld the termination despite the nexus between the misconduct and instructions from the High School History Department to create a lesson plan for the 9/11 attacks. In the case at issue, Ms. Jurkowski's misconduct had no relation to the DCPS curriculum for third-grade

20

students. Like the plaintiff high school teacher in *Ali*, Ms. Jurkowski has expressed no remorse for her actions. Finally, Ms. Jurkowski was terminated after a thorough investigation by DCPS's LMER, giving her adequate time while on administrative leave to be honest about her actions and express remorse, where the plaintiff in *Ali* was terminated the day after his misconduct was flagged by the superintendent.

Moreover, District law requires deference to an agency's discipline termination when substantial evidence demonstrates employee misconduct. In determining the appropriateness of an agency's penalty, Courts have relied on *Stokes v. District of Columbia*, 502 A.2d. 1006 (D.C. 1985). There, the D.C. Court of Appeals (*i.e.*, the District's highest court) held that the reviewing entity must determine if the penalty was supported by substantial evidence, contained any procedural error, or contrasted any applicable laws or regulations. *Id.* at 4. District of Columbia employment law recognizes that an "[a]gency has the primary responsibility for managing its employees" and that the "responsibility includes the imposition of appropriate discipline." *Employee v. District of Columbia Public Schools*, OEA Matter No. 1601-0024-22, *Opinion and Order on Petition for Review* at *9 (January 19, 2023). Staying consistent with the Court of Appeals in *Stokes*, the Office of Employee Appeals (OEA) maintained that its review of a penalty is limited to determining whether managerial discretion has been "legitimately invoked and properly exercised." *Id.* (citing *Stokes* at 1010). The OEA emphasized it would not substitute its judgment of the penalty imposed by the Agency if there existed no contrast from law, regulation, or error of judgment. *Id.* at 9-10. In *Employee*, the OEA upheld DCPS's decision to terminate an employee for his egregious and dishonest misconduct. *Id.* at 10.

District of Columbia jurisprudence supports upholding a termination where the decision to terminate is based on substantial evidence of misconduct. *See, e.g., Monica Fenton v. District of*

21

*Columbia Public Schools*, OEA Matter No. 1601-0013-05, *Opinion and Order on Petition for Review* (April 3, 2009). In *Fenton*, the OEA upheld DCPS's termination of a teacher who denied misconduct. *Id.* The teacher in Fenton threw keys at a student, leaving scars on him, and later denied doing so. *Id.* at 2. At the hearing, both an assistant principal and nurse employed at the teacher's school testified that the teacher threw the keys at the student, causing his injuries. *Id.* at 3-4. Despite the teacher's assertion that she did not throw the keys at the student, the OEA gave deference to the Administrative Judge's finding that testimony from the school's assistant principal and school nurse were credible in establishing the grievant did throw keys at a victim student. *Id.* at 4-5.

In the present case, Grievant Jurkowski denies that she ordered students to reenact the Holocaust. However, M.T. and A.M. have testified that Grievant Jurkowski instructed them to reenact the Holocaust and Ms. Moxley testified that her entire third grade class told her they reenacted the Holocaust, and they completed written statements to corroborate that. DCPS found substantial evidence in statements from the students themselves and Ms. Moxley, the students' teacher, in providing just cause for Grievant Jurkowski's termination. As in *Fenton*, there is substantial evidence to refute the Grievant Jurkowski's assertion of false allegations made against her. Like *Employee*, DCPS has terminated Grievant Jurkowski for egregious misconduct paired with blatant dishonesty. Thus, the arbitrator should agree that DCPS's decision to terminate was appropriate for Jurkowski's misconduct.

## VIII. CONCLUSION

To conclude, DCPS has demonstrated that Ms. Jurkowski engaged in grave misconduct when she instructed her third-grade library class to reenact scenes from the Holocaust and that Ms. Jurkowski's termination was for just cause. For the reasons provided herein, DCPS respectfully

22

requests that the honorable Arbitrator Pye deny the grievance and uphold DCPS's management

right to discipline Ms. Jurkowski in accordance with the law.

Respectfully submitted, this 21st day of February 2024, by:

For DCPS:

DISTRICT OF COLUMBIA OFFICE OF LABOR
RELATIONS AND COLLECTIVE BARGAINING
441 4th Street, N.W., Suite 820 North
Washington, D.C. 20001
Phone: 202-724-4953
Fax: 202-727-6887

/s/De'Yan Harris
De'Yan Harris, Esq.
Attorney Advisor, OLRCB

/s/Kevin Stokes
Kevin Stokes, Esq.
Supervisory Attorney Advisor, OLRCB

23

 Gmail                                    **kimberlynn jurkowski <kjurkowski777@gmail.com>**

---

## Appeals, Challenge, other actions available..?
9 messages

---

**kimberlynn jurkowski** <kjurkowski777@gmail.com>                    Thu, Mar 21, 2024 at 7:57 AM
To: "Danny M. Rosenthal" <dmrosenthal@jamhoff.com>, Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>
Cc: Charles Moore <cmoore@wtulocal6.net>, "Jessie M. Beyderman" <jmbeyderman@jamhoff.com>, "Alice C. Hwang"
<achwang@jamhoff.com>, Olga Metelitsa Thall <omthall@jamhoff.com>, kimberlynn jurkowski <kjurkowski777@gmail.com>

> GM, Thank you for the hard work and support on the Jurkowski arbitration.  What are the options to cure the unfair/bias
> decision of Arbitrator Pye's decision?   May I have a copy of the Arbitrator's agreement with WTU? Thank you, have a nice
> day.
>
> Kimberlynn Jurkowski

---

**Charles Moore** <cmoore@wtulocal6.net>                          Fri, Mar 22, 2024 at 12:47 PM
To: "kjurkowski777@gmail.com" <kjurkowski777@gmail.com>, "dmrosenthal@jamhoff.com" <dmrosenthal@jamhoff.com>,
Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>
Cc: "Jessie M. Beyderman" <jmbeyderman@jamhoff.com>, "Alice C. Hwang" <achwang@jamhoff.com>, Olga Metelitsa Thall
<omthall@jamhoff.com>, "kjurkowski777@gmail.com" <kjurkowski777@gmail.com>

Hi Kimberlynn,

The WTU's legal counsel has advised that there is no viable basis for an appeal of the Arbitrator's decision.

Charles

**We're continuing to update our database.**

Charles R. Moore · WTU Consultant · **WASHINGTON TEACHERS' UNION**
O: 202.517.1477| Direct: 202.517.0731 | 1239 PENNSYLVANIA AVENUE, S.E. WASHINGTON, DC 20003 |
Website: www.wtulocal6.org

Contact the WTU Membership Team at membership@wtulocal6.net to ensure your personal contact
information is on file.



[Quoted text hidden]

---

**kimberlynn jurkowski** <kjurkowski777@gmail.com>                    Mon, Apr 1, 2024 at 9:45 AM
To: "Danny M. Rosenthal" <dmrosenthal@jamhoff.com>, Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>

Gmail - Appeals, Challenge, other actions available..?

Cc: Charles Moore <cmoore@wtulocal6.net>, "Jessie M. Beyderman" <jmbeyderman@jamhoff.com>, "Alice C. Hwang" <achwang@jamhoff.com>, Olga Metelitsa Thall <omthall@jamhoff.com>, kimberlynn jurkowski <kjurkowski777@gmail.com>

GM, All, I hope you enjoyed the Easter Holiday and Weekend.  May you email me the notice to appeal and my appeal rights letter for Arbitration decision and/or let me know where to find it. Thank you, have a nice day.

Kimberlynn Jurkowski
[Quoted text hidden]

---

**kimberlynn jurkowski** <kjurkowski777@gmail.com>                        Mon, Apr 1, 2024 at 9:45 AM
To: kimberlynn jurkowski <kjurkowski777@gmail.com>


---------- Forwarded message ---------
From: **kimberlynn jurkowski** <kjurkowski777@gmail.com>
Date: Thu, Mar 21, 2024 at 7:57 AM
Subject: Appeals, Challenge, other actions available..?
[Quoted text hidden]
[Quoted text hidden]

---

**Olga Metelitsa Thall** <omthall@jamhoff.com>                        Mon, Apr 1, 2024 at 11:12 AM
To: kimberlynn jurkowski <kjurkowski777@gmail.com>
Cc: Charles Moore <cmoore@wtulocal6.net>, "Jessie M. Beyderman" <jmbeyderman@jamhoff.com>, "Alice C. Hwang" <achwang@jamhoff.com>, Daniel Rosenthal <dmrosenthal@jamhoff.com>, Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>

Good morning Ms. Jurkowski,


As Charles referenced in his email on March 22, 2024 at 12:47pm, the WTU has decided not to pursue an appeal following our opinion, as WTU's legal counsel, that there is no viable basis for an appeal of the Arbitrator's decision and an appeal here is unlikely to be successful.


As WTU's legal counsel, our firm does not represent you individually and cannot advise you about any appeal that you may want to file individually. Frankly, I don't even know if there is a mechanism for an individual grievant to bring a separate appeal. No notice to appeal or appeal rights letter was included with the Arbitrator's decision. When a named party to the case (WTU, DCPS) brings an appeal, the process is laid out here: https://perb.dc.gov/page/section-538-grievance-arbitration-review-request.


Regards,


*Olga Metelitsa Thall*

James & Hoffman, P.C.

1629 K Street NW, Suite 1050

Washington, DC 20006

ph:  202-960-1650

fax: 202-496-0555

www.jamhoff.com

Case 1:23-cv-03788-ACR    Document 83    Filed 06/16/26    Page 109 of 110

6/15/26, 9:21 PM                                Gmail - Appeals, Challenge, other actions available..?

Confidentiality Notice: This email is not encrypted.  However, the email is confidential and may be privileged, and it is for the sole use of the named and intended recipient. Any review by or distribution to others is strictly prohibited and may be illegal.  If  you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it.  If you have received this message in error, please delete all copies received and notify the sender or the receptionist of James & Hoffman, P.C. immediately at (202)496-0500.
[Quoted text hidden]

---

**kimberlynn jurkowski** <kjurkowski777@gmail.com>                    Mon, Apr 1, 2024 at 11:35 AM
To: Olga Metelitsa Thall <omthall@jamhoff.com>
Cc: Charles Moore <cmoore@wtulocal6.net>, "Jessie M. Beyderman" <jmbeyderman@jamhoff.com>, "Alice C. Hwang" <achwang@jamhoff.com>, Daniel Rosenthal <dmrosenthal@jamhoff.com>, Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>, kimberlynn jurkowski <kjurkowski777@gmail.com>

Thank you for letting me know. Does the Arbitrator sometimes include a right to appeal letter with the decision? Only the named party to the case (WTU, DCPS) can bring an appeal? Am I not a named party? Thank you, Olga, have a nice day.
[Quoted text hidden]

---

**Olga Metelitsa Thall** <omthall@jamhoff.com>                        Mon, Apr 1, 2024 at 11:56 AM
To: kimberlynn jurkowski <kjurkowski777@gmail.com>
Cc: Charles Moore <cmoore@wtulocal6.net>, "Jessie M. Beyderman" <jmbeyderman@jamhoff.com>, "Alice C. Hwang" <achwang@jamhoff.com>, Daniel Rosenthal <dmrosenthal@jamhoff.com>, Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>

Hi Ms. Jurkowski,


I have never seen an arbitrator include a right to appeal letter with a decision. I cannot advise you if anyone other than WTU can bring an appeal, as our firm represents only WTU.


Olga

[Quoted text hidden]

---

**kimberlynn jurkowski** <kjurkowski777@gmail.com>                    Mon, Apr 1, 2024 at 5:50 PM
To: Olga Metelitsa Thall <omthall@jamhoff.com>
Cc: Charles Moore <cmoore@wtulocal6.net>, "Jessie M. Beyderman" <jmbeyderman@jamhoff.com>, "Alice C. Hwang" <achwang@jamhoff.com>, Daniel Rosenthal <dmrosenthal@jamhoff.com>, Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>

Thank you for the clarification, Olga, have a nice day.
[Quoted text hidden]

---

**kimberlynn jurkowski** <kjurkowski777@gmail.com>                    Thu, Apr 4, 2024 at 9:14 AM
To: kimberlynn jurkowski <kjurkowski777@gmail.com>, "orion jurkowski (via Google Docs)" <orionlj@gmail.com>


---------- Forwarded message ---------
From: **kimberlynn jurkowski** <kjurkowski777@gmail.com>
Date: Thu, Mar 21, 2024 at 7:57 AM
Subject: Appeals, Challenge, other actions available..?
To: Danny M. Rosenthal <dmrosenthal@jamhoff.com>, Jacqueline Pogue Lyons <jpoguelyons@wtulocal6.net>
Cc: Charles Moore <cmoore@wtulocal6.net>, Jessie M. Beyderman <jmbeyderman@jamhoff.com>, Alice C. Hwang

<achwang@jamhoff.com>, Olga Metelitsa Thall <omthall@jamhoff.com>, kimberlynn jurkowski <kjurkowski777@gmail.com>

[Quoted text hidden]